UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

No 07-03071

---

KEITH D. NELSON,

Appellant,

vs.

UNITED STATES OF AMERICA,

Appellee.

---

# MOTION BY APPELLANT FOR A CERTIFICATE OF APPEALABILITY (DEATH PENALTY CASE)

Appellant, Keith D. Nelson, hereby moves before the United States Court of Appeals for the Eighth Circuit, by and through his undersigned attorneys, for the issuance of a certificate of appealability ("COA") pursuant to 28 U.S.C. 2253(c)(1)(B). A COA is sought to allow appellate review of the decision of the United States District Court for the Western District of Missouri, Hon. Fernando J. Gaitan, Jr., U.S.D.J., denying, without a hearing or consideration of new evidence, Appellant's motion for relief pursuant to 28 U.S.C. § 2255, thus affirming Appellant's sentence of death. The district court declined to issue a COA as to any issue.

TABLE OF CONTENTS

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A. Introductory statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

B. Procedural history

1. Trial and direct appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

2. Proceedings on the 2255 motion . . . . . . . . . . . . . . . . . . . . . . . . 4

THE RELIEF SOUGHT BY THIS MOTION . . . . . . . . . . . . . . . . . . . . . . . . . . 5

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

A. In light of the specific nature of the claims advanced regarding the performance of trial and appellate counsel, the need for a hearing in this case was both obvious and conceded below by the government. . . . . . . . . . . . . . . . . . . . . . . . . . 7

B. During the 2255 proceedings, the district court denied basic funding applications whose purpose was to demonstrate the factual basis for Appellant's claims . . . . . . . . . . . . . . 9

C. Because the district court revealed in a signed order that the court had pre-judged the merits of Appellant's 2255 motion, Appellant's recusal motion should have been granted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

D. The need for a COA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13



Appellate Case: 07-3071 Page: 2 Date Filed: 11/26/2007 Entry ID: 3375881

LEGAL ARGUMENT

POINT ONE

BECAUSE THE ISSUES PRESENTED FOR REVIEW ARE AT LEAST FAIRLY DEBATABLE AMONG JURISTS OF REASON, AND/OR DESERVE FURTHER DEVELOPMENT, AND ALSO BECAUSE THE ISSUES ARISE IN THE CONTEXT OF A SENTENCE OF DEATH, A CERTIFICATE OF APPEALABILITY SHOULD ISSUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

POINT TWO:

A COA SHOULD ISSUE TO ALLOW APPELLATE REVIEW OF THE CLAIMS OF INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL. . . . . . . . . . . . . . . . . . . . . . . 19

A. Introduction: Appellant presented the district court with specific and detailed factual issues regarding the ineffective assistance of trial counsel and was prepared to prove those assertions at a hearing. . . . . . . . . . . 19

B. The *Wiggins* standard – Appellant's counsel had a constitutional duty to conduct an adequate and complete mitigation investigation. . . . . . . . . . . . . . . . . . . . . . 29

C. The inadequacy of the investigation conducted by trial counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

1. The Federal Public Defender warned trial counsel in a parting memorandum that the mitigation investigation was inadequate and incomplete. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

2. Tena Francis, the mitigation specialist appointed by the district court at Appellant's trial, warned trial counsel of a woefully inadequate and incomplete mitigation investigation. . . . . 49

3. Mitigation specialist Jill Miller's specifically outlined, as of the fall of 2005, what was not accomplished prior to Appellant's trial and what was then needed in order to conduct a through and complete mitigation investigation. . . . . 50

4. Trial counsel's duty, and their failure in this case, to conduct a mental health investigation. . . . . 58

5. The inadequacy of the mitigation case presented at trial . . . . . 62

6. Mitigation developed for the first time during the 2255 proceeding . . . . . 63

a. Childhood sexual abuse . . . . . 63

b. Mental impairment – Fetal Alcohol Spectrum Disorder ("FASD") . . . . . 64

c. Mental impairment – Dr. Gelbort's findings of organic brain dysfunction and the need for further clinical psychological examination regarding schizophrenia . . . . . 68

7. There is a reasonable possibility that the outcome of the case would have been different had trial counsel investigated, discovered, and presented all reasonably available evidence in mitigation . . . . . 69

D. The failure of trial counsel to object or move for a mistrial in the face of patently improper remarks in the government's two closing addresses was ineffective assistance of counsel. . . . . . . . . . . . . . . . . . . . . . 70

POINT THREE:

A COA SHOULD ISSUE TO ALLOW APPELLATE REVIEW OF APPELLANT'S CLAIMS REGARDING INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

POINT FOUR:

A COA SHOULD ISSUE TO ALLOW APPELLATE REVIEW OF THE DISTRICT COURT'S FAILURE TO CONDUCT THE HEARING THAT ALL PARTIES THOUGHT WAS NECESSARY. . . . . . . . . . . . . . . . . . . . . . . . . . 99

A. The case law on this issue demonstrates that the district court's denial of a hearing was blatant and indefensible error that denied Appellant the opportunity to prove his claims. . . . . . . . . . . . . . . . . . . . . . 100

B. The case law from this Circuit supports Appellant's position that a hearing was a necessary predicate to the resolution of his 2255 motion and that the district court's denial of a hearing was blatant and indefensible error that denied Appellant the opportunity to prove his claims. . . . . . . . . . . . . . . . . . . . . . 104

C. The witnesses identified by Appellant in the district court all had specific and relevant information to bring to the issues raised in the 2255 motion. . . . . . . . . . . . 114

D. Since it can hardly be said that jurists of reason could not differ over the need for a hearing (indeed, such jurists would likely *agree*), and since it cannot



Appellate Case: 07-3071 Page: 5 Date Filed: 11/26/2007 Entry ID: 3375881

be said that the moving papers were such that they *conclusively* demonstrated that relief was not possible, a COA should issue to review this ruling. . . . . . . 118

POINT FIVE:

A COA SHOULD ISSUE TO ALLOW APPELLATE REVIEW OF THE DISTRICT COURT'S DENIAL OF FUNDING NEEDED TO ESTABLISH THE CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL. . . . . . . . . . . . . . . . 120

POINT SIX:

A COA SHOULD ISSUE TO ALLOW APPELLATE REVIEW OF THE DISTRICT COURT'S DENIAL OF THE RECUSAL MOTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150



Appellate Case: 07-3071 Page: 6 Date Filed: 11/26/2007 Entry ID: 3375881

## STATEMENT OF THE CASE

### A. Introductory statement

The jury which quickly condemned Keith Nelson to death never heard evidence that he suffered from organic brain dysfunction, or from the effects of pre-natal alcohol ingestion by his mother, or that he was the survivor of childhood sexual abuse, or that he was likely schizophrenic. The lawyers who represented him at his capital trial conceded guilt, and advised Mr. Nelson to plead guilty, which he did. Those same lawyers never had Mr. Nelson evaluated for mental illness and failed to investigate, and therefore discover, evidence in mitigation that was both compelling and reasonably available. The jury returned a verdict of death in just two hours and, but for a single juror finding in favor of a single mitigating factor, completely rejected the one-dimensional case in mitigation put forward by his trial counsel.

A neuropsychological examination conducted, for the first time, as part of the 2255 proceedings revealed that Appellant is, in fact, brain-damaged, and that this damage has from childhood onward gravely affected his ability to control his impulses and to think, act, and view the world as a normal person does. It is highly likely (and, for the purpose of denying funding in the 2255 proceedings, the district court was prepared to assume) that Appellant suffers from schizophrenia, a debilitating hereditary mental illness that also afflicts two of his four brothers, one of whom is serving a life sentence in Texas for murder. An assessment begun as part

of the 2255 proceedings revealed that Mr. Nelson is likely further plagued by Fetal Alcohol Spectrum Disorder ("FASD"), a profound disability that impedes development and affects adult behavior, judgment and control across a wide variety of behaviors, and is associated with criminal and anti-social actions. The district court would not fund the assessment to completion and, thus, ruled on the assumption that the condition had been established. Additionally, the evidence developed as part of the 2255 proceedings strongly suggested (and, for the purpose of denying funding in the 2255 proceedings, the district court was prepared to assume) that Mr. Nelson was the victim of sustained sexual abuse as a young child and as a juvenile.

Each of the circumstances described above represents compelling evidence in mitigation. Each would be of enormous significance to any juror contemplating the choice between life or death. Significantly, each of these circumstances has been cited by the United States Supreme Court as so important that the failure to develop such evidence constitutes ineffective assistance of counsel. Yet, as noted above, the jurors who sentenced Mr. Nelson to death, and the judge who denied Mr. Nelson's 2255 motion without conducting a hearing, heard none of this. Instead, at his penalty trial Mr. Nelson's jury was presented with a series of witnesses who could say only that Mr. Nelson grew up in a dysfunctional home with an abusive father and a neglectful and overwhelmed alcoholic mother. While these were certainly significant facts, they did not begin to tell the full story of the mentally-ill child with brain

dysfunction who grew up as the adult survivor of childhood sexual violence with a brain that had been permanently damaged by alcohol before he was even born. Moreover, the "bad-childhood" evidence, while an important piece of the puzzle, was patently inadequate standing on its own to counter the aggravation presented by the government in this difficult case. In essence, because trial counsel did not do their job, the jury heard only one chapter of a much longer and more meaningful story. It is hardly surprising that Mr. Nelson's mitigation case drew only one vote from one juror for one mitigating factor. (Penalty-phase verdict sheet reproduced at A12.)[1]

In the post-conviction proceedings below, Mr. Nelson requested a hearing to prove that evidence of brain dysfunction, alcohol damage, mental-illness, and sexual exploitation had been readily available to Mr. Nelson's trial counsel and that the failure to discover or present it was the result, not of tactics or strategy, but of an inadequate investigation, and that this failure on counsel's part – along with others – affected the outcome of his sentencing. Instead of conducting the hearing that was so obviously needed, a hearing which the government conceded was necessary, the district court precluded Mr. Nelson from developing and presenting that case. Although he was given initial funding in the 2255 proceedings to explore brain dysfunction, after 2255 counsel's expert neuropsychologist found that brain dysfunction was indeed present, the trial court inexplicably denied a hearing on that

[1]"A" to designate the separate addendum submitted in support of this motion.

issue. Although establishing FASD is a multi-step process, the trial court allowed funding for the first step – *which proved fruitful* – but refused to permit the second and third. (*See* affidavits of Natalie Novick Brown, Ph.D., at A104; 114.) The district court also stopped funding a mitigation specialist's investigation that had uncovered powerful, relevant mitigating evidence that trial counsel had neglected even to explore. While every step 2255 counsel pursued opened doors to powerful evidence in mitigation, the trial court's abrupt cessation of funding closed them shut.

Despite the government's concession that a hearing was needed, the district court barred Mr. Nelson from presenting the evidence he had developed – including testimony from the attorneys, investigators and experts who had worked on Mr. Nelson's capital trial and direct appeal – by refusing to conduct such a hearing,

Poorly-served by trial counsel, Mr. Nelson fared no better on appeal. His appellate counsel were prepared to come to court and testify that they had overlooked important issues, including inflammatory, vicious, and misleading argument of a sort that has been condemned by this Court in a long line of cases. The district court would not permit the testimony.

Mr. Nelson now comes before this court seeking appellate review of the proceedings below.



Appellate Case: 07-3071 Page: 10 Date Filed: 11/26/2007 Entry ID: 3375881

## B. Procedural history

### 1. Trial and direct appeal

The judgment of conviction and sentence of death which are the subject of this motion were entered in the United States District Court for the Western District of Missouri. The case was docketed as *United States v. Keith D. Nelson*, 4:99-cr-00303-FJG. Appellant was charged in count one of a two-count indictment with the interstate kidnapping and murder of 10-year old Pamela Butler. 18 U.S.C. § 1201. Count two alleged aggravated sexual assault. 18 U.S.C. § 2241.

On October 25, 2001, Appellant entered a plea of guilty to count one of the indictment. The government agreed, in return for the plea of guilty, to dismiss count two at the conclusion of the proceedings. A jury was thereafter empaneled, in a single day, solely for the purpose of deciding penalty. On November 28, 2001, after uncommonly brief deliberations (two hours and five minutes), the jury resoundingly rejected the case in mitigation and recommended imposition of a sentence of death. Judgment was imposed in accordance with the jury's verdict on March 12, 2002, and Appellant was sentenced to death. At the time of sentencing, count two of the indictment was dismissed on motion of the government.

Appellant appealed his conviction and sentence to this Court, which affirmed. *United States v. Nelson*, 347 F.3d 701 (8th Cir. 2003). The Supreme Court denied *certiorari* review. *Nelson v. United States*, 125 S.Ct. 486 (2004).



Appellate Case: 07-3071 Page: 11 Date Filed: 11/26/2007 Entry ID: 3375881

2. Proceedings on the 2255 motion

On December 14, 2004, the district court appointed the undersigned counsel for the purposes of developing evidence and argument as to why Appellant's conviction and/or sentence of death should be vacated pursuant to 28 U.S.C. § 2255. (DE-4.)[2] The 2255 motion was filed on November 6, 2005. (Motion reproduced at A22-40.) On November 21, 2006, after cutting short the investigation and without having conducted a hearing on any issue, the district court entered a two-page order denying the 2255 motion. (A108.) In the same order the district court denied a motion for recusal that had been filed with Appellant's reply to the government's answer to the 2255 petition. (DE-61.)

On December 5, 2006, Appellant moved to set aside the judgment, and for other relief, pursuant to F.R.CIV.P. 59. (DE-63.) The district court denied the motion on April 13, 2007. (A119.) On June 10, 2007, Appellant filed a notice of appeal (A10) and a motion for the issuance of a COA. (DE-79.) On September 4, 2007, the district court denied the motion for a COA. (A125-134.)

THE RELIEF SOUGHT BY THIS MOTION

Appellant moves before this Court for a certificate of appealability as to the following issues:

---

[2]"DE" to designate an entry on the district court's docket sheet, a copy of which is submitted as part of the separate addendum to this motion at A 1-9.

1. Appellant's claims that his trial counsel failed to provide effective assistance of counsel, contrary to the guarantees of the Fifth, Sixth, and Eighth Amendments and 18 U.S.C. § 3005.

2. Appellant's claims that his appellate counsel failed to provide effective assistance of counsel, contrary to the guarantees of the Fifth, Sixth, and Eighth Amendments and 18 U.S.C. § 3005.

3. Appellant's constitutional and statutory claim that the district court, despite a government concession that a hearing was necessary, failed to conduct a hearing regarding any of Appellant's claims, a decision contrary to 28 U.S.C. § 2255 and the guarantees of the Fifth, Sixth, and Eighth Amendments.

4. Appellant's constitutional and statutory claim that the district court improperly denied funding requests that were intended to develop evidence to support his claims of the inadequacy of the investigation and defense provided by trial counsel, contrary to 18 U.S.C. § 3599(f), and its predecessor statute 21 U.S.C. § 848(q) and the guarantees of the Fifth, Sixth, and Eighth Amendments.

5. Appellant's constitutional and statutory claim that the trial judge should have recused himself from further proceedings after he issued an order denying certain funding requests and, *inter alia*, revealing he had prematurely determined the merits of the overall 2255 motion, contrary to 28 U.S.C. § § 144 and 455, and the guarantees of the Fifth, Sixth, and Eighth Amendments.

## SUMMARY OF THE ARGUMENT

### A. In light of the specific nature of the claims advanced regarding the performance of trial and appellate counsel, the need for a hearing in this case was both obvious and conceded below by the government.

Section 2255 requires a hearing unless the moving papers demonstrate *conclusively* that relief is not warranted. That can hardly be said of this case. In the

pleadings filed below, Appellant advanced detailed and specific factual assertions in support of his motion for 2255 relief, and the concomitant need for a hearing. Mr. Nelson alleged that trial counsel had failed to investigate and present important mitigating evidence that would have led the jury (or at least one member of the jury) to favor life imprisonment over death. Appellant noted, for example, the proposed testimony of trial counsel that the case, for no reason related to strategy, proceeded to trial with the mitigation investigation inadequate and incomplete. At a hearing Appellant would have established that there had been no mental health evaluation, despite orders entered early in the history of the case funding such examinations. Counsel who handled the direct appeal would have described a hurried and inadequate briefing on direct appeal that omitted issues critical to this Court's review, such as the inflammatory and patently improper remarks of the prosecutors in their closing arguments.

Since there was no evidence as to the matters raised in the 2255 motion, the government agreed below that a hearing was required to resolve many factual issues presented. The district court, however, simply closed down the investigation and, in a terse two-page order, denied the 2255 motion without ever allowing Appellant the chance to prove the factual underpinnings of his claims, particularly those regarding the inadequate performance of trial and appellate counsel.

As noted above, had a hearing gone forward, Mr. Nelson would have presented

compelling mitigating evidence about which the jury had heard nothing. Appellant's trial counsel would have conceded an inadequate investigation and level of preparedness. This testimony would have been independently confirmed by investigative and expert personnel familiar with the level of preparedness of counsel and with the inadequate and incomplete status of the investigation of mitigating evidence and Appellant's mental health at the time the case went to trial. Appellate counsel would have testified to failing to discern, brief or argue appellate claims apparent from the record.

Other experts appointed for purposes of the 2255 proceedings, even though inadequately and incompletely funded, would have testified concerning the ready availability of evidence in mitigation that differed in kind and quality from the evidence actually presented, including evidence of organic brain dysfunction, Fetal Alcohol Spectrum Disorder, childhood sexual victimization, and mental illness.

The failure of the district court to allow a hearing was fundamental error which forecloses reliance on the district court's conclusions that Appellant received an adequate defense or appellate representation.

**B. During the 2255 proceedings, the district court denied basic funding applications whose purpose was to demonstrate the factual basis of Appellant's claims.**

Over the course of the 2255 proceedings, Appellant's counsel presented several *ex parte* applications requesting funding for expert and investigative

resources. The applications represented the only chance for 2255 counsel[3] to conduct the thorough and adequate mitigation and related mental health investigation that trial counsel had failed to conduct or complete in the first instance.[4] The district court responded inconsistently and idiosyncratically to such funding requests, granting some, granting some in part only, and denying others. For example, the district court agreed to fund the initial phase of an investigation into FASD. However, when that first phase produced results strongly suggesting the presence of the disorder, the district court cut off further inquiry.

Although the district court refused some of Appellant's funding requests, and more critically refused to fund a complete investigation, those that were approved, even in part, bore fruit. Specifically, the investigation conducted in connection with the 2255 motion disclosed the following mitigation, none of which was heard by the jury that sentenced Appellant to death:

- Neuropsychological testing conducted by Michael Gelbort, Ph.D., determined that Appellant suffers from frontal lobe disturbance/dysfunction, a circumstance that affects Appellant's

---

[3]Mr. Brotherton is a solo practitioner. Mr. Ruhnke is part of a two-attorney firm. Unlike defender offices or large corporate firms, 2255 counsel had to rely on the district court to provide the expert and investigative assistance necessary to establish constitutional error and, in particular, the prejudice prong of *Strickland* and *Wiggins*.

[4]In the course of the proceedings below, all *ex parte* applications for investigative and expert assistance – at both the trial and 2255 stages – were unsealed on the motion of 2255 counsel. (A93; 107.)

everyday thinking and reasoning capacities, and that his brain does not conform with what is seen in individuals with normal functioning brains, and that his overall testing performance was consistent with and indicative of brain dysfunction.

- An initial evaluation by Natalie Novick Brown, Ph.D., a psychologist expert in the evaluation of Fetal Alcohol Spectrum Disorder, determned that Appellant likely suffered from this condition as the result of alcohol ingestion by his mother when she was pregnant with Appellant; the district court would not fund the next step of the analysis. (*See* affidavit at A104; 114.)

- An in-depth interview of Appellant by mitigation specialist Jill Miller, MSSW, disclosed evidence of childhood sexual abuse and symptoms of mental illness. The mitigation specialist utilized by Appellant's trial attorneys only met with him one time for a short "meet and greet" session. The district court would not fund further mitigation investigation in support of the 2255 motion. Despite the recommendations of both Dr. Gelbort and Ms. Miller, the district court would not fund the services of a forensic psychologist with expertise in schizophrenia. (Two of Appellant's brothers are schizophrenics.) (Motion for additional funding for Ms. Miller' services at A58; motion for appointment of clinical psychologist Xavier Amador, Ph.D. at A79.)

What 2255 counsel tried to develop and present below was not simply "more of the same," but evidence that was never discovered and which went beyond (while complementing) the "bad-childhood" focus of the failed mitigation presentation at Appellant's capital trial.

**C. Because the district court revealed in a signed order that the court had pre-judged the merits of Appellant's 2255 motion, Appellant's recusal motion should have been granted.**

The motion to recuse arose following the denial of funding applications, specifically the district court's response to a series of funding motions presented to



Appellate Case: 07-3071 Page: 17 Date Filed: 11/26/2007 Entry ID: 3375881

the district court by 2255 counsel in the fall of 2005. Appellant's 2255 counsel requested, *inter alia*, the following funding of expert and investigative assistance: (1) on October 30, 2005, funding of additional hours for the services of mitigation specialist Jill Miller, MSSW; (2) on November 23, 2005, funding for the services of a clinical forensic psychologist with expertise in schizophrenia; and (3), on December 5, 2005, funding for an attorney to evaluate trial counsel's representation and potentially to testify as an expert in the trial and preparation of capital cases.

On February 28, 2006, the district court issued an order denying all three funding requests. While these rulings made no sense within the context of the case since all early efforts had produced results highly favorable to Mr. Nelson, the denial of funding was not what led to the motion to recuse. In the same order the district court, with briefing and investigation incomplete, and having heard no evidence or argument, announced that the court had pre-determined the merits of the case, at least so far as it challenged the constitutionality of the assistance Appellant had received from his trial counsel. The district court explained the reasons for denying the funding requests as follows, essentially concluding that nothing was going to change his mind:[5]

---

[5]To illustrate the idiosyncratic nature of the district court's rulings on funding issues, consider that five months after issuing the February 28, 2006 order saying nothing would alter is view, the district court approved funding for a preliminary investigation concerning whether Mr. Nelson could be diagnosed with FASD, an issue never explored by trial counsel. However, when *that* proved favorable, the

> The above-referenced motions [for investigative and expert assistance] have been denied because the Court does not agree with the assertions therein. Appellate[6] counsel, with the benefit of hindsight, is attempting to vilify trial counsel's judgment on trial strategy. In reality, trial counsel's conduct and strategy far exceed those standards of *Strickland v. Washington,* 466 U.S. 669 (1984). Further, the resources requested by counsel in these motions are not likely to lead to a different result. Mr. Nelson received a fair trial. Appellate counsel is reminded that excessive expenditures of judicial resources have their limits.

(A92.) Respectfully, because the district court had determined the ultimate question of trial counsel's ineffectiveness without hearing any of Appellant's evidence, without allowing full development of that evidence, and without hearing from trial counsel themselves, Mr. Nelson moved to disqualify the district court from presiding further over the 2255 proceedings. Applying the appropriate legal standards to this revelation of bias, it is plain that reasonable people would question the district court's impartiality.

**D. The need for a COA**

At this juncture, Appellant seeks nothing beyond the simple, but transcendently important, opportunity, via the grant of a COA, of appellate review of the 2255 proceedings. Without overstating the issue, this is, at this point, a matter of life or

---

district court again closed the door to the further funding needed to complete the job.

[6]In context, the district court's comments make it clear that by "appellate counsel" he was referring to Appellant's 2255 counsel, not to the counsel who had represented Mr. Nelson on his direct appeal to this Court.



Appellate Case: 07-3071 Page: 19 Date Filed: 11/26/2007 Entry ID: 3375881

death. A detailed discussion of the applicable law and the underlying factual basis for each claim follows.



Appellate Case: 07-3071 Page: 20 Date Filed: 11/26/2007 Entry ID: 3375881

## LEGAL ARGUMENT

## POINT ONE

BECAUSE THE ISSUES PRESENTED FOR REVIEW ARE AT LEAST FAIRLY DEBATABLE AMONG JURISTS OF REASON, AND/OR DESERVE FURTHER DEVELOPMENT, AND ALSO BECAUSE THE ISSUES ARISE IN THE CONTEXT OF A SENTENCE OF DEATH, A CERTIFICATE OF APPEALABILITY SHOULD ISSUE.

The Anti-terrorism and Effective Death Penalty Act ("AEDPA") requires, as a pre-condition to appellate review of the denial of a motion brought pursuant to 28 U.S.C. § 2255, that a certificate of appealability issue upon a showing that the applicant has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Supreme Court has determined, however, that AEDPA requires only a modest showing on the part of a litigant who seeks a COA. Proof of ultimate success is not required. The grant of a COA is especially favored in a capital case.

The leading cases on this issue are *Miller-El v. Cockrell*, 537 U.S. 322 (2003) and *Slack v. McDaniel*, 529 U.S. 473 (2000). A review of the cases shows that the Supreme Court has simply adapted to AEDPA the standards that were formerly applied to the issuance of a former certificate of probable cause in pre-AEDPA *habeas* litigation, particularly as that standard was enunciated in *Barefoot v. Estelle*,



Appellate Case: 07-3071 Page: 21 Date Filed: 11/26/2007 Entry ID: 3375881

463 U.S. 880 (1983).[7] Thus, in *Miller-El*, the Court summarized the controlling legal standard as follows:

> Consistent with our prior precedent and the text of the habeas corpus statute, we reiterate that a prisoner seeking a COA need only demonstrate "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c). A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented are adequate to deserve encouragement to proceed further.

*Miller-El*, 537 U.S. at 327. The Court explained further:

> The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits. We look to the district court's application of AEDPA to petitioner's constitutional claims and ask whether that resolution was debatable among jurists of reason. This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims. In fact, the statue forbids it.

*Miller-El*, 537 U.S. at 336. In *Slack*, the Court noted that an applicant for a COA need only establish that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 529 U.S. at 484.

As developed further in *Miller El*, the issuance of a COA,

> does not require a showing that the appeal will succeed.

[7]Prior to AEDPA there was no requirement that a certificate of probable cause issue as a precondition to appellate review of a 2255 challenge to a *federal* judgment of conviction. The requirement of a certificate of probable cause applied only to state prisoners challenging state convictions pursuant to 28 U.S.C. § 2254.

> Accordingly, a court of appeals should not decline the application for a COA merely because it believes the applicant will not demonstrate an entitlement to relief. The holding in *Slack* would mean very little if appellate review were denied because the prisoner did not convince a judge, or, for that matter, three judges, that he or she would prevail. It is consistent with § 2253 that a COA will issue in some instances where there is no certainty of ultimate relief. After all, when a COA is sought, the whole premise is that the prisoner "has already failed in that endeavor." *Barefoot*, *supra*, [463 U.S.] at 893, n.4.

*Miller El*, 537 U.S. at 337. Also in accord with this approach are *Tennard v. Dretke*, 542 U.S. 274 (2004) and *Banks v. Dretke*, 540 U.S. 668, 705 (2004); *see also*, *Carson v. Director*, 150 F.3d 973, 975 (8th Cir. 1998) ("[Petitioner] had made a 'substantial showing that reasonable courts might differ' as to whether the jury instructions violated his due process rights," and, therefore, a COA was properly issued).

An additional element that further tips the balance in this case in favor of issuing a COA is that the motion is brought to permit appellate review of a district court judgment affirming a sentence of death. In *Barefoot* the Court emphasized that "in a capital case, the nature of the penalty is a proper consideration" in determining whether to issue a COA. *Barefoot*, 463 U.S. at 893; *see also, e.g.*, *Graves v. Cockrell*, 351 F.3d 143, 150 (5th Cir. 2003) ("Any doubt regarding whether to grant a COA is resolved in favor of the petitioner, and the severity of the penalty may be considered in making this determination"); *Valerio v. Crawford,* 306 F.3d 742, 767 (9th Cir.



Appellate Case: 07-3071 Page: 23 Date Filed: 11/26/2007 Entry ID: 3375881

2002) ("Because this is a capital case, we resolve in Valerio's favor any doubt about whether he has met the standard for a COA"); *Jermyn v. Horn*, 266 F.3d 257, 279 n. 7 (3d Cir. 2001) ("'In a capital case, the nature of the penalty is a proper consideration in determining whether to issue a [COA]'"); *Clark v. Johnson*, 202 F.3d 760, 763 (5th Cir. 2000) ("[I]n capital cases, doubts as to whether a COA should issue must be resolved in favor of the petitioner").

The issues presented in this capital case more than satisfy the standards for the issuance of a COA.



Appellate Case: 07-3071 Page: 24 Date Filed: 11/26/2007 Entry ID: 3375881

## POINT TWO

A COA SHOULD ISSUE WITH REGARD TO THE CLAIMS OF INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL.

**A. Introduction: Appellant presented the district court with specific and detailed factual issues regarding the ineffective assistance of trial counsel and was prepared to prove those assertions at a hearing.**

In his initial 2255 motion, and throughout the proceedings below, Appellant presented the district court with specific and focused factual contentions regarding the question of effective assistance of trial counsel. None of the claims presented, however, was ever tested by way of a hearing or other factual development. Instead, in denying the motion without a hearing, the district court literally adopted the government's arguments by reference (with the exception of the government's concession of the necessity for a hearing) and concluded in a two-page order, without analysis, factual support, or explanation, that the performance of "trial and appellate counsel fell within the broad perimeters of trial strategy." (A108.) There was no testimony or other basis in the record to support that finding.

In Appellant's 2255 motion, he alleged, and was prepared to prove, the following specifics regarding his trial-level representation.

First of all, Appellant's case was marked by numerous changes of counsel, a circumstance that undoubtedly contributed to the disjointed and ineffective case



Appellate Case: 07-3071 Page: 25 Date Filed: 11/26/2007 Entry ID: 3375881

presented in penalty. Appellant was prepared to establish the following at a hearing:

- Immediately following Appellant's arrest on October 17, 1999, he was represented by a "volunteer" retained attorney, Daniel L. Franco, who has since been disbarred. Thereafter, the Court appointed the Federal Public Defender (effective October 21, 1999), Susan Hunt, Esquire (effective November 2, 1999), and William E. Shull, Esquire (effective November 2, 1999).

- Larry C. Pace, Esquire, of the Federal Public Defender, remained in the case for approximately 10 months. On July 28, 2000, Appellant filed a motion to withdraw Mr. Pace as Appellant's counsel. The motion was granted on August 21, 2000, although the actual order was apparently not entered on the docket until March 2, 2001.

- On September 6, 2000, Appellant filed a notice with the Court that Mr. Franco had been discharged as Appellant's counsel. An order withdrawing Mr. Franco was entered on the docket on March 2, 2001.

- With regard to Mr. Shull, an order was docketed on November 14, 2000 denying Appellant's request to withdraw Mr. Shull as counsel. (There does not appear to be a docket entry for the motion itself.) Thereafter, on February 20, 2001, an order was docketed granting Mr. Shull's oral motion to withdraw as Appellant's counsel.

- On the same date as Mr. Shull's withdrawal, February 20, 2001, Patrick Berrigan, Esquire was appointed as counsel to Appellant.

At a hearing, Appellant was prepared to establish – largely through the testimony of trial counsel themselves – that his trial attorneys had failed to conduct an adequate mitigation investigation, an investigation that should have, but did not, consist of efforts to discover all reasonably available mitigating evidence and to rebut any aggravating evidence to be introduced by the Government. A properly-conducted mitigation investigation would have yielded significant additional evidence in



Appellate Case: 07-3071 Page: 26 Date Filed: 11/26/2007 Entry ID: 3375881

mitigation. Even the limited funding given 2255 counsel bore this out.

In support of this contention, Appellant was also prepared to call as a witness a mitigation investigator appointed by the Court to assist defense counsel in preparation of the case. That witness, Tena Francis, had advised defense counsel in June of 2001 that the mitigation investigation was inadequate and incomplete and that there was substantial investigation that remained to be completed. Despite this warning, trial counsel did not take the steps required to complete the mitigation investigation. By the Fall of 2001, with the trial date imminent, trial counsel were aware that an adequate mitigation investigation had not been conducted, that no mental health investigation, examination, or testing had been conducted, and that a substantial amount of additional time was required in order to complete an adequate investigation. Despite this knowledge, and despite a specific request from Appellant that his counsel seek to adjourn the trial because counsel were not ready to proceed, no such motion was made. At a hearing, trial counsel would have conceded that an adjournment should have been requested but, for no discernible reason, was never sought.

With regard to the investigation of Appellant's mental health issues, despite the availability of court-authorized funding, trial counsel failed to conduct an adequate investigation of Appellant's mental health, including a failure to conduct a neuropsychological examination and/or to have Appellant examined by a qualified

clinical psychologist or psychiatrist. A properly-conducted mental health investigation would have yielded significant clinical findings of mental illness. A properly-conducted neuropsychological examination would have revealed that Appellant is brain-damaged. The failure of trial counsel to conduct a timely and adequate mental health investigation lead counsel, in turn, to instruct Appellant that he should decline to submit to mental health testing by Government experts, advice that was followed by Appellant. This resulted in a court order barring Appellant from presenting any mitigating evidence relating to his mental health, a meaningless sanction since the defense had developed none.

Trial counsel also failed to elicit a complete and accurate family history from Nancy Nelson, Appellant's mother, because she was uncomfortable talking about her childhood, her use of alcohol during pregnancy, and the manner in which Appellant and his brothers were raised. Counsel knew that Dr. Mark Cunningham would later describe a family history of abuse as a risk factor affecting subsequent generations. Nevertheless, counsel "agreed" not to ask Nancy Nelson uncomfortable questions, the answers to which would have provided the foundation for the presence of significant risk factors in Appellant's childhood, including regular and significant levels of pre-natal exposure to alcohol, a circumstance that would have established the presence of Fetal Alcohol Spectrum Disorder.

In addition to the above, all as set forth in the 2255 motion filed below, trial

counsel failed to file appropriate pre-trial motions challenging the capital aspects of Appellant's case or to conduct an adequate *voir dire* of prospective jurors on, among other issues, the prospective jurors' views regarding capital punishment and the exposure of potential jurors to publicity regarding Appellant's then recent suicide attempt. The additional following specific averments were presented in Appellant's 2255 motion:

- Trial counsel told the jury in opening statements that Appellant was born a month premature, suffered from low birth-weight and respiratory distress, but that "he recovered just fine." Counsel's assertion was based on an inadequate investigation of Appellant's life history, including a failure to consult with appropriate experts or proper utilization of hospital records in possession of the defense. When Dr. Mark Cunningham later testified that the circumstances of Appellant's birth were risk factors, the jury was prepared to reject the testimony because Appellant's counsel had already conceded the contrary view, *i.e.*, that Appellant since had "recovered just fine."

- Trial counsel failed to call William R. Criss, Shift Supervisor for Corrections Corporation of America, to testify. Counsel knew that Criss could have testified that, as early as January 20, 2000, Appellant wanted to take responsibility for his actions in this case. After talking to his girlfriend, Appellant became emotional and stated he wanted to "do something right for the first time in [his] life." Such testimony would have refuted the Government's view that Appellant was emotional with his girlfriend only because he was sorry he had gotten caught.

- Trial counsel asked Kenneth Nelson about his intelligence but failed to make an offer of proof after the District Court told him the Court had heard enough and to move on. The omitted evidence was critical to showing that Kenneth Nelson had a protective factor that Appellant simply did not have – *i.e.*, native intelligence which opened doors for Kenneth that were not open to Appellant.

- Trial counsel failed to object when the District Court admitted testimony about a knife taken from Appellant's kitchen. This testimony had no tendency to prove or disprove any fact in issue; rather, the testimony simply diverted the jurors' attention away from the issue at hand – should Appellant live or die.

- Trial counsel failed to object when the district court allowed testimony that a police officer, Paul Wilt, had won an award from the Kansas City, Kansas Police Department, "as a testament to [his] quick thinking or quick action in this case." This evidence had no tendency to prove or disprove any fact in issue; rather, it served only to divert the jurors' attention away from the issues surrounding the only question the jurors had to answer – should Appellant live or die?

- Trial counsel failed to elicit from Dr. Thomas Young, Medical Examiner, that his initial findings indicated: (1) that it would be "difficult" to determine whether the victim's hymenal tear was the result of a fresh injury; and (2) that, without positive results from the rape kit, "no determination of sexual assault can be conclusively made." This evidence would have explained refuted or undercut the Government's theory that Appellant sexually assaulted the victim at the time of the murder.

- Trial counsel failed to make appropriate objections at trial, including, but not limited to, the following:

  (a) Once the jury was sworn, trial counsel failed to object to the case proceeding as a capital case since the requisite elements of capital murder were not contained in the indictment.

  (b) Trial counsel failed to object to comments in the Government's opening that the Government sought the death penalty in Appellant's case "without reservation" or "without hesitation" implying that the Government had undertaken a comparison of Appellant's case with other potentially capital cases and that Appellant's case was, in the opinion of the Government prosecutors, worse than those other cases and, therefore, more deserving of a sentence of death.



Appellate Case: 07-3071 Page: 30 Date Filed: 11/26/2007 Entry ID: 3375881

(c) Trial counsel failed to object to comments in the Government's opening that Appellant would present "a continuing threat to society," implying erroneously that Appellant might some day be released from confinement.

(d) Trial counsel agreed pretrial not to object to certain prefatory hearsay statements about which Agent Cullen Scott would testify. This agreement resulted in the Government presenting hearsay testimony at will, using Agent Scott as something of a narrator for its case from beginning to end. Such hearsay was not admissible under any exception to the rule and its use deprived Appellant of his Sixth Amendment right to confront his accusers.

When it came to improper argument from the government, trial counsel were simply asleep at the switch and failed to make objections to patently improper and inflammatory statements, as follows:[8]

<u>The initial summation</u>:

- Argument that the jury should vote for death because, "If this crime doesn't call for the death penalty, what crime does?"
- Argument that the jury should vote for death because, "We need to protect our children. We need to send a message to guys like the defendant . . . ."
- Argument that the death penalty should be imposed because, "The community cries out for justice."
- Argument that legally appropriate and relevant mitigating evidence was "all this excuse testimony" and a "guilt trip."
- Argument that the jury should impose a death penalty because the Government recommended it "without reservation."

---

[8] *See* discussion *infra* at pp. 70-90.



Appellate Case: 07-3071 Page: 31 Date Filed: 11/26/2007 Entry ID: 3375881

The rebuttal summation:

- Argument that the case was about the "slaughter" of "our children."

- Argument that denigrated legally appropriate and relevant mitigating evidence as "an excuse," "the blame game," "the abuse excuse," and an effort by trial counsel to claim the crime was "somebody else's fault."

- Argument that the mitigating evidence was not worthy of jury consideration since it didn't "explain why" the crime occurred.

- Argument that described Appellant as "a rotten human being."

- Argument that personally denigrated trial counsel's efforts to persuade the jury of mitigating evidence as "a smoke screen" and an attempt to "divert [the jury] from what this case is really about, the slaughter of an innocent."

- Argument that personally denigrated trial counsel's efforts to persuade the jury of mitigating evidence as masking counsel's true motive, *i.e.*, "What they want you to do is have him escape justice."

- Argument that equated mercy with weakness.

- Argument that described Appellant as "evil at his core."

- Argument that invited jurors to rely on the prosecution's experience by telling the jury that, "There is no clearer call for the death penalty than there is in this case," and, later, "If not him, who? If not now, when? If killing and raping a kid isn't enough, then we don't need a death penalty. We don't need a death penalty."

- Argument that suggested that the jury should impose a sentence of death since the jury "represent[ed] the people of the United States in this case . . . ."

- Argument that instructed the jurors to close their eyes and re-live the horrors of the victim's last hours, calling upon the jury to "Think about . . . what that little girl was thinking," and to imagine, "What was she thinking?" and to, "Imagine what she experienced in that last part of her life," and to "Close your eyes, and . . . envision [the abduction and murder]."

- Argument that a verdict of death was the only just verdict and that the jurors were "the dispensers of justice," and that the victim's mother "Waits for you to give her some justice. And justice in this case can only be had by imposing a sentence of death," essentially suggesting to the jury, *inter alia*, that a sentence of death should be imposed because that's what the victim's survivors wished.

- Argument that, "[T]he death penalty was enacted for crimes like this."

Trial counsel also failed to call a highly-qualified forensic pathologist, Thomas L. Bennett, M.D., who was present in the courthouse and prepared to testify that the physical findings at the autopsy did not support a conclusion that the victim had been sexually penetrated. Dr. Bennett was prepared to testify that the opening in the hymen's mid-part discovered at autopsy is a normal condition for young girls and "any statements offering that there are injuries [to the vaginal vault] are directly in conflict with the forensic evidence." The emotional center-piece of the government's case for death was the alleged rape of the victim, and Dr. Bennett could have and would have refuted that evidence. Without Dr. Bennett's testimony, the government was able to argue in closing, with no evidence presented to the contrary, that the



Appellate Case: 07-3071 Page: 33 Date Filed: 11/26/2007 Entry ID: 3375881

hymen was unnaturally torn, as a result of the victim's sexual assault by Appellant, while drawing the jury's attention to the graphic and disturbing post-mortem photographs, and pointing, "right there and right there."

Trial counsel also failed to object when the Government asked Penny Butler, the victim's sister, if she was scared as she testified. The child's fear had no tendency to prove or disprove any fact in issue; rather, it served only to inflame the passions and prejudices of the jury by implying that Appellant had scared Penny twice – once during the kidnapping and once during the trial.

Although trial counsel advised and convinced Appellant to plead guilty to count one of the indictment in exchange for the Government dismissing count two of the indictment and letting the defense argue that Appellant had accepted responsibility for his actions, a contention that was unanimously rejected by the jury. To reach this agreement, Appellant was required to waive any post-conviction challenge as to the guilty plea. This was an unenforceable condition and trial counsel were placed in a conflicted position when they advised Appellant to accept the conditions of the offer while ostensibly avoiding post-conviction review of the reasonableness of that advice as it pertained to Appellant's decision to enter a guilty plea.

There were additional factually-centered instances of prejudicial ineffective assistance of trial counsel alleged below, all of which individually, and in

combination with other instances of ineffective assistance, denied Appellant the Sixth Amendment's guarantee of the effective assistance of counsel. This was by every measure a case of specific and focused claims.

### B. The *Wiggins* standard – Appellant's counsel had a constitutional duty to conduct an adequate and complete mitigation investigation.

In *Wiggins v. Smith*, 539 U.S. 510 (2003), the Court mandated the following with regard to trial counsel's obligations to prepare and, more importantly, *investigate*, a case in mitigation:

> Investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) . . . . Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources.

*Wiggins*, 539 U.S. at 524 (emphasis in original). As the following discussion will demonstrate, and as an evidentiary hearing would have established, this case is essentially *Wiggins* on all fours. As in *Wiggins*, "counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." In a case where reasonable investigative efforts would have uncovered a multi-dimensional case in mitigation, the jury heard only one aspect of the case for life, *i.e.* that Appellant had suffered an

extraordinarily difficult childhood.

A properly-conducted investigation should have consisted of efforts to discover all reasonably available mitigating evidence and to rebut any aggravating evidence to be introduced by the Government. That was not done. Appellant further asserted that trial counsel provided less than effective representation in other aspects of the case as well. The challenge to Appellant's conviction and sentence of death asserted that, but for the failings of his counsel: (1) there is a reasonable probability that the results of these proceedings would have been different, (2) confidence in the reliability of the outcome has been undermined; and (3), one or more jurors would have struck a different balance.[9]

The prejudice prong of the test enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984) requires a defendant in Appellant's position to show that "there is a *reasonable* probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694 (emphasis added). In *Wiggins*, as stated, the Court noted that in a death penalty scheme where a non-unanimous jury spares the defendant's life, such as the federal system, confidence in the outcome is undermined where there is "a reasonable probability that

[9]In *Wiggins*, the Court noted that in a death penalty scheme where a non-unanimous jury spares the defendant's life, such as the federal system, confidence in the outcome is undermined where there is "a reasonable probability that at least one juror would have struck a different balance." 539 U.S. at 536.



Appellate Case: 07-3071 Page: 36 Date Filed: 11/26/2007 Entry ID: 3375881

at least one juror would have struck a different balance." *Id.* at 536. The United States Supreme Court has stressed that "the adjective [reasonable] is important." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). In *Kyles*, the Court observed as follows:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Id.*; *see also Strickland*, 466 U.S. at 693 ("a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case"); *Nix v. Whiteside*, 475 U.S. 157, 175 (1986) ("a defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice"). As explained in *Strickland* itself:

> "[R]easonable probability of a different result" is thus *less than a preponderance of the evidence*. It is present when an evaluation of all of the evidence that should have been before the jury is "sufficient to undermine confidence in the outcome."

*Strickland*, 466 U.S. at 693 (emphasis added). In a capital case, a "reasonable probability" of a different result occurs when the full "body of mitigation evidence" that could have been presented in the case "might well have influenced the jury's appraisal of [the defendant's] moral culpability." *Williams*, 529 U.S. at 398.

The task of defending a capital case, and preparing a case in mitigation, is unfamiliar to most courts and most attorneys, no matter how experienced in the area



Appellate Case: 07-3071 Page: 37 Date Filed: 11/26/2007 Entry ID: 3375881

of criminal law. In 1983, Professor Gary Goodpaster published an article entitled, "The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases," 58 N.Y.U.L.REV. 299 (1983). In the article, Professor Goodpaster discussed the role of the advocate in a death-penalty case in the following terms:

> As an advocate, . . . defense counsel has the related but distinct function of attempting to persuade the jury to exercise mercy. Defense counsel therefore has both the opportunity and the duty to present potentially beneficial mitigating evidence and to attempt to convince the sentencer that, notwithstanding the defendant's guilt, he or she is a person who should not die. Once the defendant has been found guilty of a capital crime, a life sentence is counsel's only remaining advocacy goal. As an advocate for life, counsel must attempt to demonstrate that mitigating factors outweigh aggravating factors and must present the sentencer with the most persuasive possible case for mercy.

58 N.Y.U.L.REV. at 318. In his article, the author also outlined the steps an attorney handling a capital case should follow, including the absolute duty of trial counsel "to investigate the client's life history, and emotional and psychological make-up, as well as the substantive case and defenses" noting further that, "The importance of this investigation, and the thoroughness and care with which it is conducted, cannot be overemphasized." *Id.* at 324. In describing the nature of such an investigation, Professor Goodpaster emphasized both its difficulty and time-consuming nature:

> Such investigations present more obstacles than those conducted in furtherance of an ordinary criminal defense, primarily because of the difficulty in locating

> relevant witnesses. Over the years, the witnesses who are acquainted with the defendant are likely to have become geographically dispersed and more difficult to trace than guilt-phase witnesses. Indeed, constructing a mitigating case on the basis of the life-history investigation is perhaps best viewed as a successive winnowing process: the attorney's investigator tracks down all mitigating leads; the attorney next interviews the most promising contacts and then chooses to call some of them at the penalty phase of the trial in accordance with a coherently developed strategy.

*Id.*

There is, of course, no specific set of rules for judging reasonable performance. *Strickland*, 466 U.S. at 688-89. Instead, "[i]n any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688. However, "[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides." *Strickland*, 466 U.S. at 688. In *Wiggins*, and quite recently in *Rompilla v. Beard*, 125 S.Ct. 2456 (2005), the Court specifically cited the American Bar Association's 1989 "Standards for the Appointment and Performance of Counsel in Death Penalty Cases" as a guide to "'determining what is reasonable.'" *Wiggins*, 539 U.S. at 524, quoting *Strickland*, 466 U.S. at 688. In interpreting *Wiggins*, at least one court has concluded that the 2003 revision of those guidelines should control the analysis of cases tried prior to 2003 since the 2003 Guidelines "simply explain in greater detail the 1989 Guidelines," especially in the area of "the



Appellate Case: 07-3071 Page: 39 Date Filed: 11/26/2007 Entry ID: 3375881

obligations of counsel to investigate mitigating evidence." *Hamblin v. Mitchell*, 354 F.3d 482 (6th Cir. 2003).

It is at the heart of this case and motion for a COA that Appellant's trial counsel could not have made a reasonable tactical judgment not to offer the results of a neuropsychological evaluation, or other mental health evaluations, including FASD, without having conducted such evaluations in a timely fashion or, indeed, at all. Similarly, in the absence of a complete mitigation investigation, Appellant's trial counsel could not have made reasonable tactical judgments about the scope and nature of the case in mitigation that would be presented.

Courts regularly find counsel's performance lacking in cases where counsel failed to make "reasonable investigations or to make a reasonable decision that makes a particular investigation unnecessary," *Strickland*, 466 U.S. at 691; *see also, Rompilla v. Beard*, 125 S.Ct. at 2463; *Williams v. Taylor*, 529 U.S. at 396; *Marshall v. Cathel*, 428 F.3d 452 (3d Cir. 2005); *Mayfield v. Woodford*, 270 F.3d 915 (9th Cir. 2001) (en banc); *Coleman v. Mitchell*, 268 F.3d 417 (6th Cir. 2001); *Ainsworth v. Woodford*, 268 F.3d 868 (9th Cir. 2001); *Jermyn v. Horn*, 266 F.3d 257, 312 (3d Cir. 2001); *Carter v. Bell*, 218 F.3d 581, 596 (6th Cir. 2000); *Smith v. Stewart*, 189 F.3d 1004, 1008 (9th Cir. 1999); *Berryman v. Morton*, 100 F.3d 1089, 1101 (3d Cir. 1996); *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995); *Workman v. Tate*, 957 F.2d 1339, 1345 (6th Cir. 1992); *Kenley v. Armontrout,* 937 F.2d 1298, 1309 (8th Cir.



Appellate Case: 07-3071 Page: 40 Date Filed: 11/26/2007 Entry ID: 3375881

1991).

The American Bar Association's guidelines for counsel in death penalty cases have come to play an increasingly important role in assessing the performance of counsel in a capital case. The 2003 guidelines set forth the following about investigation and preparation:[10]

> GUIDELINE 10.7 – INVESTIGATION
>
> A. Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.
>
> GUIDELINE 10.10.1– TRIAL PREPARATION OVERALL
>
> A. As the investigations mandated by Guideline 10.7 produce information, trial counsel should formulate a defense theory. Counsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies.

In discussing the scope of the investigation to be undertaken pursuant to Guideline 10.7, the ABA Commentary states the following:

> Because the sentencer in a capital case must consider in mitigation, "anything in the life of the defendant which might militate against the appropriateness of the death penalty for the defendant," "Penalty Phase preparation

---

[10]As noted earlier, in *Hamblin v. Mitchell*, 354 F.3d 482 (6th Cir. 2003) the court concluded that the 2003 revision of those guidelines should control the analysis of cases tried prior to 2003 since the 2003 Guidelines "simply explain in greater detail the 1989 Guidelines," especially in the area of "the obligations of counsel to investigate mitigating evidence."



Appellate Case: 07-3071 Page: 41 Date Filed: 11/26/2007 Entry ID: 3375881

requires extensive and generally unparalleled investigation into personal and family history." In the case of the client, this begins with the moment of conception. Counsel needs to explore:

(1) Medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage);

(2) Family and social history (including physical, sexual or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one or a natural disaster, experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (*e.g.*, failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities);

(3) Educational history (including achievement, performance, behavior and activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof and activities;

(4) Military service, (including length and type of service, conduct, special training, combat exposure, health and mental health services);

(5) Employment and training history (including skills and performance, and barriers to employability);

(6) Prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding



Appellate Case: 07-3071 Page: 42 Date Filed: 11/26/2007 Entry ID: 3375881

clinical services).

ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (Rev. Ed. 2003).

The importance of the ABA Guidelines is illustrated by *Wiggins* where the Court specifically cited the ABA's 1989 Standards as the benchmark for "'determining what is reasonable'" to expect of counsel in a capital case. *Wiggins*, 539 U.S. at 524, quoting *Strickland*, 466 U.S. at 688. *Wiggins* thus stands squarely for the proposition that the "prevailing professional norms" by which the performance of counsel in a capital case is measured are those set forth in the ABA Guidelines. As noted earlier, *Wiggins* also held the following with regard to trial counsel's obligations to prepare and, more importantly, *investigate*, a case in mitigation:

> Investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) . . . . Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources.

*Wiggins*, 539 U.S. at 524 (emphasis in original).[11] In *Rompilla v. Beard*, *supra*, the

[11]The Summer 2003 edition of the Hofstra Law Review contains a complete rendition of the 2003 ABA Guidelines, together with official commentary and accompanying scholarly articles regarding the Guidelines and the defense of death penalty cases. *See*, "The Guiding Hand of Counsel: ABA Guidelines for the



Appellate Case: 07-3071 Page: 43 Date Filed: 11/26/2007 Entry ID: 3375881

Court found that the Appellant had not received effective assistance of counsel at the penalty-phase of his Pennsylvania capital case and re-emphasized the importance of trial counsel conducting a full penalty-phase investigation. In describing the case before it, the majority observed that, "This case, like some others recently, looks to norms of adequate investigation in preparing for the sentencing phase of a capital trial . . . ." The Court also, once again, emphasized and reiterated the importance of the American Bar Association's Guidelines on criminal cases in general and capital cases in particular in resolving a claim of ineffective assistance of counsel. *See* discussion, *id.*, at nn. 6, 7.

The importance of mitigating evidence in capital sentencing proceedings is a fundamental tenet of the Supreme Court's capital jurisprudence. *Penry v. Lynaugh*, 492 U.S. 302, 307 (1989); *Eddings v. Oklahoma*, 455 U.S. 104, 110-12 (1982); *Lockett v. Ohio*, 438 U.S. 586, 605 (1978). It is critical to the reliability of the capital sentencing proceeding that the jury render an individualized decision. *Gregg v. Georgia*, 428 U.S. 153, 206 (1976). A jury cannot make that decision in a reliable, individualized, and constitutional way without mitigating evidence about the defendant. Reasonable investigation of the mitigation in a capital case is therefore an absolute prerequisite to constitutional representation. The core Eighth

---

Appointment and Performance of Defense Counsel in Death Penalty Cases," 31 HOFSTRA L.REV. 903-1211 (2003).



Appellate Case: 07-3071 Page: 44 Date Filed: 11/26/2007 Entry ID: 3375881

Amendment principle that "respect for humanity" requires consideration of information about the offender, *Lockett*, 438 U.S. at 602 (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976)), allows for no less. "It is critical to the reliability of a capital sentencing proceeding that the jury render an individualized determination." *Harris v. Dugger*, 874 F.2d 756, 763 (11th Cir. 1989) (citing *Gregg v. Georgia*, *supra*, 428 U.S. at 206; *Armstrong v. Dugger*, 833 F.2d 1430, 1433 (11th Cir. 1987).

Under clearly established United States Supreme Court precedent, a defendant's Sixth Amendment right to the effective assistance of counsel is violated whenever counsel provides professionally deficient representation that results in prejudice. *Strickland v. Washington*, *supra*; *Williams v. Taylor*, *supra*; *Wiggins v. Smith*, *supra.; Rompilla v. Beard*, *supra*. Counsel's performance at capital sentencing must be evaluated in light of the fundamental principle that a capital defendant has "a right – indeed, a constitutionally protected right – to provide the jury with [all reasonably available] mitigating evidence" in his case. *Williams v. Taylor*, 529 U.S. at 363. Accordingly, capital counsel have an "obligation to conduct a thorough investigation of the defendant's background" for mitigating evidence, *Williams*, 529 U.S. at 396 (citing 1 ABA STANDARDS FOR CRIMINAL JUSTICE 4-4.1, commentary,



Appellate Case: 07-3071 Page: 45 Date Filed: 11/26/2007 Entry ID: 3375881

p. 4-55 (2d ed. 1980)),[12] quoted in *Wiggins v. Smith*, 123 S. Ct. at 2535, and anything less than a "thorough investigation" constitutes deficient performance under *Strickland*. *Wiggins*, 123 S. Ct. at 2536; *Williams*, 529 U.S. at 396; *Jacobs v. Horn*, 129 F. Supp. 2d 390, 406 (M.D. Pa. 2001) ("the duty to investigate encompasses an investigation into mitigating circumstances including family background and mental health mitigating evidence").

When it comes to describing the scope of mitigation evidence that may properly be presented to a jury in a capital case – especially in a weighing jurisdiction – the sky is virtually the limit.[13] Starting with the Federal Death Penalty Act of 1994 itself ("FDPA"), the Act sets out seven specific mitigating factors and one "catch-all"

---

[12] *Williamson v. Ward*, 110 F. 3d 1508, 1514 (10th Cir. 1997) ("in a capital case, counsel's duty to investigate all reasonable lines of defense is strictly observed"); *Antwine v. Delo*, 54 F.3d 1357, 1367 (8th Cir. 1995) (counsel has a heightened "duty . . . to collect as much information as possible about [the defendant] for use at the penalty phase"); *Hill v. Lockhart*, 28 F.3d 832, 845 (8th Cir. 1994) ("Given the severity of the potential sentence and the reality that the life of [the defendant] [is] at stake," it is capital counsel's "duty . . . to collect as much information as possible about [the defendant] for use at the penalty phase."). The *American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* make clear that capital counsel must "make efforts to discover all reasonably available mitigating evidence." ABA GUIDELINES § 11.4.1; *id*. § 11.8.6 ("Counsel should present to the sentencing entity or entities all reasonably available evidence in mitigation"). As the United States Supreme Court explained as early as *Strickland* in 1984, and more recently in both *Wiggins* and *Rompilla*, decided, respectively in 2003 and 2005, the ABA standards serve as important guides for determining the reasonableness of counsel's performance.

[13] In *Ayers v. Belmonte*, 127 S.Ct. 469, 478 (2006), the Supreme Court made reference to the "potentially infinite" reach of mitigating evidence in capital cases.

factor. 18 U.S.C. § 3592(a)(1)-(8). Moreover the FDPA itself notes that the finder of fact in such cases, "Shall consider any mitigating factor, including the following . . ." suggesting that the range of permissible evidence a defendant may present in mitigation is broader even than the "catch-all" set forth at 18 U.S.C. § 3592(a)(8). This is entirely consistent with established Supreme Court precedent.

The United States Constitution requires that, in a death-penalty prosecution, no limitation may be placed on the right of the accused to present, for the sentencer's consideration, any relevant mitigating evidence. No limitation may be placed on the right of the accused to present for the sentencer's consideration all relevant mitigating evidence. This established tenet of capital jurisprudence is rooted in *Lockett v. Ohio*, 438 U.S. 586 (1978), where, two years after *Gregg v. Georgia*, a plurality of the Court held that "in all but the rarest kind of capital cases," a sentencing authority may not "be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record . . . as a basis for a sentence less than death." *Id*. at 113-14 (emphasis omitted); *see also Skipper v. North Carolina*, 476 U.S. 1 (1986); *Eddings v. Oklahoma*, 455 U.S. at 112. In *McCleskey v. Kemp*, 481 U.S. 279 (1987), the Court held that a constitutional death-penalty scheme

> cannot limit the sentencer's consideration of *any relevant circumstance* that could cause it to decline to impose the penalty. In this respect, the State cannot channel the sentencer's discretion, but must allow it to consider *any relevant information* offered by the defendant.

*Id*. at 305-06 (emphasis added); *see also Green v. Georgia*, 442 U.S. 95 (1979) (evidence rules may not be invoked to bar otherwise relevant mitigating evidence).

In *Buchanan v. Angelone*, 522 U.S. 269 (1998), Chief Justice Rehnquist, writing for a majority of the Court 20 years after *Lockett*, stated:

> in the [penalty] phase, we have emphasized the need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination.
>
> * * *
>
> In the [penalty] phase, our cases have established that the sentencer may not be precluded from considering any constitutionally relevant mitigating evidence.

*Id*. at 276 (citations omitted). In *Williams v. Taylor*, 529 U.S. 362 (2000), the Court noted that mitigating evidence can serve to lessen a defendant's "moral culpability" even where such evidence "does not undermine or rebut the prosecution's death-eligibility case." *Id.* at 398.

The line of cases supporting liberal admission of mitigating evidence is unbroken, and was most recently extended in *Tennard v. Dretke*, 542 U.S. 274 (2004), where the Court rejected the notion, originating with the Texas Court of Criminal Appeals and repeatedly endorsed by the Fifth Circuit, that evidence is not mitigating unless there is a nexus between the evidence and the crime. In *Tennard*, a six-member majority of the Court reversed the Fifth Circuit and bluntly criticized that court's longstanding practice of imposing a restrictive standard of relevance for

mitigating evidence at the penalty-phase of Texas capital cases. *Tennard* reiterated that the threshold of relevance for mitigating evidence is minimal, stating:

> When we addressed directly the relevance standard applicable to mitigating evidence in capital cases in *McKoy v. North Carolina,* 494 U.S. 433, 440-441, 108 L. Ed. 2d 369, 110 S. Ct. 1227 (1990), we spoke in the most expansive terms. We established that the "meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding" than in any other context, and thus the general evidentiary standard – "'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence'"– applies. *Id*., at 440, 108 L. Ed. 2d 369, 110 S. Ct. 1227 (*quoting New Jersey v. T. L. O*., 469 U.S. 325, 345, 83 L. Ed. 2d 720, 105 S. Ct. 733 (1985)). We quoted approvingly from a dissenting opinion in the state court: "'Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value.'" 494 U.S., at 440, 108 L. Ed. 2d 369, 110 S. Ct. 1227 (*quoting State v. McKoy*, 323 N. C. 1, 55-56, 372 S.E.2d, 12, 45 (1988) (opinion of Exum, C. J.)). Thus, a State cannot bar "the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death." 494 U.S., at 441, 108 L. Ed. 2d 369, 110 S. Ct. 1227.
>
> Once this low threshold for relevance is met, the "Eighth Amendment requires that the jury be able to consider and give effect to" a capital defendant's mitigating evidence. *Boyde v. California,* 494 U.S. 370, 377-378, 108 L. Ed. 2d 316, 110 S. Ct. 1190 (1990) (*citing Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978); *Eddings v. Oklahoma*, 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982); *Penry I*, 492 U.S. 302, 106 L. Ed. 2d 256, 109 S. Ct. 2934 (1989)); *see also Payne v.*



Appellate Case: 07-3071 Page: 49 Date Filed: 11/26/2007 Entry ID: 3375881

> *Tennessee,* 501 U.S. 808, 822, 115 L. Ed. 2d 720, 111 S. Ct. 2597 (1991) ("We have held that a State cannot preclude the sentencer from considering 'any relevant mitigating evidence' that the defendant proffers in support of a sentence less than death. . . . [V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances." (*quoting Eddings, supra*, at 114, 71 L. Ed. 2d 1, 102 S. Ct. 869)).

*Id.* at 284-85. In *Smith v. Texas*, 543 U.S. 37 (2004), decided five months after *Tennard*, the Court reiterated its rejection of the "nexus" requirement that the Texas Court of Criminal Appeals, as endorsed by the Fifth Circuit, had erected as a barrier to the admission of mitigating evidence, stating, "[w]e rejected the Fifth Circuit's 'nexus' requirement in *Tennard* . . . ." *Smith v. Texas*, 543 U.S. at 45. Even more recently, the "new" Supreme Court reiterated this point in an opinion authored by Justice Alito:

> [O]ur cases have firmly established that sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offense in the future.

*Abdul-Kabir v. Quartermain*, 127 S.Ct. 1654, 1664 (2007).

Thus, counsel's constitutional duty in this case was to investigate, discover, and present, in the language of *McCleskey*, evidence of "any relevant circumstance that could cause [a jury] to decline to impose the penalty [of death]." Trial counsel



Appellate Case: 07-3071 Page: 50 Date Filed: 11/26/2007 Entry ID: 3375881

were also required to protect Appellant's legal rights at trial, and to advocate zealously on his behalf. This Court has not hesitated to apply the principles discussed above and to grant relief in similar cases. *See, e.g.*, *Antwine v. Delo*, 54 F.3d 1357, 1365 (8th Cir 1995) ("The issue is whether the failure to discover and present evidence of Antwine's mental condition undermines our confidence in the outcome of either the guilt or sentencing phase of the trial. We are concerned, then, with whether the jury – not the motion court – would have found the evidence of Antwine's mental condition credible."); *Simmons v. Luebbers,* 299 F.3d 929, 939 (8th Cir 2002) ("[T]he state portrayed Simmons as an individual who responded violently when his advances were not accepted by women. During the penalty phase, Simmons's attorneys could have presented evidence of Simmons's background to demonstrate that his compulsive, violent reactions were the result of an abusive and traumatic childhood. Further, a vivid description of Simmons's poverty stricken childhood, particularly the physical abuse, and the assault in Chicago, may have influenced the jury's assessment of his moral culpability."); *Parks v. Delo,* 33 F.3d 933, 940 (8th Cir 1994) (Counsel must conduct an adequate investigation of facts, consider viable theories, and develop evidence to support those theories. The failure of counsel to adequately investigate a petitioner's mental health history and background necessitated an evidentiary hearing.); *Steinkuehler v. Meschner,* 176 F.3d 441 (8th Cir 1999) (The habeas relief granted related solely to petitioner's intoxication



Appellate Case: 07-3071 Page: 51 Date Filed: 11/26/2007 Entry ID: 3375881

defense. Trial counsel failed to present evidence that a crucial police witness on the issue of petitioner's state of intoxication had pressured another witness to "forget" that petitioner was intoxicated and that the police witness had a habit of "forgetting" exculpatory evidence. The deficient performance prejudiced petitioner and a reasonable probability existed that the result would have been different if counsel had presented the evidence. Petitioner was denied his right to effective assistance of counsel.); *Driscoll v. Delo*, 71 F.3d 701 (8th Cir 1995) (The court agreed that a writ of habeas corpus should issue on three independent bases: Appellant was denied effective counsel because his lawyer allowed the jury to retire with the factually inaccurate impression that the victim's blood was on appellant's knife; second, appellant's trial counsel was also ineffective for failing to impeach a state eyewitness using his prior inconsistent statements; finally, appellant's sentence violated U.S. Const. Amend. VIII because the prosecutor made repeated statements to the jury that diminished the jury's sense of responsibility for its sentence of death.); *Copeland v. Washington*, 232 F.3d 969, 975 (8th Cir 2000) ("The improper argument would have had a significant prejudicial effect on the jurors, and it was unreasonable, in light of Supreme Court precedent, to conclude that the argument did not result in a deprivation of due process. The district court correctly determined that the argument was improper and the failure to object to the argument constituted ineffective assistance of counsel. Accordingly, the petitioner's death sentence is vacated.")



Appellate Case: 07-3071 Page: 52 Date Filed: 11/26/2007 Entry ID: 3375881

## C. The inadequacy of the investigation conducted by trial counsel

Appellant respectfully suggests that applying the above principles to the facts as developed at an evidentiary hearing that both sides contended was required, the district court would have been required to grant relief on the issue of ineffective assistance of trial counsel. At this juncture, all Appellant seeks is the chance to be heard by this Court.

As noted earlier, after numerous changes of counsel, Mr. Berrigan and Ms. Hunt ultimately served as Appellant's trial counsel. Appellant's trial commenced approximately nine months after Mr. Berrigan's entry into the case. As would have been demonstrated during an evidentiary hearing in this matter, one side-effect of the numerous changes of counsel was that no effort at pursuing a coordinated penalty-phase investigation was begun until late 2000 and early 2001, when Tena Francis was appointed by the district court to serve as Appellant's mitigation specialist.

### 1. The Federal Public Defender warned in a parting memorandum that the mitigation investigation was inadequate and incomplete.[14]

As noted earlier, Appellant, for a short period of time (10 months), was represented by the Federal Public Defender, who withdrew when another client offered to provide information adverse to Appellant. During the time Appellant was represented by the Public Defender, the mitigation investigation was conducted by

[14] This information was also submitted to the district court in the sealed *ex parte* funding application filed October 30, 2005 and unsealed on July 10, 2006.

Ron Ninemire, an investigator with that office. On September 14, 2000, at the time the Federal Public Defender was relieved as counsel, Mr. Ninemire wrote a memo to trial counsel, Susan Hunt, Esquire, outlining records and documents that were needed to be located and obtained as the starting point of an adequate mitigation investigation. He also identified a number of persons who needed to be interviewed. (Based on Jill Miler's review, discussed *infra*, it appears that some of the investigative efforts ongoing at the time were misdirected, with investigators looking in the wrong places.) Among the records specified in Mr. Ninemire's September 2000 memorandum that had not been obtained were the following:

- "Background check" on family in Visalia, California;
- Protection orders or other "government" contact with Nelson family in Visalia, California;
- Police and Social Service records re: arrest of Kenneth Nelson in Visalia or Sacramento;
- Battered women's shelter in Visalia;
- Juvenile probation agents and juvenile police officer in White Settlement;
- School records from Amsterdam, Missouri;
- Any Missouri Division of Family Services records re: Nancy, Keith or the other children;
- "Juvenile facility" at Booneville
- Pre-school records in "Sacramento;"



Appellate Case: 07-3071 Page: 54 Date Filed: 11/26/2007 Entry ID: 3375881

- Division of Family Services in Texas

Thus, one year away from trial (and several months prior to Mr. Berrigan's appointment and the involvement of Tena Francis), the mitigation investigation was incomplete and inadequate.

2. Tena Francis, the mitigation specialist appointed by the district court at Appellant's trial, warned trial counsel of a woefully inadequate and incomplete mitigation investigation.

During the investigation conducted by 2255 counsel, Ms. Francis informed Appellant's counsel that, when the case came to trial, she had not come close to completing the necessary investigation.[15] In August of 2001 – approximately three months before the trial commenced – Ms. Francis prepared an affidavit for Appellant's trial counsel outlining the tasks she felt that she needed to accomplish in order to complete her work, estimating at the time that she would need approximately 220 hours to complete the investigation. The affidavit was apparently prepared in support of a motion for additional funding that was never filed.

At a hearing, Ms. Francis would have testified that she felt strongly that trial counsel should seek an adjournment of the trial date. At approximately the same time, Mr. Berrigan underwent heart surgery. Appellant himself agreed that an adjournment should be requested and specifically asked his counsel to request an adjournment.

---

[15] This information was submitted to the district court in the sealed *ex parte* funding application filed October 30, 2005 and unsealed on July 10, 2006. (A65-67.)

After a discussion among all counsel, however, no such motion was made. At a hearing, Appellant would have demonstrated that there were *no* strategic components to the decision not to seek an adjournment, let alone any *reasonable* tactical or strategic components. Ms. Francis would have testified that she was asked to do very little work on the case thereafter.

At a hearing trial counsel would have confirmed the lack of preparedness and the inadequacy of their investigative efforts on Mr. Nelson's behalf. It is Appellant's view that the decision not to seek an adjournment in the face of an incomplete and inadequate mitigation case was not only tactically unreasonable, it was incomprehensible and indefensible.

3. <u>Mitigation specialist Jill Miller's specific outline, as of the fall of 2005, of what had been left undone in the original investigation and was needed to conduct a through and complete mitigation investigation</u>.

Appellant's 2255 counsel initially asked the district court to fund 200 hours of mitigation specialist time in order to present the district court with a complete picture of the mitigation case that could have been presented on Appellant's behalf with reasonable efforts. The district court approved $7,500, amounting to approximately 70 hours and, when additional funding was requested, denied the application on the basis, essentially, that nothing would change the court's view that counsel had been



Appellate Case: 07-3071 Page: 56 Date Filed: 11/26/2007 Entry ID: 3375881

effective.[16] (A58-78.)

On October 30, 2005, Appellant's 2255 counsel requested an additional 250 hours for mitigation specialist Jill Miller, MSSW, recognizing that counsel were seeking a significant allocation of resources, but pointing out, they were simply seeking the tools and factual back-up for the claims that trial counsel's mitigation investigation had been inadequate and incomplete.

In the October 30, 2005 funding application, Appellant's 2255 counsel outlined the following steps Ms. Miller had already taken and what remained to be accomplished. At that point in the 2255 mitigation investigation, Ms. Miller had reviewed numerous relevant documents, conferred with Appellant's 2255 counsel, and had met with Appellant at USP/Terre Haute for a five-hour interview. In the funding motion, Appellant's 2255 counsel expressed little doubt that they would be able to convince the district court, at an evidentiary hearing, that Appellant's trial counsel had failed to represent him adequately in the preparation and representation of the mitigation case. In order to fulfill their burden of establishing *prejudicial* ineffective assistance, however, it was of critical importance that the mitigation case, for the first time, be thoroughly investigated so that case could be persuasively

[16]It was the order denying funding which led to the recusal motion since, in that order, the district court took the position that, in essence, nothing 2255 counsel could produce would make any difference since, in the district court's view, Appellant's counsel had met the *Strickland* standard.



Appellate Case: 07-3071 Page: 57 Date Filed: 11/26/2007 Entry ID: 3375881

presented during an evidentiary hearing.

As reported to the district court in the fall of 2005, Ms. Miller had prepared a confidential memorandum to counsel outlining the inadequacies of the initial mitigation investigation, summarizing her work to date, and outlining in specific terms what needed to be accomplished in order for the district court to have a complete picture of an adequately investigated and prepared mitigation case. As of October 2005, Ms. Miler had reviewed the following materials:

- Decision of the Eighth Circuit in U.S. vs. Keith Nelson
- Transcripts of pre-trial proceedings
- Transcript of the plea hearing
- Penalty phase transcript, including verdict
- Verdict form
- File of Tena Francis, including: witness interview memos; social history draft; chronology; correspondence; memos to counsel; billing records; copies of photo pages from school yearbooks; and research materials on neurological impairment, schizophrenia, attachment disorder, fetal alcohol syndrome and juvenile institutionalization
- Memos and investigative reports of Dan Grothaus, Grothaus Investigation
- Investigative memos and witness interview summaries by Ron Ninemire of the Office of the Federal Public Defender
- Letter by Ron Ninemire dated 09/14/2000 to Susan Hunt, Esquire, detailing things needed to be done in investigation



Appellate Case: 07-3071 Page: 58 Date Filed: 11/26/2007 Entry ID: 3375881

- Some interview memos authored by Susan Hunt
- Correspondence from Susan Hunt to Tena Francis, including fax covers
- Juvenile Records – Three volumes containing juvenile court, juvenile detention and Texas Youth Commission records
- Birth records, Providence and Children's Mercy Hospitals
- Medical records, John Peter Smith Hospital, 1988
- School records from White Settlement, which may be incomplete
- Report of Dr. Roger Burns, Ph.D., 1988, in juvenile records
- Southwest Missouri Mental Health Center records, 1995
- Johnny Nelson's records - police, court and mental health
- Report of Dr. Daniel Foster, Psy.D., 2001

In addition to undertaking a review of relevant records, Ms. Miller had met with Appellant's 2255 counsel on three occasions and had interviewed Keith Nelson for approximately five hours. During that interview, Appellant revealed to Ms. Miller instances in which he had been sexually victimized and exposed to the sexual victimization of others. (Ms. Francis had only met with Appellant one time, an interview she described in her own terms as a superficial "meet and greet" rather than a substantive session.)

Ms. Miller also reported to 2255 counsel that she believed, based on her training



Appellate Case: 07-3071 Page: 59 Date Filed: 11/26/2007 Entry ID: 3375881

and experience, that it was likely there was additional information regarding sexual victimization and exposure to sexually deviant/inappropriate behavior that would be revealed in the course of subsequent interviews and investigation. Ms. Miller had also consulted with Danalynn Recer of the Gulf Region Advocacy Center in Texas regarding child protective services and welfare records, and information on problems within facilities of the Texas Youth Commission. The Center had access to records relating to conditions at the facilities operated by the Texas Youth Commission that coincide with the period that Appellant was incarcerated at those facilities.

In her memorandum to trial counsel, Ms. Miller also reported the following with regard to her interview of Tena Francis concerning the status of her investigation before and after the June 13, 2001 memorandum Ms. Francis wrote to trial counsel:

> Ms. Francis noted that Keith's juvenile and adult incarceration experiences would have been significant and needed to be investigated, including conditions at the facilities. She indicated in her 6-13-01 memo that this was something she was going to do, but she personally did no work on the case after that date, and nothing was done to look into this. My conversation with Danalynn Recer indicates that this is an important area of investigation, particularly for Gainesville in the TYC. Tena further indicated that more information was needed about the paternal family, particularly re: Kenneth Morse and possible mental health problems. Again, no indication of what efforts were made to do this. My review of the file indicates virtually nothing was done following this until late August, when a number of interviews were conducted by Lisa Murphy, but mostly of maternal family and school personnel in White Settlement. Tena's billing records



Appellate Case: 07-3071 Page: 60 Date Filed: 11/26/2007 Entry ID: 3375881

> reflect no work from 5-18-01 to 8-28-01, though memos indicate that some work was done in late May and early June. There is no billing after September 6, 2001, so apparently counsel did not involve mitigation staff after that date.

In that same memorandum, Ms. Miller noted that there were other records that were likely relevant and obtainable. These included the following:

- Medical and mental health records for Nancy Nelson's extended family
- Records or information on mental illness in paternal family
- Information re: Kenneth Morse's alcohol and drug abuse
- Information on Kenneth Morse as a police informant
- Social Services records for family in Missouri (should include Kansas)
- Women's shelter records in or near Rancho Cordova and Visalia, CA
- Section 8 Housing records in White Settlement
- Mental Health/Mental Retardation in Tarrant County (1988 - Keith and Nancy referred there by juvenile authorities)
- University Psychology, Fort Worth - Nancy and Keith seen there in 1988
- Nancy Nelson's school records
- Nancy Nelson's employment records
- Information on the suicide of Nancy's boyfriend
- Pre-natal and birth records for all of Nancy's children
- Kansas and Missouri Juvenile Probation records for Keith (1988-89)



Appellate Case: 07-3071 Page: 61 Date Filed: 11/26/2007 Entry ID: 3375881

- Mark Frey, Social Worker, KS. Dept of Soc. & Rehab. Services

- Information on the death of Kenneth Morse's father - may have died in a motor vehicle accident in which Kenneth was the driver and was DUI

- Social Services records at Mercy Hospital following Keith's birth

- Hospital records for Nancy Nelson when admitted under the name of Karen Morse (Kenneth's sister) in 1975

- Police report in Kansas when Nancy went to station to get away from Kenneth (1979)

- Welfare records in Hanford, California

- Nancy's medical records in White Settlement

- Special education records in White Settlement and Amsterdam, Mo. (It is significant that the school records obtained from White Settlement had at least two memos indicating that the records were not complete, and that special education records were kept separate; transfer credits from Miami HS indicated that Keith was in resource classes; the fact that counsel knew that Keith was in special education is significant; that this was an indicator of brain dysfunction; and that there were records they didn't have, which would have, by law, included testing and assessment.)

- GED verification

- Records re: Keith in counseling with Cindy Phillips, Family and Individual Counseling (1990)

- John Peter Smith Hospital, all inpatient, ER and outpatient clinic records re: Keith (apparently received routine health care there)

- Records of Dr. Pretz, Kansas City, Mo; he delivered all Nelson children

- Nancy Nelson's criminal history, including probation records

- Everything that can be found on Kenneth Morse's criminal history,

> including indecent liberties charges, arrests not prosecuted (especially if not prosecuted because he was working as an informant). If possible, the court-ordered mental examinations from a recent case in Missouri.

In terms of what Ms. Miller needed to accomplish in the immediate short run, she advised 2255 counsel (who then advised the district court) as follows:

> Initially, my continued work should focus on the most important records and documents that were not obtained, e.g. child protective services and social services records in Kansas, Texas, and possibly California; special education records from all schools; social services records from Mercy Hospital in KC, Mo. Investigation of conditions and abuses in TYC, including the facility at Gainseville is another important area; as is conditions in the prison (s) in Missouri in which Keith was held. Kenneth Morse needs to be interviewed. More information is needed about him, including his cognitive and mental functioning, and alcohol and drug use. More information is needed from and about Nancy, including alcohol use during pregnancy, prenatal care, and neglect of the children. An accurate and complete chronology needs to be prepared. Keith's history of sexual victimization and exposure to sexually perverse or inappropriate conduct by others needs to be further explored. I will need to meet with him again. Documentation and corroboration of mental illness on both sides of the family may be helpful.

(A69.)

In the face of these specifics, the district court's *ipse dixit* that all issues could be summarily resolved by a factually unsupported rote reference to "strategy" borders on the abdication of judicial responsibility.



Appellate Case: 07-3071 Page: 63 Date Filed: 11/26/2007 Entry ID: 3375881

4. <u>Trial counsel's duty, and their failure in this case, to conduct a mental health investigation</u>.

In discussing the duty of trial counsel in a capital case to investigate the issue of mental health, the ABA Guidelines are specific, comprehensive, and emphatic:

> In particular, mental health experts are essential to defending capital cases. Neurological and psychiatric impairment, combined with a history of physical and sexual abuse, are common among persons convicted of violent offenses on death row. Evidence concerning the defendant's mental status is relevant to numerous issues that arise at various junctures during the proceedings, including competency to stand trial, sanity at the time of the offense, capacity to intend or premeditate death, ability to comprehend Miranda warnings, and competency to waive constitutional rights. The Constitution forbids the execution of persons with mental retardation, making this a necessary area of inquiry in every case. Further, the defendant's psychological and social history and his emotional and mental health are often of vital importance to the jury's decision at the punishment phase. Creating a competent and reliable mental health evaluation consistent with prevailing standards of practice is a time-consuming and expensive process. Counsel must compile extensive historical data, as well as obtain a thorough physical and neurological examination. Diagnostic studies, neuropsychological testing, appropriate brain scans, blood tests or genetic studies, and consultation with additional mental health specialists may also be necessary.
>
> Counsel's own observations of the client's mental status, while necessary, can hardly be expected to be sufficient to detect the array of conditions (e.g., post-traumatic stress disorder, fetal alcohol syndrome, pesticide poisoning, lead poisoning, schizophrenia, mental retardation) that could be of critical importance. Accordingly, Subsection A(2) mandates that at least one member of the defense team



Appellate Case: 07-3071 Page: 64 Date Filed: 11/26/2007 Entry ID: 3375881

> (whether one of the four individuals constituting the smallest allowable team or an additional team member) be a person qualified by experience and training to screen for mental or psychological disorders or defects and recommend such further investigation of the subject as may seem appropriate.
>
> Although mental health issues are so ubiquitous in capital defense representation that the provision of resources in that area should be routine, it bears emphasis that every situation will also have its own unique needs. The demands of each case - and each stage of the same case - will differ. Jurisdictions must therefore construe this Guideline broadly, keeping in mind the superior opportunity of defense counsel to determine what assistance is needed to provide high quality legal representation under the particular circumstances at hand and counsel's need to explore the potential of a variety of possible theories. For example, it might well be appropriate for counsel to retain an expert from an out-of-state university familiar with the cultural context by which the defendant was shaped or a professional who is skilled at retrieving elusive paper or electronic records. While resources are not unlimited, of course, jurisdictions should also be mindful that sufficient funding early in a case may well result in significant savings to the system as a whole.

Commentary to Guideline 4.1, 31 HOFSTRA L. REV., *supra*, at 956-57 (footnotes omitted).

Despite long having the funds to have Mr. Nelson evaluated by mental health professionals, a series of changing trial counsel simply neglected to get it done. Trial counsel would have so testified at a hearing. Indeed, by the time the defense was required to file a notice of its intent to offer mental health evidence in the fall of 2001,



Appellate Case: 07-3071 Page: 65 Date Filed: 11/26/2007 Entry ID: 3375881

Mr. Nelson had *still* not been seen or evaluated by any mental health professional. The notice filed was thus a "place-holder" since no evaluation had taken place. By the time the psychologist retained by the defense, Dr. Foster, actually visited Mr. Nelson in October, 2001, the trial was literally days away from beginning. Dr. Foster would have testified that his entrance into the case was "too little, too late" and that a competent mental health evaluation was never completed.

At a hearing, both Ms. Hunt and Mr. Berrigan would have testified that their subsequent advice to Mr. Nelson that he should refuse to be evaluated by the government's experts was born of desperation, not trial strategy. All of this, and more, would have been established at a hearing.

A review of funding orders entered by the district court demonstrates that Appellant's trial counsel sought and received authorization to retain the services of various mental health professionals at an early stage of the case, long before Mr. Berrigan was even in the case. In June 2000, a motion was presented to the district court and granted to retain the services of a psychiatrist, Dr. Peterson. Dr. Peterson never examined Appellant. In January 2001, a motion was granted to have a neuropsychological examination performed. No such examination ever took place. Indeed, it was not until the very eve of trial, the fall of 2001, that the services of a forensic psychologist was requested. However, even that motion, for the appointment of Dr. Foster, was not filed until September 17, 2001, and Dr. Foster did not actually



Appellate Case: 07-3071 Page: 66 Date Filed: 11/26/2007 Entry ID: 3375881

examine Appellant until October 5 and 6, 2001. Dr. Foster himself described his evaluation as incomplete and preliminary. Despite the fact that two of Appellant's brothers had long been diagnosed as schizophrenics, including one who was incarcerated in Texas for murder and had been deemed incompetent for a substantial period of time, no effort was made to locate a mental health professional with expertise in schizophrenia.[17]

There is no conceivable excuse for having delayed the mental health evaluation of Appellant until the very eve of trial, the fall of 2001, when the deadline for notice had passed. Applications for the funding of such examinations had been approved by the district court far in advance of the trial date. Dr. Foster would have testified that, had he done a complete examination, he would have developed powerful evidence in mitigation. The neuropsychological examination conducted by Dr. Gelbort in 2005 as part of the 2255 proceedings in fact developed evidence that Appellant is brain-damaged and suffers from a condition beyond his control, "frontal lobe disturbance/dysfunction [that] has an effect on his everyday thinking and reasoning capacities" and which will lead to "episodes of impaired reasoning . . . ."

Recognizing that Dr. Gelbort's neuropsychological testing revealed significant evidence of brain dysfunction, the government denigrated the evidence in the 2255

[17]When Appellant's 2255 counsel moved for such an appointment (A79), the district court denied the application. (A92.)



Appellate Case: 07-3071 Page: 67 Date Filed: 11/26/2007 Entry ID: 3375881

proceedings by offering to present counter expert testimony, at a hearing, that there is "no scientific method available for establishing a causal connection between brain injury and criminal behavior." Appellant was (and remains) prepared to meet such testimony if and when it is presented. Moreover, as a matter of law, for evidence to be mitigating there is no requirement of a nexus or other causal connection to the crime. This was exactly the point of the Supreme Court's decisions in *Tennard v. Dretke*, 542 U.S. 274 (2004) and *Smith v. Texas*, 543 U.S. 37 (2004). In *Smith*, decided five months after *Tennard*, the Court reiterated its rejection of the "nexus" requirement that the Texas Court of Criminal Appeals, as endorsed by the Fifth Circuit, had erected as a barrier to the admission of mitigating evidence, stating, "[w]e rejected the Fifth Circuit's 'nexus' requirement in *Tennard* . . . ." *Smith v. Texas*, 543 U.S. at 45. Accordingly, the absence of a nexus to the crime does not render neuropsychological testing irrelevant. Neither does Appellant concede that a nexus requirement could not have been established.

5. <u>The inadequacy of the mitigation case presented at trial</u>

The jury in Appellant's case retired to deliberate on its verdict at 12:25 p.m. on November 28, 2001. It asked no questions and sought no clarification of its task. By 2:30 p.m. the jury was present in open court to announce that it had sentenced Appellant to death. The case in mitigation had drawn one vote from one juror for one mitigating factor. (A16.) The jury unanimously rejected 9 of the 10 proposed factors



Appellate Case: 07-3071 Page: 68 Date Filed: 11/26/2007 Entry ID: 3375881

in mitigation. (A16-18.)

6. Mitigation developed for the first time during the 2255 proceeding

While it is true that the district court refused to fund an adequate mitigation investigation in conjunction with the 2255 proceedings, what counsel were able to do produced several areas of mitigation evidence different in kind and quality from that heard by Appellant's jury. This included significant evidence of mental impairment, a category of evidence that the Supreme Court has described as "inherently mitigating." *Tennard v. Dretke*, 542 U.S. 274, 287-88 (2004).

a. Childhood sexual abuse

One of the revelations from the 2255 investigation was that the mitigation specialist in the case, Tena Francis, had never interviewed Mr. Nelson beyond a superficial "meet and greet" session. By contrast, Ms. Miller spent five hours with Mr. Nelson. In the course of her interview, Appellant revealed to Ms. Miller instances in which he had been sexually victimized and exposed to the sexual victimization of others. As reflected in the October 2005 funding application, Ms. Miller believed, based on her training and experience, that it was likely there was additional information regarding sexual victimization and exposure to sexually deviant/inappropriate behavior that would be revealed in the course of subsequent interviews and investigation. Unfortunately, the district court refused to fund the



Appellate Case: 07-3071 Page: 69 Date Filed: 11/26/2007 Entry ID: 3375881

investigation needed to complete Ms. Miler's work.[18]

Ms. Miller's preliminary mitigation investigation in this case disclosed evidence not only of childhood sexual abuse, but also symptoms of mental illness. This is evidence which the Supreme Court has repeatedly noted constitutes compelling mitigation. *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 534-35 (2003) (counsel ineffective for failing to present evidence of petitioner's childhood sexual abuse and mental health problems). Such evidence, however, was never presented at Appellant's trial.

b. <u>Mental impairment – Fetal Alcohol Spectrum Disorder ("FASD</u>")

Natalie Novick Brown, Ph.D. was appointed by the district court in the 2255 proceedings to conduct an evaluation as to whether Mr. Nelson is afflicted with FASD. In the affidavit submitted to the district court in support of the appointment (A104), Dr. Brown described her extensive background and experience in the field and described, as well, the three-step process that is most cost-effective in FASD evaluation and diagnosis. (A105.) Step one involves an analysis of school and medical records, neuropsychological examinations, physiology and neurofunctioning. (*Id.*) If diagnostic criteria are satisfied after stage one, the second step is Magnetic Resonance Imaging (MRI) of an area of the brain, the corpus collosum, to determine

---

[18]*See* Point Five, *infra*, where a COA is sought to review the district court's refusal to fund an ongoing, non-duplicative, and productive mitigating investigation.

if there is physical evidence of brain damage. If such evidence is detected on an MRI, the final step is to synthesize all the data and "explain the contribution of FASD to the subject's behavioral history." (*Id.*)

Appellant sought funding from the district court on a stage-by-stage basis. After completion of her first stage analysis, Dr. Brown was satisfied that Appellant met the initial diagnostic criteria for FASD and 2255 counsel accordingly sought additional funding from the district court[19] to continue the evaluation, a motion that was later denied. (Motion reproduced at A110.) In the affidavit accompanying the motion for supplemental funding (A114), Dr. Brown described FASD as follows:

> FASD is an umbrella term that includes Fetal Alcohol Syndrome, Fetal Alcohol Effects, Alcohol-related Nuerodevelopmental Disorder, and Alcohol-Related Birth Defects. FASD is a permanent birth defect caused by maternal consumption of alcohol during pregnancy. Alcohol is a teratogen that inhibits and disrupts fetal development by causing structural and functional damage to developing organs and systems, including the brain and central nervous system. The damage starts at the cellular level, where ethanol may induce excessive cell death and disrupt cell responses to molecules that regulate neuron proliferation, migration, and differentiation. Because alcohol causes widespread damage throughout the fetus, there is a broad array of physical anomalies and neurobehavioral defects. Hence the condition is referred to as a "syndrome." The most serious and pervasive effects occur in the central nervous system (CNS) Brain imaging

[19]In the funding application, 2255 counsel noted specifically that additional funding would be sought if the stage-one analysis for FASD satisfied the initial diagnostic criteria. (A102.)



Appellate Case: 07-3071 Page: 71 Date Filed: 11/26/2007 Entry ID: 3375881

> studies over the last decade have shown that prenatal alcohol exposure causes significant malformation in structures within the brain (e.g., corpus collosum, basal ganglia, cerebellum) that are necessary for normal development and functioning (e.g., Bookstein et al., 2001, 2002a, 2002b).

With regard to the effects of FASD, Dr. Brown's affidavit was instructive, and in many ways descriptive of Mr. Nelson's entire life history.

> Research has shown that prenatal alcohol exposure causes structural brain damage that affects functioning in the frontal lobe of the brain, particularly the prefrontal cortex, an area that is especially sensitive to the teratogenic effects of ethanol (e.g., Bookstein et al., 2002). Brain imaging research has found that prenatal alcohol exposure seems to target the corpus collosum in particular and is associated with a pattern of deficits in executive functioning in individuals diagnosed with FASD (Bookstein et al., 2001). Executive functions, which control impulse and channel them into pro-social rather than antisocial behavior, involve cognitive skills such as perception, social awareness, organization, planning, internal ordering, working memory, self-monitoring, inhibition, motor control, regulation of emotion, and motivation. Appropriate socialization depends on intact basic cognitive functioning (Connor et al., 2000). When executive functions are compromised by parental alcohol exposure or other sources of brain damage, an individual will:
>
> - have difficulty perceiving, prioritizing and storing information,
> - have difficulty processing and retrieving information,
> - be unable to generalize and apply consequences from past actions to potential future actions,



Appellate Case: 07-3071 Page: 72 Date Filed: 11/26/2007 Entry ID: 3375881

- lack motivation and initiative,
- need external motivators such as frequent cues or guidance from others,
- be unable to perceive the effect of his/her actions on others or the social inappropriateness of those actions,
- display exaggerated emotions,
- be unable to control behaviors that stem from emotion-evoked urges, and consequently,
- engage in a wide range of socially (and often legally) inappropriate behaviors.

(A115-116.) In her affidavit, Dr. Brown described her conclusion, after the first stage of the process, that "there is a substantial possibility that Keith Nelson may suffer from Fetal Alcohol Spectrum Disorder." (A116.) Counsel sought an addition $3,750 to complete the analysis. The district court denied the funding.

Courts have recognized that evidence that a defendant suffers from FASD is compelling mitigation evidence. *See, e.g., Rompilla v. Beard*, 545 U.S. 374, 392 (2000) (noting that among the evidence which trial counsel had failed to present at trial, but which was presented at the habeas hearing to demonstrate counsel's ineffectiveness, was evidence that the petitioner suffered from fetal alcohol syndrome); *Silva v. Woodford*, 279 F.3d 825, 847 & n.17 (9th Cir. 2002) (evidence that petitioner suffered from fetal alcohol syndrome constituted compelling mitigation



Appellate Case: 07-3071 Page: 73 Date Filed: 11/26/2007 Entry ID: 3375881

evidence, and counsel's failure to investigate it, along with petitioner's childhood abuse, was "profoundly prejudicial"). *See also* 2003 ABA Guidelines, Commentary to Guidelines 41, 10.7 and 10.11 (noting the importance of investigating evidence of fetal alcohol syndrome as part of the mitigation case). It is obvious that Appellant's trial counsel could easily have conducted an investigation of FASD. Indeed, testimony at an evidentiary hearing would have shown that Tena Francis had repeatedly suggested that the issue be explored. Unfortunately that advice was ignored.

c. <u>Dr. Gelbort's findings regarding organic brain dysfunction and the need for further clinical psychological examination in the area of schizophrenia</u>

As of the initiation of the 2255 proceedings, Appellant had *never* undergone a mental health evaluation. Despite having ample funds and time to accomplish such testing, it simply never got done. Nothing in the record suggests that this had anything to do with tactical judgments and, had an evidentiary hearing gone forward, the evidence would have been exactly to the contrary. In essence, things "got away from" trial counsel and this most basic responsibility was never fulfilled.

In connection with the 2255 proceedings, Appellant's counsel set out to conduct the mental health examination that had not been conducted by trial counsel. The first step in this process was a nueropsychological examination performed by Michael Gelbort, Ph.D., of Chicago. After examining Mr. Nelson, Dr. Gelbort concluded that



Appellate Case: 07-3071 Page: 74 Date Filed: 11/26/2007 Entry ID: 3375881

Mr. Nelson indeed suffered from organic brain dysfunction. (*E.g.*, A26 at ¶ 4). Dr. Gelbort concluded that Mr. Nelson's neurological examination, as summarized in the 2255 motion, revealed:

> frontal lobe disturbance/dysfunction, which is a circumstance that affects [Mr. Nelson's] everyday thinking and reasoning capacities, and that testing [Mr. Nelson during the initial trial proceedings] would have shown that his brain does not conform with what is seen in individuals with normal functioning brains, and that his overall testing performance was consistent with and indicative of brain dysfunction.

(*Id.*) Dr. Gelbort also recommended that Mr. Nelson be evaluated for FASD, since his testing and observations were consistent with that diagnosis. (A101). Dr. Gelbort also recommended, given Mr. Nelson's familial history (two of his four brothers are diagnosed schizophrenics; one of this brothers is serving a life sentence in Texas for murder), that Mr. Nelson be evaluated by a clinical psychologist with a particular expertise in schizophrenia. (A80.) As noted earlier, Ms. Miller had also detected symptoms of mental illness, although she did not consider herself qualified to make a diagnosis.

7. <u>There is a reasonable possibility that the outcome of the case would have been different had trial counsel not failed to present all reasonably available evidence in mitigation</u>.

In *Wiggins*, the Court noted that in a death penalty scheme where a non-unanimous jury spares the defendant's life, such as the federal system, confidence in



Appellate Case: 07-3071 Page: 75 Date Filed: 11/26/2007 Entry ID: 3375881

the outcome is undermined where there is "a reasonable probability that at least one juror would have struck a different balance." 539 U.S. at 536. As the verdict sheet in the case demonstrates, the jury was unimpressed with the one-dimensional case in mitigation presented by trial counsel. However, even the evidence preliminarily developed in the course of the 2255 proceedings would have provided jurors with compelling reasons not to vote for death. The evidence was qualitatively different from the bad-childhood presentation the jury heard. Such evidence provides a neurological and biological explanation for what took place and why the "choices" that Mr. Nelson made rendered him less morally culpable than a normal person because his ability to make choices was impaired by cognitive and other deficits beyond his control.

**D. The failure to object to or move for a mistrial in the face of patently improper remarks in the government's two closing addresses was ineffective assistance of counsel.**

In this highly-charged prosecution, the government exercised no restraint in its efforts to stir and inflame the passions of the jury and misdirect it from its task. The types of remarks resorted to in this case have been condemned repeatedly by this and other courts. Nonetheless, trial counsel sat by and let it happen, not objecting once and not seeking the mistrial that should have been granted.

As set out earlier, in its initial closing, the prosecutors told the jury it should vote for death because, "If this crime doesn't call for the death penalty, what crime



Appellate Case: 07-3071 Page: 76 Date Filed: 11/26/2007 Entry ID: 3375881

does?"and that the jury should vote for death because, "We need to protect our children. We need to send a message to guys like the defendant . . . ." The death penalty should be imposed, the jury was told, because, "The community cries out for justice." Legally appropriate and relevant mitigating evidence was denigrated and trivialized as "all this excuse testimony" and a "guilt trip." Prosecutors argued that the jury should impose the death penalty for no better reason than the Government recommended it "without reservation."

In rebuttal summation, perhaps drawing comfort from the fact that there had been no objections to the opening summation, prosecutors described the case as about the "slaughter" of "our children." Legally appropriate and relevant mitigating evidence was denigrated, as it had been in the opening summation, as "an excuse," "the blame game," "the abuse excuse," and an effort by trial counsel to claim the crime was "somebody else's fault." The jury was told that the mitigating evidence was not worthy of the jury's consideration since it didn't "explain why" the crime occurred. Mr. Nelson was attacked as "a rotten human being" while his attorneys were accused of presenting "a smoke screen" in an attempt to "divert [the jury] from what this case is really about, the slaughter of an innocent." Trial counsel's efforts to persuade the jury of mitigating evidence were distorted into an effort to hide what the prosecution described as trial counsel's true motives, *i.e.*, "What they want you to do is have him escape justice." Mercy became equated with weakness. Appellant

became no longer a human being but "evil at his core." Jurors were urged to rely on the prosecution's experience by argument that, "There is no clearer call for the death penalty than there is in this case," and, later, "If not him, who? If not now, when? If killing and raping a kid isn't enough, then we don't need a death penalty. We don't need a death penalty."

Elevating the case to one of national significance, the jury was exhorted to a higher duty and to impose a sentence of death since the jury "represent[ed] the people of the United States in this case . . . ." Inviting a verdict premised on passion instead of reason, the prosecutors instructed the jurors to close their eyes and re-live the horrors of the victim's last hours, calling upon each member of the jury to "Think about . . . what that little girl was thinking," and to imagine,"What was she thinking?," and to, "Imagine what she experienced in that last part of her life," and to "Close your eyes, and . . . envision [the abduction and murder]." The prosecutors argued that a verdict of death was the only just verdict and that the jurors were "the dispensers of justice," and that the victim's mother "Waits for you to give her some justice. And justice in this case can only be had by imposing a sentence of death," essentially suggesting to the jury, *inter alia* that a sentence of death should be imposed because that's what the victim's survivors wished, and that, "[T]he death penalty was enacted for crimes like this."

These remarks were improper and violated Mr. Nelson's rights under the Fifth,



Appellate Case: 07-3071 Page: 78 Date Filed: 11/26/2007 Entry ID: 3375881

Sixth and Eighth Amendments of the United States Constitution. Moreover, trial counsel's and appellate counsel's failure to object to these remarks constituted ineffective assistance of counsel, and but for their deficient performance, there is a reasonable probability that the outcome of the proceedings would have been different.

At the time of Mr. Nelson's trial, remarks such as those quoted above had been held repeatedly to constitute reversible error. *See*, *e.g.*, *United States v. Johnson*, 968 F.2d 768 (8th Cir. 1992); *United States v. Lee,* 743 F.2d 1240 (8th Cir. 1984); *United States v. Solivan*, 937 F.2d 1146 (6th Cir. 1991); *United States v. Arrieta-Agressot*, 3 F.3d 525 (1st Cir. 1993).

In *Johnson*, the defendant was convicted of various narcotics offenses. During rebuttal closing argument, the prosecutor stated:

> [The defense attorney] says your decision to uphold the law is very important to his client. Your decision to uphold the law is very important to society. You're the people that stand as a bulwark against the continuation of what Mr. Johnson is doing on the street, putting this poison on the street.

*Johnson*, 968 F.2d at 769. Unlike this case, trial counsel in *Johnson* objected, but the trial court overruled the objection. The trial court also denied a defense motion for a mistrial, judgment of acquittal and a new trial. This Court reversed the conviction, stating:

> [T]he pressing nature of the [drug] problem does not give prosecutors license to encumber certain defendants with



Appellate Case: 07-3071 Page: 79 Date Filed: 11/26/2007 Entry ID: 3375881

> responsibility for the larger societal problem in addition to their own misdeeds. We conclude that by urging the jury to act as a 'bulwark against ... putting this poison on the streets,' the prosecutor in this case appealed to the jurors to be the conscience of the community in an improper and inflammatory manner.

968 F.2d at 771. Notably, the misconduct in question in *Johnson* constituted but a single remark made in closing. Citing to *Solivan*, discussed *infra*, this Court noted that even "a single misstep on the part of the prosecutor may be so destructive of the right to a fair trial that reversal is mandated." 968 F.2d at 771 (quoting *Solivan*, 937 F.2d at 1150). In analyzing the impact that the prosecutor's remarks likely had on the jury, this Court stated: "Given the fear and concern engendered by the national drug epidemic, we conclude it is likely that the prosecutor's comment urging the jury to strike a blow against the problem and the emotion it stirred 'influenced the jury by diverting its attention away from its task to weigh the evidence and submit a reasoned decision.'" 968 F.2d at 772 (quoting *Solivan*, 937 F.2d at 1153).[20]

In *Lee*, this Court reversed a conviction based on the following improper remarks made by the prosecutor in closing:

> Smuggling in 640 pounds of marijuana is definitely wrong.

---

[20]This Court also noted that no curative instruction was given by the trial court, and rejected the argument that standard jury instructions that arguments by counsel are not evidence were sufficient to cure the error: "Such a broadly sweeping rule would permit *any* closing argument, no matter how egregious." 968 F.2d at 772 (emphasis in original) (quoting *Newlon v. Armontrout*, 885 F.2d 1328, 1337 (8th Cir. 1989), *cert. denied*, 110 S. Ct. 3301 (1990)).



Appellate Case: 07-3071 Page: 80 Date Filed: 11/26/2007 Entry ID: 3375881

> It is a crime and they should be convicted. All the drug smugglers around should be told by your actions that bringing in marijuana is wrong.
>
> ...
>
> What you do as jurors is going to be watched here. You can better believe that each and every drug smuggler is watching what happens here today.

*Lee*, 743 F.2d at 1252-1253. In reversing, this court noted that "this argument was an emotional appeal calculated to persuade the jury to decide the case on other than the facts before it." 743 F.2d at 1253.

In *Solivan*, the defendant was convicted of seven counts related to a conspiracy to distribute narcotics. During the course of closing arguments, the prosecutor stated:

> What you're listening to is a wholesale distributor of narcotics, cocaine, discuss her business affairs and complain about her busy schedule, the lack of good product and the trouble she's having getting this stuff up here now. And I'd submit to you, folks, that she's been caught now. And I'm asking you to tell her and all of the other drug dealers like her that we don't want that stuff in Northern Kentucky and that anybody who brings that stuff in Northern Kentucky and...

*Solivan*, 937 F.2d at 1148. Trial counsel interrupted and objected, and the trial court declared a recess and heard argument outside the presence of the jury. The court sustained the objection, but denied the motion for mistrial. When the jury returned, the court issued a strongly worded curative instruction, admonishing the jury to ignore the prosecutor's remarks regarding sending a message to the community and



Appellate Case: 07-3071 Page: 81 Date Filed: 11/26/2007 Entry ID: 3375881

instructing the jury to try the case based solely on the evidence related to the defendant on trial. 937 F.2d at 1149. Despite the fact that the prosecutorial misconduct consisted of only this one instance, and despite the trial court's curative instruction, the Sixth Circuit held that the misconduct was "so destructive to defendant's right to a fair trial that it constitutes reversible error." 937 F.2d at 1150.

The *Solivan* court found that the defendant's right to a fair trial was violated because the prosecutor's remarks were designed to arouse the passion and prejudice of the jury by invoking the fear surrounding the highly publicized and pervasive social problem of the illegal drug trade. 937 F.2d at 1153. Invoking that fear improperly diverted the jury's attention away from its task of a reasoned deliberation of the evidence of guilt against a specific defendant, and instead encouraged the jury to view its verdict as a way to strike back against drug dealers and to protect its community. *Id*. The effect of these comments "was to suggest to the jury that, because of defendant's participation in the drug trade in northern Kentucky, the drug problem facing the jurors' community would continue if they did not convict her. It is error for a prosecutor to direct the jurors' desires to end a social problem toward convicting a particular defendant." *Id*. As the Court concluded, "the prosecutor's appeal to the jury to convict a defendant as a blow to the drug problem or to send messages to drug dealers cannot be other than highly prejudicial given the specific context of the case in the current social-political environment." *Id*. at 1154.



Appellate Case: 07-3071 Page: 82 Date Filed: 11/26/2007 Entry ID: 3375881

Additionally, the Court was not persuaded that the remarks in question were too limited to have prejudiced the trial. Rather, the Court stated that "a single instance of error may be so destructive of a defendant's right to a fair trial that reversal must follow." *Id*. at 1156. Furthermore, the Court found the prosecutor's remarks "to have been so gross as to probably prejudice defendant." *Id*. at 1157.[21]

In *Arrieta-Agressot*, the First Circuit reversed the defendants' convictions on account of the prosecutor's inflammatory "war on drugs" rhetoric in closing.

---

[21]The Sixth Circuit noted that in some instances, "an error may be so prejudicial that no cautionary instruction, however swiftly and forcibly given, can safely eradicate its effect." *Id*. at 1156. The *Solivan* Court found that the trial court's admonition to the jury was insufficient to neutralize the harmfulness of the prosecutor's remarks. As the Court noted:

> The admonition in this case was neither swiftly given nor did it sufficiently convey to the jury a sense of judicial disapproval of the remarks to dispel the harmful content and impact of the prosecutor's egregious statements. Even were the district court to have immediately and appropriately admonished the jury to disregard the remarks, we doubt seriously that any cautionary instruction could have safely eradicated the highly prejudicial effect of the prosecutor's statements in this case. The statements were deliberately injected into the proceedings to inflame the jurors' emotions and fears associated with the current drug epidemic that is reported daily in our newspapers and which threatens the very fabric of our society. ... The statements were so inflammatory in the context of the ongoing drug war that no charge could have sufficiently cured the prejudice.

*Id*. at 1157.



Appellate Case: 07-3071 Page: 83 Date Filed: 11/26/2007 Entry ID: 3375881

Although the remarks in question did not explicitly ask the jury to "send a message" by its verdict, it did use inflammatory language regarding the threat that drugs posed to the community. Specifically, the prosecutor repeatedly referred to the defendants as people who were knowingly trying to "poison the people and poison our children," 3 F.3d at 527, and who were "soldiers in the army of evil, in the army which only purpose [sic] is to poison, to disrupt, to corrupt." *Id*. Additionally, the prosecutor invited the jury to view itself as a bulwark against this societal evil: "And we are here today because we want to say no to drugs. We want to say no to what is corrupting and disrupting the society, because marijuana not only disrupts and corrupts our society but it also corrupts and disrupts any society in the world." *Id*.

In reversing, the First Circuit stated that "it is crystal clear that inflammatory language of this ilk falls well outside the bounds of permissible argument." 3 F.3d at 527. As the Court further noted, "such arguments are plainly improper. It is hard enough for a jury to remain dispassionate and objective amidst the tensions and turmoil of a criminal trial, and this is not the occasion for superheated rhetoric from the government urging jurors to enlist in the war on drugs." *Id*. Despite the fact that trial counsel had failed to object to the remarks, the Court reviewed the claim for plain error and held that "the prosecutor's repeated appeals to impermissible considerations might well have altered the verdict," especially given "the potency of the misstatements and the presence of direct exculpatory testimony[.]" 3 F.3d at 529.



Appellate Case: 07-3071 Page: 84 Date Filed: 11/26/2007 Entry ID: 3375881

Therefore, the Court found plain error warranting reversal.[22]

The United States Supreme Court has repeatedly recognized that prosecutorial misconduct claims are equally applicable to closing arguments in the penalty phase of a capital case. *See Caldwell v. Mississippi*, 472 U.S. 340 n.7 (1985) (death sentence vacated because prosecutor's improper closing argument during penalty phase made it appear to jury that responsibility for the death penalty would be borne by appellate court rather than by jury itself); *Romano v. Oklahoma*, 512 U.S. 1, 3 (1994) (considering petitioner's assertion that closing argument in penalty phase violated petitioner's due process rights, although concluding on the facts that no rights were violated). As this Court recognized in *Copeland v. Washington*, 232 F.3d 969, 974 n. 2 (8th Cir. 2000), "if there is any distinction between guilt and penalty phase arguments, it would seem that there should be a more searching review of the penalty phase as the Eighth Amendment is implicated." (Citing *California v. Ramos*,

---

[22] The Court rejected the claim that the trial court's standard instruction were sufficient to cure the error:

> [T]he danger was not so much that the jury would consider the prosecutor's statements to be "evidence." Rather, the threat was that the prosecutor's remarks would excite the jury, invite a partisan response, and distract its attention from the *only* issue properly presented by the case: whether the evidence established the crew members' guilt beyond a reasonable doubt.

3 F.3d at 529-530.



Appellate Case: 07-3071 Page: 85 Date Filed: 11/26/2007 Entry ID: 3375881

463 U.S. 992, 998-99 (1983): "The Court ... has recognized the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination").

Indeed, as recently held in *Weaver v. Bowersox*, 438 F.3d 832 (8th Cir. 2006), *cert. granted*, 127 S. Ct. 763 (2006), *cert. dismissed*, 2007 U.S. LEXIS 6082 (U.S. May 21, 2007), "send a message" arguments are particularly prejudicial when made in the penalty phase of a capital case because they violate the defendant's Eighth Amendment right to an individualized sentencing determination. In *Weaver*, the petitioner was convicted of being paid to kill a witness who was to testify against a drug dealer. In the penalty phase, the prosecutor urged the jury to sentence the petitioner to death in order to send a message, by its verdict in that case, to other drug dealers:

> And I'm going to beg you for the entire community and for society not to spare his life. I'm going to beg you for the right message instead of the wrong message. The right message is life? For an execution? That's the right message? That's the message you want to send to the drug dealers, the dope peddlers and the hit men they hire to do their dirty deeds: Life in prison is what you get when we catch you and convict you. Life in prison? That's the message you want to send to the scum of the world? That when we catch you and we're convinced you're guilty, we're going to give you life in prison? That's not the right message.

. . .

> The message has to be death for these types of people. That's the only message they are going to understand.
>
> The one thing you've got to get into your head, this is far more important than William Weaver. This case goes far beyond William Weaver. This touches all the dope peddlers and the murderers in the world. That's the message you have to send. It doesn't just pertain to William Weaver. It pertains to all of us, the community. They are our streets, our neighborhoods, our family. The message is death, not life. And you've just got to geer [sic] yourself to that.

438 F.3d at 837.

Citing a long line of supporting Supreme Court cases, this Court began its analysis by noting the longstanding and well-settled precedent that "the Eighth Amendment requires capital sentencing to be an individualized decision-making process." 438 F.3d at 841 (citations omitted). As the Court explained, the "send a message" argument by the prosecutor was a direct violation of that Eighth Amendment guarantee:

> The argument that a signal must be sent from one case to affect other cases puts a [sic] improper burden on the defendant because it prevents an individual determination of the appropriateness of capital punishment. Further, invoking a jury's general fear of crime to encourage the application of the death penalty in a particular case is unfairly inflammatory. Using the conscience of the community as a guiding principle for punishment puts too significant a burden on a single defendant.

*Id*. at 841 (internal citations omitted). Notably, it appears that the *Weaver* Court



Appellate Case: 07-3071 Page: 87 Date Filed: 11/26/2007 Entry ID: 3375881

decided that such arguments are *per se* prejudicial because they inherently divert the capital jury's attention away from an individual determination of the appropriateness of a death sentence for a given defendant.

This Court has also had occasion to consider other cases in which a claim of prosecutorial misconduct in the penalty phase closing arguments was raised. For example, in *Copeland v. Washington*, 232 F.3d 969 (8th Cir. 2000), this Court affirmed the grant of habeas relief based on claims that the prosecutor's penalty phase closing argument was improper, and that counsel was ineffective for failing to object to the improper argument. There, the prosecutor compared the defendant's case to gang shootings in Los Angeles and said the same thing was happening "right here in our backyards." 232 F.3d at 972. The prosecutor also told the jury that this was the worst crime ever committed in their state, and that if this case didn't deserve a death sentence, then no case did. The Eighth Circuit held that this "was the sort of argument that would result in 'mob justice' rather than result in reasoned deliberation," 232 F.3d at 975, and that the "improper argument would have had a significant prejudicial effect on the jurors[.]" *Id*. *See also Newlon v. Armantrout*, 885 F.2d 1328, 1340 -1342 (8th Cir. 1989) (affirming grant of habeas petition on the ground that prosecutor's arguments in penalty phase – that the petitioner deserved to be sentenced to death not only for what he had done, but in order to send a message to others that if they committed the same crime in their county, they would be



Appellate Case: 07-3071 Page: 88 Date Filed: 11/26/2007 Entry ID: 3375881

executed, too – violated due process). As this precedent makes plain, the government's summations in this case was an exercise in virtually non-stop prosecutorial misconduct.

The record establishes that the government's remarks in this case went far beyond the actual evidence the jury heard, and urged the jury to look beyond the facts of the case before it and make its decision based on the effect that its verdict might have by "sending a message" to defendants like Keith Nelson. This was part and parcel of a larger rhetorical strategy by the government to improperly encourage the jury to make its sentencing decision based on facts other than those before it, rather than on the individual characteristics of Mr. Nelson and the facts and circumstances of his case, as required by the Eighth Amendment.

For example, in its rebuttal closing, the government explicitly minimized the importance of any of Mr. Nelson's individual characteristics that weighed against death, and instead asked the jury to look beyond him. The government also attacked trial counsel and their motives, arguing that the defense was a deliberate "smoke screen" and that what trial counsel really wanted was to "divert [the jury] from what this case is really about, the slaughter of an innocent" and "What they want you to do is have him escape justice." Apart from the fact that these remarks improperly

impugned the integrity of trial counsel,[23] the government's argument also violated Mr. Nelson's Eighth Amendment right to an individualized sentencing determination. As the Supreme Court has made clear in *Lockett v. Ohio*, 438 U.S. 586 (1978), "the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U.S. at 604 (emphasis in original). The

[23] "Attacks on the sincerity and dishonesty of defense counsel are inappropriate." *United States v. Sblendorio*, 830 F.3d 1382, 1395 (7th Cir. 1987). Indeed, numerous courts have stated that arguments accusing trial counsel of putting up a "smoke screen" to confuse the jury are improper. *See*, *e.g.*, *Sblendorio*, 830 F.3d at 1396 (comments, such as "smoke screen" rhetoric, are "inappropriate and beneath the prosecutor); *United States v. Procopio*, 88 F.3d 21, 32 (1st Cir. 1996) (prosecutor's use of term "smoke screen" in argument was inappropriate); *United State v. Millar*, 79 F.3d 338, 343-344 (2d Cir. 1996) (same); *United States v. Matthews*, 240 F.3d 806, 819 (9th Cir. 2000) (in non-capital case where prosecutor characterized the defense argument as an "octopus squirting ink," and asserting, somewhat ambiguously, that "they're trying to get away, so they gotta hide what they're doing, they gotta hide all the facts, cloud the facts, throw up all kinds of dirt, squirt the ink," the court held that "In this case, the Government walked – and may have overstepped – the line by insinuating that trial counsel was trying to hide the truth. ... The statements made in this case are unworthy of a representative of our government").

Here, the prosecutor purported to be revealing to the jury the secret intentions and motivations of trial counsel, i.e., that their agenda was to divert the jury's attention away from the facts of the crime and to have the defendant escape justice. The effect of such improper argument, though, was not merely to impugn the integrity of trial counsel; it also served to disparage the mitigation evidence itself, as it encouraged the jury to view such mitigation evidence as an emotional ploy, rather than as a legitimate basis for returning a life verdict. Notably, counsel failed to object to any of these remarks at the time of trial or on appeal.



Appellate Case: 07-3071 Page: 90 Date Filed: 11/26/2007 Entry ID: 3375881

Court noted that "an individualized decision is essential in capital cases" because a death sentence is such an extreme penalty without the corrective mechanisms that are available with other forms of punishment. *Id*. at 605. Moreover, the Court has made it clear in subsequent cases that "the jury must be allowed *to consider and give effect to* mitigating evidence relevant to a defendant's character or record or the circumstances of the offense." *Penry v. Lynaugh*, 492 U.S. 302, 327-28 (1989) (emphasis added).

Here, the government's argument was improper because it characterized mitigation evidence as irrelevant to the jury's sentencing deliberation and encouraged the jury to simply *ignore* the proffered mitigation evidence. *See Abdul-Kabir v. Quatermain*, 127 S. Ct. 1654, 1672 n. 21 (2007) (jury may be improperly precluded from giving meaningful consideration to relevant mitigation evidence "not only as a result of the instructions it is given, but also as a result of prosecutorial argument dictating that such consideration is forbidden.") The thrust of the closing comments was to denigrate not only the proffered mitigation evidence, but the very concept of mitigation itself. Such disparagement of mitigation is improper, as the Supreme Court has repeatedly held that the sentencer must give due consideration to all relevant mitigating evidence in order to insure that a reliable verdict is imposed. *See*, *e.g.*, *Boyde v. California*, 494 U.S. 370, 377-78 (1990) (once the threshold for relevance has been met, the "Eighth Amendment requires that the jury be able *to*



Appellate Case: 07-3071 Page: 91 Date Filed: 11/26/2007 Entry ID: 3375881

*consider and give effect to*" a capital defendant's mitigating evidence) (emphasis added); *Eddings v. Oklahoma*, 455 U.S. 104, 114-15 (1982) (sentencers "may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration").[24]

---

[24]To the extent that the government was arguing in closing that mitigation evidence must bear some nexus to the offense itself before it may be considered by the sentencer, that claim is legally incorrect. In *McKoy v. North Carolina*, 494 U.S. 433 (1990), the Supreme Court set forth the relevance standard applicable to mitigating evidence in capital trials: the "meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding" than in any other context, and thus the general evidentiary standard– "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"-- applies. 494 U.S. at 440 (citation and internal quotation marks omitted). As the *McKoy* Court further noted: "Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *Id*. This "relevance" standard set forth for mitigating evidence is extremely liberal. *Payne v. Tennessee*, 501 U.S. 808, 822 (1991) ("We have held that a State cannot preclude the sentencer from considering 'any relevant mitigating evidence' that the defendant proffers in support of a sentence less than death. . . . [V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances") (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982)). Indeed, the Court has repeatedly emphasized that almost any evidence that might tend to show the defendant should not be put to death is admissible, and has explicitly rejected any requirement that mitigating evidence bear a nexus to the crime before it can be considered by the jury. *See Tennard v. Dretke,* 542 U.S. 274, 284-87 (2004); *Smith v. Texas*, 543 U.S. 37, 43-45 (2004) (noting that nexus requirement was "never countenanced" by any of the Court's precedent pre-dating *Tennard*). This "low threshold for relevance," *Tennard* , 542 U.S. at 285, is consistent with the Supreme Court's jurisprudence since *Lockett* that the Eighth Amendment requires the sentencer to consider any mitigating factor that is the basis for a sentence less than death. As the Court explained, "an individualized decision is essential in capital cases" because a death sentence is such an extreme penalty without the corrective mechanisms that are available with other forms of punishment. *Lockett*, 438 at 605.



Appellate Case: 07-3071 Page: 92 Date Filed: 11/26/2007 Entry ID: 3375881

It is clear that the thrust of the prosecutor's argument was not that the proffered mitigation should be given little weight, but rather that it would be "wrong" for the jury to rely on such evidence in determining the appropriate penalty since it amounted to nothing more than "the abuse excuse." What is particularly insidious about this form of argument is that it had the effect of camouflaging its impact on the jury's sentencing deliberations. As the Court made clear in *Brown v. Payton*, 544 U.S. 133, 162 (2005):

> The need for caution is plain: the constitutional concern with mitigating evidence is not satisfied by the mere ability of a defendant to present it. The sentencing body must have a genuine opportunity to consider it and give effect to it. *Penry v. Lynaugh*, 492 U.S., at 320, 106 L. Ed. 2d 256, 109 S. Ct. 2934. As the Court said in *Boyde*, "[p]resentation of mitigating evidence alone . . . does not guarantee that a jury will feel entitled to consider that evidence." 494 U.S., at 384, 108 L. Ed. 2d 316, 110 S. Ct. 1190. For this reason, the Court has found Eighth Amendment violations in circumstances precluding the sentencing body from considering the defendant's mitigating evidence, even where the evidence was extensive and where it accordingly might have been thought unnatural for the sentencer to disregard it. See, e.g., *Penry v. Johnson*, 532 U.S. 782, 788, 803-804, 150 L. Ed. 2d 9, 121 S. Ct. 1910 (2001); *Eddings v. Oklahoma*, 455 U.S., at 107, 113-114, 71 L. Ed. 2d 1, 102 S. Ct. 869.

This point was recently reiterated by the Supreme Court in an opinion authored by the Court's newest member, Justice Alito:

> [O]ur cases have firmly established that sentencing juries must be able to give meaningful consideration and effect to



Appellate Case: 07-3071 Page: 93 Date Filed: 11/26/2007 Entry ID: 3375881

> all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offense in the future.

*Abdul-Kabir v. Quatermain*, *supra*, 127 S.Ct. at 1664 (2007).

The record demonstrably proves that the government's argument was aimed at encouraging the jury to *ignore* the facts and evidence it received in the penalty phase regarding Mr. Nelson's character and background, and instead re-focus the jury's attention on facts other than those before it – namely, the potential effect that its verdict would have as a message sent to others who would "slaughter the innocent." Such argument was clearly improper and constituted a violation of Mr. Nelson's right to due process and a fair trial under the Fifth Amendment, and his right to an individualized sentencing determination under the Eighth Amendment.

*Strickland*'s reference to counsel's "thorough investigation of law," 466 U.S. 668, 690 (1984), indicates that reasonably competent trial counsel must be aware of applicable legal principles.[25] Here, reasonably competent counsel should have been

---

[25] Since *Strickland*, courts have held in a number of cases that failure to be aware of an applicable legal principle constitutes ineffective assistance. *See*, *e.g.*, *Williams v. Taylor*, 529 U.S. 362, 395 (2000) (trial counsel ineffective for failing to "conduct an investigation that would have uncovered extensive records graphically describing [petitioner's] nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records"); *Kimmelman v. Morris*, 477 U.S. 365, 385 (1986) (trial counsel's failure to make obvious and meritorious objection to tainted evidence was ineffective and "betray[ed] a startling ignorance of the law"); *Reagan v. Norris*, 365 F.3d 616, 621-22 (8th Cir. 2004) (trial counsel unreasonably failed to object to jury instruction that



Appellate Case: 07-3071 Page: 94 Date Filed: 11/26/2007 Entry ID: 3375881

aware that the above-cited remarks by the government were improper. At the time of Mr. Nelson's trial, this legal principle was well-established, as such remarks repeatedly had been held to constitute reversible error. *See*, *e.g.*, *United States v. Johnson*, 968 F.2d 768 (8th Cir. 1992); *United States v. Lee,* 743 F.2d 1240 (8th Cir. 1984); *United States v. Solivan*, 937 F.2d 1146 (6th Cir. 1991); *United States v. Arrieta-Agressot*, 3 F.3d 525 (1st Cir. 1993). Thus, counsel's failure to make appropriate objections and move for a mistrial based on the government's improper remarks constitutes deficient performance under *Strickland*. *Cf. Burns v. Gammon*, 260 F.3d 892, 896 (8th Cir. 2001) (trial counsel's failure to object to prosecutor's improper remarks in closing constituted ineffective assistance of counsel). *See also Hodge v. Hurley*, 426 F.3d 368, 385 (6th Cir. 2005) ("trial counsel's failure to object to any aspect of the prosecutor's egregiously improper closing argument was

---

omitted essential *mens rea* element of charged offense); *Blackburn v. Foltz*, 828 F.2d 1177, 1182-83 (6th Cir. 1987) (dicta stating counsel's lack of knowledge as to the admissibility of defendant's prior convictions was unreasonable), *cert. denied*, 485 U.S. 970 (1988); *Kubat v. Thieret*, 867 F.2d 351, 370 (7th Cir. 1989) (finding that trial counsel's failure to object to jury instructions that misstated applicable law was deficient performance under *Strickland*); *Goodwin v. Balkcom*, 684 F.2d 794, 819-20 (11th Cir. 1982) (holding counsel was ineffective for not understanding the "fruit of the poisonous tree" doctrine and, as a result, not challenging the admissibility of defendant's confession), *cert. denied*, 460 U.S. 1098 (1983). Moreover, even before *Strickland*, it was established that "failure to object properly or to preserve fundamental errors at trial may constitute ineffective assistance of counsel." *Smith v. Black*, 904 F.2d 950, 980 (5th Cir. 1990). *See*, *e.g.*, *Vela v. Estelle*, 708 F.2d 954 (5th Cir. 1983) (capital case holding counsel's failure to object to prosecutor's character witness on specific grounds so as to preserve the issue for appeal was ineffective assistance of counsel).



Appellate Case: 07-3071 Page: 95 Date Filed: 11/26/2007 Entry ID: 3375881

objectively unreasonable"); *Washington v. Hofbauer*, 228 F.3d 689, 709 (6th Cir. 2000) (trial counsel's failure to object to prosecutor's improper examination and closing arguments amounted to ineffective assistance of counsel; "One of defense counsel's most important roles is to ensure that the prosecutor does not transgress th[e] bounds [of proper conduct]."); *Martin v. Grosshans*, 424 F.3d 588, 591 (7th Cir. 2005) (defense counsel performed deficiently "for failing to move for a mistrial after the prosecutions's [improper and prejudicial] closing argument"); *Cargle v. Mullins*, 317 F.3d 1196, 1217 (10th Cir. 2003) (trial counsel ineffective for*, inter alia*, failing to object to instances of prosecutorial misconduct in closing argument).

The failure to object to these highly prejudicial and clearly over-the-line closing remarks constituted ineffective assistance of counsel.



Appellate Case: 07-3071 Page: 96 Date Filed: 11/26/2007 Entry ID: 3375881

## POINT THREE

A COA SHOULD ISSUE TO ALLOW APPELLATE REVIEW OF APPELLANT'S CLAIMS REGARDING THE INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL.

Appellant made the following specific claims regarding the inadequacy of appellate counsel and was prepared to prove them at a hearing. None of these claims were ever the subject of a hearing or, for that matter, any analysis by the district court:

(1) At the time Appellant's brief was prepared and filed by appellate counsel, neither of his appellate counsel had conducted an adequate review of the record or the applicable law in order to determine which issues should be presented on Appellant's behalf. Despite this lack of preparedness, appellate counsel knowingly filed an inadequate brief instead of seeking additional time from the Court of Appeals in which to prepare an adequate brief on Appellant's behalf.

With regard to this particular claim, 2255 counsel assured the district court they were prepared to prove this factual component of the overall claim of ineffective assistance of appellate counsel. What could possibly be "strategic" about a lack of preparedness and the knowing filing of an inadequate brief? In addition, Appellant presented the following on this issue:

(2) Appellate counsel failed to brief and argue the following issues, which individually or in combination, undercut confidence in the reliability of the outcome:

(a) Appellate counsel failed to argue on appeal that the indictment was inadequate as not alleging the requisite elements of capital



Appellate Case: 07-3071 Page: 97 Date Filed: 11/26/2007 Entry ID: 3375881

murder, including Appellant's age, his state-of-mind at the time of the offense, and the existence of aggravating factors.

(b) Appellate counsel failed to argue on appeal that the District Court abused its discretion in admitting numerous disturbing, gruesome, and inflammatory photographs. While such photographs may have had some tendency to prove issues of fact relevant to a guilt-phase trial, this was simply a penalty phase case where the defense did not contest the manner or nature of death.

(c) Appellate counsel failed to argue on appeal numerous instances of improper closing argument.[26]

(d) Appellate counsel failed to argue on appeal that the District Court abused its discretion in overruling trial counsel's objections that Agent Scott's hearsay testimony was merely cumulative to the anticipated testimonies of Penny Butler, Casey Butler, Paul Wilt, David Cunningham, Steven Underwood, Patti Griffith, Robert Howell and Lauri Torrez, and that the testimony violated the Confrontation Clause of the Sixth Amendment.

(e) Appellate counsel failed to argue on appeal that the District Court abused its discretion in not declaring a mistrial during Dr. Mark Cunningham's testimony when the Government alleged that mitigation didn't really matter in the context of the murder of a ten year old girl.

(f) Appellate counsel failed to argue on appeal that the District Court erred in finding that Officer Keith did not interrogate Appellant when he looked Appellant "dead in the eye," when a bystander asked, "What about the girl?" This "look" was designed to elicit an incriminating response; indeed, Officer Keith agreed that he hoped to get an answer from Appellant.

---

[26]The factual basis of this argument has been set forth *supra* at pp. 25-27 and in the discussion of trial counsel's failure to object to the improper argument at pp. 70-90.



Appellate Case: 07-3071 Page: 98 Date Filed: 11/26/2007 Entry ID: 3375881

(g) Appellate counsel failed to argue on appeal that the District Court erred in letting the Government ask Penny Butler if she was scared as she testified. Penny's fear had no tendency to prove or disprove any fact in issue; rather, it served only to inflame the passions and prejudices of the jury by implying that Appellant had scared Penny twice – once during the kidnapping and once during the trial.

(h) Appellate counsel failed to argue on appeal that the District Court abused its discretion and erred in refusing to let the defense ask Fred Lawrence whether the Bureau of Prisons was equipped to handle the security of Appellant. To bolster its theory that Appellant was a future danger to society, the Government elicited from Lawrence that Appellant poses a security risk, and the defense should have been allowed to explain, deny or refute that testimony.

(I) Appellate counsel failed to argue on appeal that the District Court abused its discretion and erred in refusing to let the defense ask Roger Moore, Jr., why two inmates would have claimed that he had called Appellant a "sissy" or a "punk." This evidence was not being offered to prove the truth of Moore's statement, but rather to show that he made them. Such evidence was necessary to put the altercation with Moore into context by showing that Moore had been goading Appellant.

(j) Appellate counsel failed to argue on appeal that the District Court abused its discretion and erred in letting the Government present evidence through Bruce Roberts that an inmate had told him that Appellant had threatened to harm the inmate's five year old daughter. This alleged statement of Appellant was never disclosed to the defense. Further, this was precisely the class of evidence that the District Court precluded Appellant from presenting through Roger Moore, Jr.

(k) Appellate counsel failed to argue on appeal that the District Court abused its discretion and erred in admitting testimony about an unrelated knife taken from Appellant's kitchen. This testimony had no tendency to prove or disprove any fact in issue; rather, it



Appellate Case: 07-3071 Page: 99 Date Filed: 11/26/2007 Entry ID: 3375881

simply diverted the jurors' attention away from the issue at hand – should Appellant live or die.

(l) Appellate counsel failed to argue on appeal that the District Court abused its discretion and erred when it admitted testimony that Paul Wilt had won an award from the Kansas City, Kansas Police Department, "as a testament to [his] quick thinking or quick action in this case." This evidence had no tendency to prove or disprove any fact in issue; rather, it served only to divert the jurors' attention away from the issues surrounding the only question the jurors had to answer – to wit: should Appellant live or die.

(m) Appellate counsel failed to argue on appeal other meritorious issues that individually, or cumulatively, denied Appellant the effective assistance of appellate counsel.

None of the claims presented with regard to appellate counsel were the subject of any hearing or fact-development. Without a hearing, the district court's conclusion that all of appellate counsel's decisions were somehow "strategic" is simply and completely lacking in factual support.

The Sixth Amendment guarantees the effective assistance of appellate counsel. *Smith v. Robbins,* 528 U.S. 259, 276 (2000). In the non-capital context, appellate counsel need not raise every non-frivolous claim of error. *Evitts v. Lucey,* 469 U.S. 387, 394 (1985), *citing Jones v. Barnes,* 463 U.S. 745 (1983). However, the ABA Guidelines take into account the need for heightened reliability in capital cases in identifying what a reasonably competent appellate attorney must do in a capital case.

The ABA commentary notes the paramount importance of appellate counsel's duty to "proceed, like all post-conviction counsel, in a manner that maximizes the client's ultimate chance of success." ABA Guidelines, *supra*; 31 HOFSTRA L.REV. at 1083 (2003):

> Practice varies among jurisdictions as to the limits of the appellate process and the relationship between direct appeals and collateral post-conviction challenges to a conviction or sentence. (footnote omitted). Issues that are only partially or minimally reflected by the record, or that are outside the record, should be exploited by appellate counsel as a predicate for informed decision making about legal strategy.
>
> As Subsection C emphasizes, it is of critical importance that counsel on direct appeal proceed, like all post-conviction counsel, in a manner that maximizes the client's ultimate chances of success. *"Winnowing" issues in a capital appeal can have fatal consequences.* Issues abandoned by counsel in one case, pursued by different counsel in another case and ultimately successful, cannot necessarily be reclaimed later. *When a client will be killed if the case is lost, counsel should not let any possible ground for relief go unexplored or unexploited.*

*Id.* (footnote omitted) (emphasis added).

Indeed, appellate counsel in capital cases must raise all arguable legal issues for the client; nothing less will facilitate the court's review of the death sentence. *See Ellis v. United States*, 356 U.S. 674, 674-675 (1958) (appellate counsel acted more like *amici curiae*; much more is required.) Counsel must "research relevant facts and law, or make an informed decision that certain avenues will not prove fruitful."



Appellate Case: 07-3071 Page: 101 Date Filed: 11/26/2007 Entry ID: 3375881

*United States v. Reinhart*, 357 F.3d 521, 525 (5th Cir. 2004) (counsel rendered ineffective assistance in failing to brief and argue Reinhart's accountability as it related to his sentence); *Roe v. Delo,* 160 F.3d 416 (8th Cir. 1998) (appellate counsel failed to argue that the trial court erroneously blurred the distinction between first and second degree murder); *Bell v. Lockhart,* 795 F.2d 655 (8th Cir. 1986) (appellate counsel rendered ineffective assistance in failing to properly advise client of the risks of waiving a direct appeal because post-conviction appeal was not an adequate substitute); *Matire v. Wainwright*, 811 F.2d 1430, 1438 (11th Cir. 1987) (ineffective assistance when appellate counsel failed to raise issue of prosecutor's improper use of defendant's post-arrest silence in state's case-in-chief); *Ballard v. United States*, 400 F.3d 404 (6th Cir. 2005) (appellate counsel rendered ineffective assistance in failing to raise *Apprendi*[27] error); *Mapes v. Tate*, 388 F.3d 187 (6th Cir. 2004) (appellate counsel rendered ineffective assistance in failing to argue that the trial court erred in refusing to let the jury consider mitigating factors related to an out-of-state conviction). *See also*, *Roe v. Delo*, 160 F.3d 416, 420 (8th Cir. 1998) ("Our review of these cases leaves us uncertain whether the Missouri Court of Appeals would have found plain error had this issue been raised in Roe's direct appeal. But the question before us is limited to whether there is a reasonable probability that the outcome would have been different, the test for determining whether Roe received

---

[27] *Apprendi v. New Jersey*, 530 U.S. 466 (2000).



Appellate Case: 07-3071 Page: 102 Date Filed: 11/26/2007 Entry ID: 3375881

constitutionally ineffective assistance of counsel.”).

Moreover, there is no doubt that Mr. Nelson was prejudiced by appellate counsel’s failure to raise the prosecutorial misconduct claim. In the context of appellate ineffectiveness, *Strickland* prejudice is demonstrated by showing that but for counsel’s failure to raise the claim, there is a reasonable probability that the petitioner “would have prevailed on his appeal.” *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *see also Link v. Luebbers*, 469 F.3d 1197, 1205-06 (8th Cir. 2006) (same). What is significant here is that even though appellate counsel would have had to argue the claim as “plain error” given counsel’s failure to preserve the issue at trial, it is quite clear that the Eighth Circuit considered this type of prosecutorial misconduct to be egregious and consistently held it to constitute reversible error. Indeed, at the time that Mr. Nelson’s case was on appeal, the Eighth Circuit had already reversed in a number of cases on a nearly identical claim. *See United States v. Johnson*, 968 F.2d 768, 771 (8th Cir. 1992); *United States v. Lee,* 743 F.2d 1240, 1252-1253 (8th Cir. 1984); *Copeland v. Washington*, 232 F.3d 969, 975 (8th Cir. 2000); *Newlon v. Armantrout*, 885 F.2d 1328, 1340 -42 (8th Cir. 1989). Moreover, considering the result in *Weaver v. Bowersox*, discussed *supra*, it is clear that had appellate counsel raised the prosecutorial misconduct issue on appeal, there is a reasonable probability that the Eighth Circuit would have similarly vacated Mr. Nelson’s death sentence and remanded for a new penalty phase hearing. Thus,



Appellate Case: 07-3071 Page: 103 Date Filed: 11/26/2007 Entry ID: 3375881

appellate counsel delivered deficient performance which resulted in prejudice to Mr. Nelson on his appeal. Here, the prosecutorial misconduct claim was an issue that was obvious from the trial record and, given the pattern of reversals in the Eighth Circuit on this very issue, competent appellate counsel should have known that, if raised, this claim would probably have resulted in a reversal on appeal. Failure to raise a claim under such circumstances is clearly deficient performance.

Plainly – as both sides contended in this case – an evidentiary hearing was needed to resolve this issue as well as for the district court to have made informed fact-findings and rulings of law. At the very least, "jurists of reason could disagree with the district court's resolution" of this issue and, as well, such jurists "could conclude that the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, *supra*, 537 U.S. at 336. Reasonable jurists could also disagree with the Court's decision to resolve the issue of ineffective assistance of appellate counsel without conducting a hearing or that the question of the district court's failure to conduct a hearing on this issue deserves encouragement to proceed further in this capital case.

## POINT FOUR

### A COA SHOULD ISSUE TO REVIEW THE DISTRICT COURT'S FAILURE TO CONDUCT THE HEARING THAT ALL PARTIES THOUGHT WAS NECESSARY.

A hearing into the claims advanced by Appellant in his 2255 motion – a hearing the government conceded below was required – was a necessary predicate to any fair or accurate resolution of Appellant's claims. Section 2255 provides for a hearing as follows: "Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, . . . ." 28 U.S.C. § 2255; *accord*, *Koskela v. United States*, 235 F.3d 1148 , 1149 (8th Cir. 2001) (cause remanded for an evidentiary claim that counsel rendered ineffective assistance in failing to call certain witnesses); *Donahue v. United States*, 2000 U.S. App. LEXIS 18 (8th Cir. 2000) (Evidentiary hearing was required to resolve a post-conviction claim of ineffective assistance of counsel where the government presented only the affidavit of defendant's trial counsel as evidence to rebut the claim); *Smith v. United States*, 182 F.3d 1023 (8th Cir. 1999) (Judgment dismissing prisoner's motion to set aside a criminal conviction was overturned, where the district court failed to hold an evidentiary hearing regarding prisoner's ineffective assistance of counsel claim); *Rose v. United States*, 513 F.2d 1251 (8th Cir. 1975) (A defendant was entitled to a hearing on his post-conviction motion to set aside his sentence based on his alleged incompetence at the time of his guilty plea, when there had never been a previous

federal hearing on the issue).

**A. The case law on this issue demonstrates that the district court's denial of a hearing was blatant and indefensible error that denied Appellant the opportunity to prove his claims.**

A movant is entitled to an evidentiary hearing on a 2255 motion unless the motion, files and records of the case *conclusively* show that the movant is not entitled to relief. Section 2255 states, in pertinent part:

> Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto.

28 U.S.C. § 2255 at ¶ 2. The Rules Governing Section 2255 Proceedings indicate that this language is intended to incorporate the standards governing evidentiary hearings in habeas corpus cases that was articulated by the United States Supreme Court in *Townsend v. Sain*, 372 U.S. 293, 312 (1963). *See* Advisory Committee Notes to Rule 8, Rules Governing Section 2255 Proceedings (incorporating Advisory Committee Notes to Rule 8, Rules Governing Section 2254 Cases).[28] There, the Supreme Court articulated the appropriate standard for determining when an

[28]The Advisory Committee Notes to Rule 8 of the Rules Governing Section 2255 Proceedings state: "The standards for § 2255 hearings are essentially the same as for evidentiary hearings under a habeas petition, except that the previous federal fact-finding proceeding is in issue [in determining whether a hearing is necessary] rather than the state's."

evidentiary hearing was mandatory as follows: "Where the facts are in dispute, the federal court in habeas corpus *must* hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding." 372 U.S. at 312 (emphasis added).[29]

In 2255 cases, of course, there is no prior habeas proceeding in which an evidentiary hearing could have been conducted on the movant's claims. Thus, the 2255 proceeding is the only vehicle through which a factual record may be made. An evidentiary hearing is warranted when (1) there are disputed issues of fact that cannot be conclusively resolved on the basis of the extant record alone, and (2) those facts,

---

[29] As the *Townsend* court further explained, the litigant must also demonstrate that the facts alleged, if true, would entitle the litigant to relief. 372 U.S. at 312. The *Townsend* court further identified six circumstances under which a federal court must grant an evidentiary hearing:

> If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

372 U.S. at 313.



Appellate Case: 07-3071 Page: 107 Date Filed: 11/26/2007 Entry ID: 3375881

if true, would entitle the movant to relief.

The United States Supreme Court addressed the question of evidentiary hearings in the context of a 2255 motion specifically in *Machibroda v. United States*, 368 U.S. 487 (1962).[30] In that case, the Court remanded for an evidentiary hearing to determine whether the movant's plea was involuntary because it was allegedly induced by promises made by the prosecuting attorney as to the length of the sentences that would be imposed. The movant submitted an affidavit claiming that on three separate occasions the A.U.S.A. had promised him that if he pleaded guilty he would receive a sentence of not more than twenty years; that the A.U.S.A. cautioned him not to tell his defense lawyer about the offer, and that if he didn't obey, the A.U.S.A. would raise two other previously uncharged robberies; and that the movant had sent letters to both the A.U.S.A. and the sentencing court regarding the

[30] It should be noted that *Machibroda* is cited in Rule 5 of the Rules Governing Section 2255 Proceedings, which concerns the government's answer and the movant's traverse. As the Advisory Committee Notes state:

> Numerous cases have held that the government's answer and affidavits are not conclusive against the movant, and if they raise disputed issues of fact a hearing must be held. *Machibroda v. United States*, 368 U.S. 487, 494, 495 (1962); *United States v. Salerno*, 290 F.2d 105, 106 (2d Cir.1961); *Romero v. United States*, 327 F.2d 711, 712 (5th Cir.1964); *Scott v. United States*, 349 F.2d 641, 642, 643 (6th Cir.1965); *Schiebelhut v. United States*, 357 F.2d 743, 745 (6th Cir.1966); and *Del Piano v. United States*, 362 F.2d 931, 932, 933 (3d Cir.1966).

Advisory Committee Notes to Rule 5, Rules Governing Section 2255 Cases.



Appellate Case: 07-3071 Page: 108 Date Filed: 11/26/2007 Entry ID: 3375881

misrepresentations of the A.U.S.A., to which the movant had received no reply.

The A.U.S.A. filed an affidavit in response denying any promises or coercion with respect to the movant's plea, but admitting to speaking with the movant in the county jail the day before the co-defendant's trial, and telling the movant that this was his last opportunity to tell the truth, and that the sentencing court might well take into consideration the movant's refusal to talk. The district judge decided, without a hearing, that the movant's allegations were false, observing that the court had received no letters from the movant mentioning any alleged agreement with the A.U.S.A. and that the movant had not complained in a timely manner when no request was forthcoming by the A.U.S.A. for a reduction of sentence.

The Supreme Court held that the district court should have conducted a hearing, stating:

> This was not a case where the issues raised by the motion were conclusively determined either by the motion itself or by the "files and records" in the trial court. The factual allegations contained in the Appellant's motion and affidavit, and put in issue by the affidavit filed with the Government's response, related primarily to purported occurrences outside the courtroom and upon which the record could, therefore, cast no real light. Nor were the circumstances alleged of a kind that the District Judge could completely resolve by drawing upon his own personal knowledge or recollection.

368 U.S. at 494-495. The Court rejected the government's argument that a hearing in the case would be futile because of the apparent lack of any other witnesses to the

alleged occurrences, other than the movant himself and the A.U.S.A.:

> The petitioner's motion and affidavit contain charges which are detailed and specific. It is not unreasonable to suppose that many of the material allegations can either be corroborated or disproved by the visitors' records of the county jail where the petitioner was confined, the mail records of the penitentiary to which he was sent, and other such sources. Not by the pleadings and the affidavits, but by the whole of the testimony, must it be determined whether the petitioner has carried his burden of proof and shown his right to a discharge. The Government's contention that his allegations are improbable and unbelievable cannot serve to deny him an opportunity to support them by evidence. On this record it is his right to be heard.

368 U.S. at 495 (citation and quotation marks omitted).

The Court in *Machibroda* held further that the specific and detailed factual assertions by the movant in that case, "while improbable, cannot at this juncture be said to incredible. If the allegations are true, the [movant] is clearly entitled to relief. Accordingly, we think the function of [§ 2255] can be served in this case only by affording the hearing which its provisions require." 368 U.S. at 496.

**B. The case law from this Circuit supports Appellant's position that a hearing was a necessary predicate to the resolution of his 2255 motion.**

As is detailed in the discussion below, this Court has held consistently that a district court abuses its discretion in denying to hold an evidentiary hearing where the movant alleges specific facts pertinent to the claims that were not conclusively



Appellate Case: 07-3071 Page: 110 Date Filed: 11/26/2007 Entry ID: 3375881

refuted by the extant record. Cases in which this Court has affirmed the denial of a hearing have in common the fact that the § 2255 motion either raised purely legal questions based on the existing record, or failed to allege specific facts which demonstrated that there were contested issues which could not be conclusively resolved based on the existing record.[31]

In *United States v. Unger*, 665 F.2d 251 (8th Cir. 1981), the movant alleged that her attorney had induced her to enter a guilty plea to kidnapping charges with the promise of probation if she would do so. She also alleged that her trial counsel told her that if she went to trial, she would probably receive the death penalty. The district court denied the motion without an evidentiary hearing. This Court remanded for further fact-finding proceedings because the movant's allegations "were neither conclusory nor wholly incredible in the face of the record." 665 F.2d at 254 (citation and internal quotation marks omitted). Citing *Machibroda*, 368 U.S. at 494-495, this Court stated:

> The Supreme Court has stated that an evidentiary hearing should be held where, as here, "[t]he factual allegations contained in the petitioner's motion and affidavit ... relat[e] primarily to purported occurrences outside the courtroom and upon which the record could, therefore, cast no real light" and where "the circumstances alleged [are not] of a kind that the District Judge could completely resolve by

[31] In his 2255 pleadings below, as set out in this motion, Appellant was specific about his allegations and equally specific about the witnesses he intended to call and the overall content of their testimony.



Appellate Case: 07-3071 Page: 111 Date Filed: 11/26/2007 Entry ID: 3375881

> drawing upon his own personal knowledge or recollection."

665 F.2d at 254. Citing § 2255, this Court further noted that because the motion, files and records of the case did not conclusively show that the movant was not entitled to relief, the movant was entitled to an opportunity to substantiate her claim at an evidentiary hearing. *Id.*

In *Shaw v. United States*, 24 F.3d 1040 (8th Cir. 1994), the movant was convicted of having sex with his eleven-year-old foster daughter. The movant alleged in his 2255 motion that trial counsel was ineffective for failing to rely on certain exceptions to the rape-shield law that would have allowed for the admission of evidence regarding the victim's past sexual behavior. The district court denied the motion without a hearing. This Court held that the district court had abused its discretion in failing to hold an evidentiary hearing on the IAC claim. Citing to the statutory language of § 2255, the Court noted that a district court "must hold an evidentiary hearing unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 24 F.3d at 1043. As this Court further noted, a claim may not be dismissed without a hearing unless "the claim is inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based." *Id.* (Citation omitted). This Court further found that it could not conclude that the movant's claim was inadequate on its face with respect to either



Appellate Case: 07-3071 Page: 112 Date Filed: 11/26/2007 Entry ID: 3375881

prong of *Strickland. Id*. In broad language, this Court also stated, "As is generally true when the petitioner's claim is that his trial counsel was constitutionally ineffective, the files and records of this case do not conclusively show that Shaw is entitled to no relief." *Id*.

More recently, in *Watson v. United States*, 493 F.3d 960 (8th Cir. 2007), the movant alleged that trial counsel was ineffective for failing to file a notice of appeal following movant's guilty pleas to one count of conspiracy to distribute cocaine. The district court denied the motion without a hearing, and determined that the movant "had not offered sufficient evidence that he had asked his attorneys to appeal." It characterized his allegation that he made such a request as a "bare assertion" insufficient to entitle him to relief or to a further inquiry. 493 F.3d at 962. This Court reversed and remanded for a hearing as to whether the movant had requested an appeal. Even where the only evidence in the record was a "bare assertion" by the movant, who was litigating the 2255 motion *pro se*, this Court held that because there was no evidence to the contrary in the record, an evidentiary hearing was warranted:

> Where petitioner's allegations, if true, amount to ineffective assistance of counsel, a hearing must be held unless the record affirmatively refutes the factual assertions upon which the claim is based. There is no evidence in the record to contradict [the movant's] assertion that he requested an appeal. Although the district court was not required to credit [the movant's] assertion, it was required to hold a hearing before making factual determinations about [the movant's] credibility.

493 F.3d at 964.

In *Neary v. United States*, 998 F.2d 563 (8th Cir. 1993), the movant alleged that counsel was ineffective for failing to appeal an obstruction of justice enhancement to his sentence. The district court denied the claim without a hearing on the ground that the enhancement was proper because the movant had admitted that he made material falsehoods to the probation officer. The district court relied on the PSR, which stated that the movant claimed that he had no knowledge of where certain drugs were obtained; denied receiving cash for the purpose of purchasing drugs; and denied that his purpose in traveling to certain cities was to buy drugs, but rather that the travel was for the sole purpose of buying auto parts. This Court also noted that in the commentary to the relevant Guidelines enhancement, the Commission stated that the enhancement does not apply when a defendant provides incomplete or misleading information, not amounting to a material falsehood, in respect to a pre-sentence investigation. Although the movant admitted that he was less than cooperative during his interview with the probation officer, this Court stated that it was not apparent how the movant's interview impeded the preparation of the PSR, nor did probation explain why the movant's statements were "material falsehoods." Moreover, the government offered no evidence of materiality at sentencing, and the trial court simply accepted the probation officer's unsupported assertion of materiality. As this Court then noted, "Thus, the record appears on its face



Appellate Case: 07-3071 Page: 114 Date Filed: 11/26/2007 Entry ID: 3375881

insufficient to support the obstruction enhancement, yet there is no explanation of why counsel, having properly raised the issue at sentencing, failed to raise it on appeal." 998 F.2d at 567. The matter was therefore remanded for an evidentiary hearing on the IAC claim. *Id.*

In *Latorre v. United States*, 193 F.3d 1035 (8th Cir. 1999), the movant had pleaded guilty to a firearms charge in connection with drug trafficking. Several months after he was sentenced, the Supreme Court issued its decision *Bailey v. United States*, 516 U.S. 137 (1995), which clarified the scope of conduct that constituted "use" for purposes of the firearm statute. The movant then filed a § 2255 motion, which the district court denied as procedurally defaulted for failing to take a direct appeal. Shortly thereafter, the Supreme Court issued its decision in *Bousley v. United States*, 523 U.S. 614 (1998), which held that a defendant could escape procedural default for failing to appeal if the defendant could establish actual innocence. The district court did hold a hearing, but only on the question of whether the movant could establish cause and prejudice for the default; the court did not hold a hearing on actual innocence, so the question was whether one was necessary now. This Court decided that on the record before it further hearings were necessary because the record on appeal was inconclusive as to the nature of the movant's "use" of the firearm. Neither the factual basis of the plea, nor the admissions made in the 2255 motion conclusively established that the movant would be unable to establish his

actual innocence. 193 F.3d at 1038-1039. The government had alleged in its papers that it had additional witnesses that could establish guilt and proffered their testimony. "However, these witnesses were not heard at the § 2255 hearing in the District Court. Assertions by counsel cannot foreclose an evidentiary hearing, at which such testimony can be taken and subject to cross-examination." *Id.* at 1039. Therefore, this Court remanded for an evidentiary hearing on the actual innocence claim.

In *Smith v. United States*, 182 F.3d 1023 (8th Cir. 1999), the movant alleged that trial counsel was ineffective for failing to object to the movant being tried in identifiable prison clothing. The movant submitted an affidavit stating that his attorney was supposed to make arrangements for him to be properly attired for court, and that he never consented to wearing prison garb for trial. Trial counsel submitted a counter-affidavit stating that the movant had indicated, prior to trial, that the movant would provide his own clothing. Counsel also stated that it was his practice to inquire whether a client wished to object to being tried in prison garb and, if so, would make an appropriate record. The district court denied the motion without an evidentiary hearing. This Court remanded the case for an evidentiary hearing, summarily noting that the district court had denied the motion without making any specific findings regarding the conflicting statements in the affidavits, therefore a hearing was warranted to resolve the facts that were in dispute. 182 F.3d at 1026.



Appellate Case: 07-3071 Page: 116 Date Filed: 11/26/2007 Entry ID: 3375881

In *West v. United States*, 994 F.2d 510 (8th Cir. 1993), the movant alleged that prior to appearing at his sentencing hearing, he had not reviewed the PSR, and that during a brief review of the PSR in the courtroom he pointed out several errors to his trial counsel, but she failed to direct the court's attention to all of them. The movant alleged that trial counsel was ineffective for failing to raise all of the mistakes in the PSR that he had pointed out to her, and in failing to make sure that the district court made specific findings of fact with respect to each of the factual inaccuracies raised during the sentencing hearing and indicate on the record whether it was relying upon the disputed facts in imposing its sentence. The district court denied the 2255 motion without an evidentiary hearing. Once again, this Court remanded for a hearing, pointing out that the government did not refute the movant's allegations that he and counsel were not given the PSR until immediately before the sentencing hearing and told to review it then. Nor did the government refute the claim that while movant was attempting to point out several errors in the PSR prior to the hearing, counsel repeatedly told him to be quiet, and that counsel failed to object to all of the errors in the PSR noted by the movant. The Court also noted that there was nothing in the record to indicate that trial counsel objected to not receiving the PSR more than ten days before the sentencing hearing. The Court, therefore, concluded that the movant's allegations "were sufficient to create a question of fact as to whether counsel's representations fell below an objective standard of reasonableness," 994

F.2d at 513 (citation and internal quotation marks omitted), and that the record did not conclusively show that the movant was entitled to no relief. *Id.*

In *Koskela v. United States*, 235 F.3d 1148 (8th Cir. 2001), the movant was convicted of stealing firearms from a supply company in Bismarck, North Dakota, and traveling the next day to Denver, Colorado, where he traded some of the firearms for cocaine. The movant filed a § 2255 motion alleging that trial counsel was ineffective for failing to put on an alibi defense and subpoena certain witnesses in support of that defense. The movant attached to his motion affidavits from the alibi witnesses. The government argued that these affidavits were not credible and provided an affidavit from trial counsel in which counsel stated that his client never mentioned the names of potential alibi witnesses and had made admissions about going to Bismarck to get "dope," and to accompanying two of the co-defendants to Colorado. The district court concluded, without an evidentiary hearing, that the alibi affidavits lacked credibility in the face of the government's pleadings and affidavits, and that the alibi affidavits did not undermine its confidence in the verdict. Citing to *Engelen v. United States*, 68 F.3d 238 (8th Cir. 1995), this Court held that the district court abused its discretion in failing to hold an evidentiary hearing and remanded for further proceedings on the ineffective assistance/alibi claim. As the Court noted, "A Section 2255 movant is entitled to an evidentiary hearing, however, unless the motion, files, and record conclusively show that he is not entitled to relief. Because



Appellate Case: 07-3071 Page: 118 Date Filed: 11/26/2007 Entry ID: 3375881

the record before the District Court contained sharply conflicting evidence, the Court abused its discretion in finding a hearing unnecessary." 235 F.3d at 1149.

On the other side of the coin, this Court has affirmed the denial of evidentiary hearings in 2255 proceedings, but only under quite narrow circumstances, such as where the 2255 motion contains factual allegations that, even if accepted as true, would not entitle the movant to relief. *See, e.g., Engelen v. United States*, 68 F.3d 238 (8th Cir. 1995), where the Court set out the following standard:

> A prisoner is entitled to an evidentiary hearing on a section 2255 motion unless the motion, files and records of the case conclusively show that the prisoner is not entitled to relief. Accordingly, a petition can be dismissed without a hearing if (1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.

68 F.3d at 240. (Citations omitted). *See also*, e.g., *Buster v. United States*, 447 F.3d 1130 (8th Cir. 2006), where the movant alleged that his trial counsel was ineffective for advising him to plead guilty to possessing a firearm following conviction for domestic abuse, movant claiming that his prior conviction involved a live-in girlfriend, who did not qualify as a "person similarly situated to a spouse" as described in the federal definition of domestic violence. The district court denied the motion without an evidentiary hearing and this Court affirmed noting that the district court did not err in failing to conduct a hearing because the undisputed facts



Appellate Case: 07-3071 Page: 119 Date Filed: 11/26/2007 Entry ID: 3375881

underlying the movant's prior conviction for domestic abuse could, in fact, support a conviction for the weapons charge. 447 F.3d at 1132. Thus, even if trial counsel had mistakenly believed at the time of the plea that the relevant federal law encompassed live-in girlfriends, it was not ineffective assistance. Given that the allegations in the motion, even if accepted as true, would not entitle the movant to relief, an evidentiary hearing was not warranted. *See also*, *Sanders v. United States*, 341 F.3d 720 (8th Cir. 2003).

### C. The witnesses identified by Appellant in the district court all had specific and relevant information to bring to the issues raised in the 2255 motion.

Appellant was explicit below about the witnesses he planned to call at a hearing. Thus, in requesting an evidentiary hearing, Appellant provided the district court with the following outline:[32]

- Patrick Berrigan, Esquire: Mr. Berrigan served as Appellant's trial counsel and would be expected to provide testimony on the broad range of issues set out in the 2255 motion. He did not enter the case until February 2001. Of particular relevance, Mr. Berrigan would be expected to testify that, as of the fall of 2001, Appellant's case was not ready to go to trial and that Mr. Berrigan should have moved to adjourn the trial, but did not do so. Mr. Berrigan was also expected to testify that Appellant's decision not to cooperate with the government's mental

[32]This listing was initially set forth in Appellant's reply to the government's answer to his 2255 motion. (DE-52.) The outline was not intended to serve as a complete formal proffer of the proposed testimony, beyond a good faith effort to indicate that each proffered witness had relevant information to bring to the dispute. Neither was the list intended to be exhaustive in the sense of setting out the universe of potential witnesses.

health experts was on the advice of his counsel and not an independent decision reached by Appellant. Mr. Berrigan was also expected to testify that despite having funding for mental health experts, no mental health evaluation of Appellant was undertaken until October 2001, shortly before the commencement of the trial.

- Susan M. Hunt, Esquire: Ms. Hunt served as Appellant's trial counsel and was expected to provide testimony on the broad range of issues set out in the 2255 motion. She served as Appellant's counsel from early in the case. In addition to confirming certain statements by Mr. Berrigan, Ms. Hunt was expected to testify about the efforts she made to gather evidence in mitigation and to supervise the activities of mitigation specialist Tena Francis. By the time the case came to trial in the fall of 2001, it was Ms. Hunt's belief that an adjournment should have been requested. She was expected to confirm the fact that Appellant's refusal to be evaluated by government mental health experts was on the advice of counsel. Ms. Hunt also served as one of Appellant's appellate counsel and will provide testimony regarding appellate representation and the process through which issues were selected for appellate briefing.

- Jennifer Herndon, Esquire: Ms. Herndon served as one of two of Appellant's appellate counsel. She was expected to testify that, because of time constraints and other pressures, she was unable to conduct an adequate review of the record of Appellant's case and, as a result, did not file a complete and adequate appellate brief.

- Daniel V. Foster, Psy.D.: Dr. Foster was a psychologist who evaluated Appellant over the weekend of October 5 and 6, 2001. Dr. Foster would have described his evaluation as, in essence, only a beginning and as "too little, too late." Dr. Foster never completed his evaluation and was not asked to do so.[33] In his report, he described his

[33]The record of this case reflects that on September 4, 2001, Appellant's trial counsel filed a notice that the defense would offer expert evidence on the issue of Appellant's mental condition. However, a motion to have Dr. Foster approved to serve as an expert was not even filed until September 17, 2001. The first (and only) motion to have Dr. Foster travel to interview and evaluate Appellant was not filed until October 2, 2001. It is hard to imagine a clearer example of a defense team in



Appellate Case: 07-3071 Page: 121 Date Filed: 11/26/2007 Entry ID: 3375881

time with Appellant as "primarily spent in trust building and history taking."

- Tena Francis: Ms. Francis served as the mitigation specialist in Appellant's case. The application to have her serve in that capacity was filed on December 12, 2000. Ms. Francis was expected to testify regarding the incomplete status of the mitigation investigation when she entered the case and the difficulties she encountered in conducting her investigation. She was expected to testify that in June 2001 she advised trial counsel, in a detailed memorandum and telephone conference, of many areas of the ongoing mitigation investigation that needed to be completed prior to trial. Ms. Francis was expected to testify that she had very little involvement in the case following the June memo and conference and, to the best of her knowledge and ability, very few of the necessary investigative steps were accomplished.

- Deborah Haddid: Ms. Haddid was an investigator who worked for Ms. Francis. She was expected to testify about the investigative steps that she took in attempting to prepare a case-in-mitigation. As importantly, Ms. Haddid was expected to testify regarding investigative steps that were not taken.

- Jill Miller, MSSW: Ms. Miller is a highly-experienced and respected mitigation investigator. She was appointed by the district court, on the application of Appellant's counsel, to assess the status of the mitigation investigation at the time Appellant's case came to trial and to develop a plan for completing an adequate mitigation investigation so that this Court would be in a position to make an accurate judgment regarding the failure of trial counsel to conduct an adequate investigation and to present an adequate penalty-phase. When additional funding was sought from the district court to have Ms. Miller continue her work, the application was denied.

- Michael M. Gelbort, Ph.D.: In early 2001, Appellant's trial counsel secured funds to conduct a neuropsychological examination of Appellant. That examination, however, was never done. The district court subsequently approved a motion brought by 2255 counsel to

full scramble-mode, unable to arrive at reasonable tactical judgments.

> conduct such an examination. In 2005, Dr. Gelbort examined Appellant for evidence of organic brain dysfunction and reached the conclusion that there was such evidence.

(DE-52.)

Additionally, Appellant noted in his reply 2255 memorandum (DE-52) that it would be necessary to call as witnesses Appellant's prior counsel in order to establish a record of the nature of any investigation conducted and the capital qualifications of those attorneys. Appellant also noted that he intended to present several mitigation witnesses not called by Appellant's trial counsel. Finally, Appellant also noted in prior pleadings that Natalie Novik Brown, Ph.D., a psychologist expert in the diagnosis of Fetal Alcohol Spectrum Disorder, had completed the first stage of a two-stage analysis and had reached a tentative initial conclusion that Appellant fell within that diagnosis. Dr. Brown's analysis was, at the time, ongoing.

It is also respectfully noted, and obvious, that many of the claims presented in Appellant's 2255 motion focused on matters counsel *failed* to pursue and, therefore, no tactical judgment could have been assigned to those decisions without at least hearing from counsel. It is equally obvious that the district court's conclusion that all of trial and appellate counsel's actions were the result of strategy is wholly without factual support.

Indeed, in dismissing the motion without a hearing, the district court appears to have tried to have matters both ways. On the one hand, the district court accepted

as true the allegations in Appellant's motion to vacate his conviction and sentence. On the other hand, the Court made contrary "fact-findings" with no basis in the record for doing so, concluding, for example, that, "The claims of ineffective assistance of trial and appellate counsel fall within the broad perimeters of trial strategy." In fact, nothing in the record supported that conclusion. Moreover, Appellant had made specific factual assertions in his 2255 motion, that should have precluded such a finding without a hearing. The government, as noted in the district court's order dismissing the 2255 motion, had "requested that movant's trial and appellate counsel submit affidavits or to a hearing to further explain their reasons for this strategy . . . ." (DE-39.) Although the references to "this strategy" and "further explain" are unclear, at such a hearing appellant's trial and appellate counsel, and other witnesses, would have testified subject to cross-examination and penalties of perjury that there were no strategic or tactical components, let alone reasonable or good explanations, for many of the actions, and inactions, of counsel.

**D. Since it can hardly be said that jurists of reason could not differ over the need for a hearing (indeed, such jurists would likely *agree* on the need for a hearing), and since it cannot be said that the moving papers were such that they *conclusively* demonstrated that relief was not possible, a COA should issue to review this ruling.**

There are numerous open and undeveloped questions regarding the effectiveness of counsel's performance, both at trial and on direct appeal. Those questions cannot be resolved *conclusively*, the statutory standard, on the exiting



Appellate Case: 07-3071 Page: 124 Date Filed: 11/26/2007 Entry ID: 3375881

record. It was for that reason that the government recognized below the need for further fact development by way of a hearing since the existing record did not provide a sufficient factual basis for assessing the reasonableness of trial and appellate counsel's performance. Given the wealth of promising mitigation evidence uncovered as part of the incomplete 2255 investigation, the district court's ruling that, "the records and file conclusively show that petitioner is entitled to no relief," (A123) is plainly incorrect. For example, there is nothing in the record that *conclusively* establishes any reasonable explanation for why counsel failed to investigate and present any of the evidence in mitigation that was uncovered as part of the incomplete investigation conducted by 2255 counsel. Nor did the district court refer to any specifics in its order denying the 2255 motion. (Indeed, the district court referred to very little in that order.) Moreover, given the fact that neither trial counsel nor appellate counsel testified or otherwise explained their actions and omissions, there is literally *no* record upon which the district court could have relied to find that the record *conclusively* demonstrates that counsel rendered constitutionally effective assistance. Jurists of reason could disagree over this issue and, in the context of a capital case and the importance of the district court's failure to hold a hearing, a COA should issue on this question.



Appellate Case: 07-3071 Page: 125 Date Filed: 11/26/2007 Entry ID: 3375881

## POINT FIVE

### A COA SHOULD ISSUE TO ALLOW APPELLATE REVIEW OF THE DISTRICT COURT'S DENIAL OF FUNDING NEEDED TO ESTABLISH THE CLAIMS OF INEFFECTIVE ASSISTANCE.

As stated earlier, in a series of funding motions filed in the fall of 2005, Appellant's counsel requested, *inter alia*, the following funding of expert and investigative assistance: (1) on October 30, 2005, funding of additional hours for the services of mitigation specialist Jill Miller, MSSW; (2) on November 23, 2005, funding for the services of a clinical forensic psychologist; and (3), on December 5, 2005, funding for an attorney to evaluate trial counsel's representation and potentially to testify as an expert in the trial and preparation of capital cases. On February 28, 2006, the district court issued an order denying all three funding requests, finding, in essence, that nothing that Appellant could present would make a difference.

The Court later denied Appellant's motion for additional funding for Dr. Natalie Novik Brown, an expert in Fetal Alcohol Spectrum Disorder ("FASD"). The Court did fund preliminary work by Dr. Brown, but when she reached an initial conclusion that Appellant in fact likely suffered from FASD, the Court denied the further funding needed to conclude the examination and evaluative process. Respectfully, that approach made no sense. If the outcome of the examination was going to be irrelevant, why fund the initial inquiry?



Appellate Case: 07-3071 Page: 126 Date Filed: 11/26/2007 Entry ID: 3375881

The denial of adequate funding was a denial of due process of law and equal protection since Appellant, an indigent, was unable to fund these experts on his own. *Cf. Ake v. Oklahoma*, 470 U.S. 68, 83 (1985). The denial of funding, as well, violated Appellant's entitlement to a full and fair hearing. Thus, the district court was left free to deny Appellant's allegations of ineffective assistance of counsel as unproven because the court had declined to provide the resources necessary to prove his claims. *Cf. Davis v. Norris*, 423 F.3d 868, 875 (8th Cir. 2005) (Noting COA granted on the issue of failure to appoint psychiatric expert).

Although never squarely addressed in this Circuit, there is support from other courts for the proposition that appeal from the denial of funds for expert services does not require the issuance of a COA because the right to such funding is statutory in nature. In *McFarland v. Scott*, 512 U.S. 849 (1994), the United States Supreme Court held that a petitioner in a capital § 2254 proceeding has a statutory right to qualified legal counsel prior to the filing of a formal, legally sufficient petition. 512 U.S. at 855. In construing the relevant statutory provision, 21 U.S.C. § 848 (q),[34] the Supreme Court noted that the statute also created a right to investigative and expert services upon a showing that such services were reasonably necessary for the representation of the capital petitioner:

---

[34]This statutory provision was repealed effective March 9, 2006 by the USA Patriot Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, Title II, §§ 221(4), 222 (c), 120 Stat. 192, 231-32 (2006), and recodified, in pertinent part, at 18 U.S.C. § 3599.



Appellate Case: 07-3071 Page: 127 Date Filed: 11/26/2007 Entry ID: 3375881

> Section 848(q)(4)(B) expressly incorporates 21 U.S.C. § 848 (q)(9), which entitles capital defendants to a variety of expert and investigative services upon a showing of necessity ... The services of investigators and other experts may be critical in the preapplication phase of a habeas corpus proceeding, when possible claims and their factual bases are researched and identified.

*Id.* (block quotation of § 848 (q)(9) omitted).

The relevant statutory provision, now 18 U.S.C. § 3599, (B), states in pertinent part:

> In any post conviction proceeding under section 2254 or 2255 of Title 28, seeking to vacate or set aside a death sentence, any defendant who is or becomes financially unable to obtain adequate representation or investigative, expert, or other reasonably necessary services shall be entitled to the appointment of one or more attorneys and the furnishing of such other services in accordance with subsections (b) through (f).
>
> . . . .
>
> (f) Upon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt or the sentence, the court may authorize the defendant's attorneys to obtain such services on behalf of the defendant and, if so authorized, shall order the payment of fees and expenses therefor[.]

18 U.S.C. 3599.

There is no substantive difference between the text of § 848(q) and § 3599 with respect to the funding of expert services. Moreover, the relevant legislative history



Appellate Case: 07-3071 Page: 128 Date Filed: 11/26/2007 Entry ID: 3375881

indicates that Congress did not intend to lessen or otherwise alter the availability of expert services in capital habeas cases through this re-codification. As noted in the relevant Congressional Conference Report:

> Section 222 of the conference report[35] is a new provision. This section transfers existing statutes from the death penalty procedures contained in title 21 of the United States Code to the death penalty procedures in title 18 of the United States Code. This section requires that any death-penalty eligible defendant who is or becomes financially unable to obtain adequate representation or investigative, expert, or other reasonably necessary services will be entitled to the appointment of one or more attorneys and the furnishing of such other services.

Conference Report on H.R. 3199, USA Patriot Improvement and Reauthorization Act of 2005, Cong. Rec. – House H11279, H1306 (Dec. 8, 2005).

As other lower courts have held, appeal from the denial of funds for expert services does not require the issuance of a COA. Rather, such denials are reviewable on their own merits and the governing standard is whether the movant made a showing that the requested services were "reasonably necessary." *See*, *e.g.*, *Smith v. Dretke*, 422 F.3d 269, 287-88 (5th Cir. 2005) (COA is not necessary to appeal the denial of funds for expert assistance of psychologist); *Riley v. Dretke*, 362 F.3d 302, 307 (5th Cir. 2004) (COA unnecessary to appeal denial of funds to investigate petitioner's background; rather, petitioner must show that "he is indigent and that the

[35] This is a reference to section 222 of House Report 109-333 (2005), which repealed §848(q) and replaced it with what is now § 3599.



Appellate Case: 07-3071 Page: 129 Date Filed: 11/26/2007 Entry ID: 3375881

requested services are 'reasonably necessary' for his representation. This Court has construed 'reasonably necessary' to mean that a petitioner must demonstrate 'a substantial need' for the requested assistance.") (citations omitted); *Barraza v. Cockrell*, 330 F.3d 349, 351 (5th Cir. 2003) (petitioner "does not need a certificate to appeal the district court's order denying funding for additional psychiatric, psychological, and medical testing pursuant to 21 U.S.C. § 848 (q)(4)(B)."); *Clark v. Johnson*, 202 F.3d 760, 768 n.1 (5th Cir. 2000) ("while a COA is required for habeas appeals, there is no such requirement for appeals brought under § 848 (q)(4)(B)"; claimants under § 848 (q)(9) "need only show indigence and that the services requested are 'reasonably necessary.'")

As numerous court have held, a movant in a capital habeas proceeding is statutorily entitled to funding for investigative and expert services when such services are necessary for the factual development of a claim that trial counsel were ineffective in failing to adequately investigate, develop and present mitigating evidence. For example, in *Brinkley v. Warden*, No. 4:06CV0110, 2007 U.S. Dist. LEXIS 37911 (N. D. Ohio May 24, 2007) (Memorandum of Opinion and Order), the district court granted in part a request for funds for investigative and expert services. In analyzing the request, the court noted:

> In a capital case, an individual seeking a writ of habeas corpus (28 U.S.C. § 2254) to vacate a state court conviction is entitled to expert assistance. 18 U.S.C. §



Appellate Case: 07-3071 Page: 130 Date Filed: 11/26/2007 Entry ID: 3375881

> 3599 (formerly 21 U.S.C. § 848(q)(9)). The statute allows appointment of experts only if the petitioner can show that such services are reasonably necessary for his representation. The statute does not define "reasonably necessary." However, Congress intended to provide prisoners with all resources needed to discover, plead, develop, and present evidence determinative of their colorable constitutional claims. The determination of a habeas claim often depends on the full development of factual issues, and experts play an important role in the fact-finding process. Specific allegations must be presented which demonstrate that the petitioner is confined illegally and entitled to relief. Otherwise, the appointment of an expert is not 'reasonably necessary.'
>
> Although there are few cases defining when appointment of experts is "reasonably necessary," the request must elucidate some factual allegation of a claim yet unexplored. The services of an expert are reasonably necessary if either: (a) the services are needed to prepare the claims in the habeas petition, or to obtain evidence not yet acquired to support a claim in the habeas petition; or (b) the habeas petition raises claims entitling the petitioner to a hearing at which an expert would testify. Also, a request for appointment of experts should set forth both the necessity for the expert and the expert's exact duties. A district court's decision to grant or deny expert or investigatory funds and the amount allowed is discretionary.

2007 U.S. Dist. LEXIS 37911 at *1 - *3 (internal quotation marks and citations omitted).

Citing to *Rompilla* and *Wiggins*, the district court noted that the United States Supreme Court "has unequivocally declared that a thorough and complete mitigation investigation is absolutely necessary in capital cases." *Id*. at *10. Here, "the



Appellate Case: 07-3071 Page: 131 Date Filed: 11/26/2007 Entry ID: 3375881

mitigation phase of the trial was very short," *id*. at *11, consisting of the testimony from the petitioner, his mother, sister and two aunts. *Id*. Referring to an affidavit prepared by a psychologist that evaluated records ignored by trial counsel and who interviewed witnesses that were either ignored or insufficiently considered by trial counsel, the district court noted that there potential mitigation evidence concerning the petitioner which was never presented at trial. *Id*. Therefore, the district court approved the petitioner's request for funds to hire a "psychologist/psychiatrist or mitigation specialist." *Id*.

In *Bell v. King*, No. 7:04CV00752, 2006 U.S. Dist. LEXIS 18365 (W.D. Va. April 11, 2006) (Opinion and Order), the district court granted in part the petitioner's requests for investigative and expert services. In analyzing § 848(q)(9), the district court stated:

> While the statute does not provide guidance as to what constitutes a "reasonable necessity," courts have held that the services of an expert are reasonably necessary when a substantial question exists over an issue requiring expert testimony for its resolution and the defendant's position cannot be fully developed without professional assistance. In other words, established habeas corpus and death penalty precedent suggests that Congress intended to provide prisoners with all resources needed to discover, plead, develop, and present evidence determinative of their "colorable" constitutional claims. Expert services are not reasonably necessary if the petitioner would not be able to win on the merits regardless of the expert's findings.

2006 U.S. Dist. LEXIS 18365 at *4-*5 (internal quotation marks and citations



Appellate Case: 07-3071 Page: 132 Date Filed: 11/26/2007 Entry ID: 3375881

omitted). The district court ruled that a fact investigator was reasonably necessary to the petitioner's claim that trial counsel were ineffective in failing to interview available witnesses and develop available mitigation evidence at trial because any such uncovered evidence would be relevant to the prejudice prong of *Strickland*. *Id.* at *10.

In *Flores v. Quartermain*, No. 3-07-CV-0413-M, 2007 U.S. Dist. LEXIS 45934 (N.D. Tex. June 22, 2007) (Memorandum Order), the district court granted the petitioner's request for a hypnosis expert and an investigator. In construing § 3599 (f), the court held that "a petitioner under a sentence of death is entitled to expert assistance if the petitioner is indigent and the expert services are reasonably necessary for his representation." 2007 U.S.Dist. LEXIS 45934 at * 2. The court also noted that this required the petitioner to demonstrate a "substantial need" for the requested assistance. *Id.* As the court explained:

> In order to establish a "substantial need" for investigative or expert assistance, a petitioner must show:
>
> 1. A nexus between the investigative or expert services and a habeas claim of constitutional dimension;
>
> 2. that the need for an investigator or expert did not result from petitioner's failure to develop his claims in state court; and
>
> 3. that the claims sought to be developed are not barred from federal habeas review.



Appellate Case: 07-3071 Page: 133 Date Filed: 11/26/2007 Entry ID: 3375881

*Id.* at *2-*3 (citations omitted).

The court noted that the petitioner in that case satisfied the first prong, as his claims of ineffective assistance and prosecutorial misconduct implicated significant constitutional rights under the Sixth and Fourteenth Amendments. Specifically, the petitioner alleged that trial counsel was ineffective for failing to call an alibi witness that could have established his whereabouts on the day of the murder, and that the prosecutor threatened that same witness with the loss of her children if she testified. The petitioner also alleged that another prosecution witness was tainted by improper hypnosis techniques. *Id.* at *4.

With respect to the second prong, the district noted that the record was silent as to whether state habeas counsel requested an investigator and an hypnosis expert to develop him claims in state habeas. The record indicated that the state habeas petition was decided on the basis of the extant record and affidavit testimony, without a hearing, which "suggest[ed] that the petitioner was not permitted to develop his case in the manner he requested." *Id.* at *5 n.3. Absent "some evidence to suggest that petitioner failed to adequately develop his claims in state court," *id.*, the district court decided to exercise its discretion to allow the petitioner to fully develop and investigate those claims in federal court. *Id.*

With respect to the third prong, the district court rejected the state's argument that the missing alibi witness and hypnosis claims were procedurally barred:

> Although further development of petitioner's missing alibi witness and hypnosis claims may result in "material additional evidentiary support" that was not presented to the state court, thereby subjecting those claims to dismissal on exhaustion grounds, petitioner is not required to make such a showing as a condition to obtaining investigatory and expert funds. Nor is petitioner required to establish any exception to a potential procedural bar before his federal writ is even filed. The petitioner in this case seeks funds to hire an investigator and an expert to fully develop potential claims of constitutional dimension. ... To deny him that opportunity because of the possibility that facts uncovered by the investigator and provided by the expert may constitute "material additional evidentiary support" that render the claims unexhausted would frustrate the purpose of section 3599(f).

*Id*. at *6-*8 (internal citations and block quotation omitted).[36]

In *Patterson v. Johnson*, No. 3:99-CV-0808-G, 2000 U.S. Dist. LEXIS 12694 (N.D. Tex. August 31, 2000) (Memorandum Order), the district court granted the petitioner's request for investigative funds to develop a claim that trial counsel failed to investigate and develop available mitigation evidence at trial. The magistrate judge had previously recommended that the funds be denied until the petition was filed, on the ground that the petitioner first had to establish cause and prejudice as to why he failed to present this claim in state habeas. In rejecting the magistrate judge's approach the district court noted that:

[36] Unlike § 2254 petitions, the exhaustion rule which the *Flores* court discussed is not implicated in the Appellant's case, as there is no state fact-finding procedure that exists prior to the filing of a § 2255 motion with the district court.

> [F]or the district court to adopt such a holding would place him in a difficult, if not impossible, predicament. In order to obtain relief in a federal post-conviction proceeding, Patterson must allege facts which, if true, would entitle him to relief. Without investigative funds to help identify promising habeas corpus claims, Patterson's counsel may not be able to marshal the facts needed to make a good-faith allegation of a federal constitutional violation. Even if he could allege facts which, if true, would establish "cause" for the procedural default, without investigative funds at the pre-application stage, Patterson may be unable to show a constitutional violation with sufficient particularity (and perforce, would be unable to show "prejudice"). As the Supreme Court noted in *McFarland v. Scott*, 512 U.S. 849, 855, 129 L. Ed. 2d 666, 114 S. Ct. 2568 (1994), the investigative resources provided under 28 U.S.C. § 848(q)(9) "may be critical in the preapplication phase of a habeas corpus proceeding, when possible claims and their factual bases are researched and identified."
>
> Ultimately, the court concludes that it makes little sense to force Patterson to first try to make a good faith claim of a constitutional violation before supplying him with the resources to investigate this claim's factual basis and validity. This is especially true of a claim that may have been procedurally defaulted in the state post-conviction forum, for which Patterson must also allege and prove not just "cause" for the procedural default, but "prejudice" as well. If Patterson is to make the requisite allegation of constitutional deficiency and consequent "prejudice" in his petition, he should be allowed to investigate and develop the full extent of the mitigating evidence that trial counsel allegedly failed to investigate and produce at his trial. It is for this purpose that he seeks federal investigatory funds.

2000 U.S. Dist. LEXIS 12694 at *4-*6.

As in the above-cited cases, the services for which the Appellant requested



Appellate Case: 07-3071 Page: 136 Date Filed: 11/26/2007 Entry ID: 3375881

funding were reasonably necessary for the development of his constitutional claims that trial counsel were ineffective in failing to adequately investigate, develop and present mitigation evidence. The funding requests for investigative and expert services submitted by the Appellant were particularly necessary for the Appellant to be able to fully and adequately develop his claims of *Strickland* prejudice. That is, in order to determine whether there is a reasonable probability that the result of the sentencing proceeding would have been different but for counsel's failure to present available mitigating evidence, the Appellant must be permitted to develop facts about such mitigating evidence so that there is an adequate factual basis to make the necessary comparison between the mitigation case that trial counsel *did* present versus the mitigation case that trial counsel *could have* presented. See, e.g., *United States ex rel. Cross v. Derobertis*, 811 F.2d 1008, 1016 (7th Cir. 1987) (petitioner alleging ineffective assistance based on failure to investigate must make "comprehensive showing" of "what information would have been obtained from an investigation and whether such information, assuming its admissibility in court, would have produced a different result"; "[u]nder usual circumstances, we would expect that such information would be presented to the habeas court through the testimony of potential witnesses"). Each of the Appellant's funding requests were tailored for this precise purpose, and the record demonstrates that the Appellant had a good-faith basis for believing that the requested investigative and expert services

were reasonably necessary to prove that trial counsel were ineffective in investigating and presenting the mitigation case.

First, the Appellant's request for funding for additional hours for the services of mitigation specialist Jill Miller, MSSW, was reasonably necessary for the litigation of the Appellant's *Strickland* claims. Ms. Miller's preliminary mitigation investigation in this case disclosed evidence of childhood sexual abuse and symptoms of mental illness, evidence which the Supreme Court has repeatedly noted constitutes compelling mitigation evidence. *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 534-35 (2003) (counsel ineffective for failing to present evidence of petitioner's childhood sexual abuse and mental health problems). Such evidence, however, was never presented at the Appellant's trial. Despite these initial findings, there were a number of leads that remained for Ms. Miller to investigate, including obtaining and reviewing a number of relevant and available educational, social service, medical, mental health and other records crucial to completing a thorough mitigation investigation. As the Supreme Court has unequivocally declared, a thorough and complete mitigation investigation is absolutely necessary in capital cases. *See Rompilla v. Beard*, 545 U.S. 374, 387 n.7 (2005); *Wiggins*, 539 U.S. at 524. *See also Dickerson v. Bagley*, 453 F.3d 690, 695 (6th Cir. 2006) (conducting a partial, but ultimately incomplete, mitigation investigation does not satisfy *Strickland*). Additional funding for Ms. Miller to complete her mitigation investigation was,



Appellate Case: 07-3071 Page: 138 Date Filed: 11/26/2007 Entry ID: 3375881

therefore, reasonably necessary for the Appellant's representation, as her investigation was necessary to develop an adequate factual basis to compare the mitigation case that trial counsel *did* present with the mitigation case that trial counsel *could have* presented, and thus establish *Strickland* prejudice.

Second, Appellant's request for additional funding for Dr. Natalie Novik Brown, an expert in fetal Alcohol Spectrum Disorder ("FASD") was reasonably necessary for Appellant's representation. After completing the first stage of a two-stage analysis, Dr. Brown reached a tentative initial conclusion that "there is a substantial possibility that Keith Nelson may suffer from Fetal Alcohol Spectrum Disorder." (A116.) Appellant's counsel thereafter filed a motion with the Court for additional funding of Dr. Brown's evaluation. Given Dr. Brown's preliminary findings, Appellant had a good-faith basis for believing that additional funding was reasonably necessary for the development of his claim that he suffered from FASD, and that trial counsel were ineffective in failing to investigate, develop and present this evidence. Indeed, courts have recognized that evidence that a defendant suffers from FASD is compelling mitigation evidence. *See, e.g., Rompilla v. Beard*, 545 U.S. 374, 392 (2000) (noting that among the evidence which trial counsel had failed to present at trial, but which was presented at the habeas hearing to demonstrate counsel's ineffectiveness, was evidence that the petitioner suffered from fetal alcohol syndrome); *Silva v. Woodford*, 279 F.3d 825, 847 & n.17 (9th Cir. 2002) (evidence

that petitioner suffered from fetal alcohol syndrome constituted compelling mitigation evidence, and counsel's failure to investigate it, along with petitioner's childhood abuse, was "profoundly prejudicial"). *See also* 2003 ABA Guidelines, Commentary to Guidelines 41, 10.7 and 10.11 (noting the importance of investigating evidence of fetal alcohol syndrome as part of the mitigation case). Such evidence was not previously investigated or presented at Appellant's trial. Additional funding for Dr. Brown's services, therefore, was reasonably necessary for Appellant to develop his claim that trial counsel failed to adequately investigate and present evidence that he suffered from FASD.

Third, the expert services of a clinical forensic psychologist were reasonably necessary in order to establish counsel's unreasonable failure to pursue a mental health investigation. In order to adequately develop such a claim, it is obviously necessary to establish that Appellant did indeed have mental impairments. Here, there was a good faith basis to believe that an examination by a clinical forensic psychologist would have yielded such information. In addition to Ms. Miller's qualified observations that Appellant displayed symptoms of mental illness, a neuropsychological examination of Appellant revealed evidence that he suffered from organic brain dysfunction and frontal lobe disturbance. Indeed, the neuropsychologist that performed that examination, Dr. Michael M. Gelbort, specifically recommended to Appellant's counsel that Appellant be seen and

evaluated by a clinical psychologist, especially one experienced in diagnosing schizophrenia. Thus, there was a more than an adequate basis to believe that the expert services of a clinical psychologist were reasonably necessary for Appellant's representation in his § 2255 case. This is especially so considering the Supreme Court's characterization of evidence of mental impairment as "inherently mitigating." *See Tennard v. Dretke*, 542 U.S. 274, 287-88 (2004).

The district court's February 28, 2006 Order denying Appellant's funding requests constituted an abuse of discretion. Its stated reason for denying the requested funds was that "the resources requested by counsel in these motions are not likely to lead to a different result." This conclusion, however, is not grounded in either logic or law. The type of mitigation evidence which Appellant sought to investigate and develop has been the basis for successful ineffective assistance claims in other capital habeas cases. *See Wiggins*, 539 U.S. at 534-35 (2003) (unreasonable failure to present evidence of childhood sexual abuse and mental health problems); *Rompilla*, 545 U.S. at 387 n.7 (2005) (unreasonable failure to present evidence of fetal alcohol syndrome); *Silva*, 279 F.3d at 847 & n.17 (same). The district court's assertion, therefore, that facts which would prove that trial counsel failed to present available evidence regarding Appellant's childhood sexual abuse, fetal alcohol syndrome, and mental health problems would "not likely lead to a different result" is plainly incorrect given the fact that death sentences have been reversed by the



Appellate Case: 07-3071 Page: 141 Date Filed: 11/26/2007 Entry ID: 3375881

Supreme Court on precisely such grounds.

Moreover, the district court's blanket assertion that no evidence adduced as a result of the requested § 2255 investigation would have been sufficient to establish *Strickland* prejudice is fundamentally flawed. As the Supreme Court has demonstrated repeatedly in a number of recent cases, a court cannot reach a conclusion regarding *Strickland* prejudice in a vacuum. Rather, the court must compare the *actual* mitigation evidence presented at trial with the *actual* mitigation evidence developed as part of the habeas investigation. *See, e.g., Rompilla* , 545 U.S. at 391-93 (comparing the evidence that was presented at the original sentencing hearing with the mitigation evidence and testimony presented at a post-conviction hearing to conclude that the undiscovered mitigation evidence "might well have influenced the jury's appraisal of [the defendant's] culpability" and led to a different sentencing decision); *Wiggins*, 539 U.S. at 535-38 (comparing the evidence adduced at trial with the evidence presented at the habeas proceeding regarding the petitioner's "excruciating life history" in finding that trial counsel's failure to investigate and present such evidence resulted in *Strickland* prejudice); *Williams v. Taylor,* 529 U.S. 362, 397-98 (2000) (*Strickland* prejudice determination must take into account mitigation evidence adduced in post-conviction proceedings).

The district court's failure to even entertain the possibility that sufficient mitigation evidence could have been developed in the § 2255 proceedings to establish

the ineffective assistance of trial counsel is unmistakable evidence that the district improperly prejudged Appellant's case.



Appellate Case: 07-3071 Page: 143 Date Filed: 11/26/2007 Entry ID: 3375881

POINT SIX

A COA SHOULD ISSUE TO ALLOW APPELLATE REVIEW OF THE COURT'S DENIAL OF THE RECUSAL MOTION.[37]

In an effort to establish the harmful nature of the alleged ineffective assistance of trial counsel, Appellant's 2255 counsel sought funding for expert, investigative, and other assistance, as previously permitted by 21 U.S.C. § 848(q)(9).[38] In a series of such motions filed in the fall of 2005, Appellant's counsel requested, *inter alia*, the funding of expert and investigative assistance from Ms. Miller and a clinical

---

[37]While this issue combines constitutional and statutory claims, the Supreme Court in *Slack v. McDaniel*, *supra*, made it clear that the COA process also applies where the Court has denied relief on non-constitutional procedural grounds. *Slack v. McDaniel, supra*, 529 U.S. at 477:

> [W]hen the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue (and an appeal of the district court's order may be taken) if the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

529 U.S. at 477. It cannot be the law that a jurist whose impartiality is open to question may, without appellate review of that issue, nonetheless decide whether a defendant lives or dies.

[38]Effective March 9, 2006, the procedural aspects of the Title 21 federal death penalty, including the above-cited provision, were repealed and reenacted at 18 U.S.C. § 3599.



Appellate Case: 07-3071 Page: 144 Date Filed: 11/26/2007 Entry ID: 3375881

psychologist, Xavier Amador, Ph.D., with special expertise in schizophrenia. On February 28, 2006, the district court issued an order denying three funding requests. In that order, the court also revealed that, without hearing any evidence or argument, it had pre-determined the merits of the 2255 motion. The district court explained its reasons for denying the funding requests as follows:

> The above-referenced motions [for investigative and expert assistance] have been denied because the Court does not agree with the assertions therein. Appellate[39] counsel, with the benefit of hindsight, is attempting to vilify trial counsel's judgment on trial strategy. In reality, trial counsel's conduct and strategy far exceed those standards of *Strickland v. Washington,* 466 U.S. 669 (1984). Further, the resources requested by counsel in these motions are not likely to lead to a different result. Mr. Nelson received a fair trial. Appellate counsel is reminded that excessive expenditures of judicial resources have their limits.

(A92.)

A clearer case of judicial bias can hardly be imagined. So far as the district court was concerned, the issue of *Strickland* effectiveness was a foregone conclusion, Appellant had received "a fair trial," and was therefore entitled to no relief. Moreover, the order gratuitously denigrated the efforts of 2255 counsel, characterizing their decision to raise the issue of ineffective assistance as an exercise

[39]In context, the district court's comments made it clear that the reference to "appellate was to Appellant's 2255 counsel, not to counsel who had represented Appellant on his direct appeal.



Appellate Case: 07-3071 Page: 145 Date Filed: 11/26/2007 Entry ID: 3375881

guided by the "benefit of hindsight" and, worse, motivated by a desire to "vilify" trial counsel. The tone of the order suggested open hostility to the efforts of 2255 counsel on Appellant's behalf, the very antithesis of impartiality. As a matter of law, the district court should have recused itself himself from further involvement in this case. The failure to do so was constitutional error that would be, at the very least, subject to debate among reasonable jurists and is certainly an issue that deserves further encouragement, especially in a capital case. Accordingly a COA should issue on this ground as well.

The fair trial guarantees of the Due Process Clause of the Fifth Amendment encompass a litigant's right to have "a neutral and detached judge" preside over judicial proceedings. *Ward v. Village of Monroe*, 409 U.S. 57, 62 (1972). In *In re Murchison*, 349 U.S. 133 (1959) the Supreme Court observed:

> A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias. But our system of law has always endeavored to prevent even the probability of unfairness. . . . Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way "justice must satisfy the appearance of justice."

*Id* at 136 (citations omitted). So important is this constitutional guarantee that its denial is not subject to the harmless error rule. *See, e.g.*, *Tumey v. Ohio*, 273 U.S. 510 (1927).



Appellate Case: 07-3071 Page: 146 Date Filed: 11/26/2007 Entry ID: 3375881

In addition to the guarantees of due process, two acts of Congress protect a federal litigant's entitlement to impartial justice. Section 144 of Title 28 provides:

> Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.
>
> The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten[40] days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

Similarly, § 455(b)(1) of Title 28 provides:

> (b) He shall also disqualify himself in the following circumstances:
>
> (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding….

Sections 144 and § 455(b)(1) thus set out identical grounds for recusal except that § 455 makes those grounds applicable to all justices, judges and magistrates and places the obligation to identify the existence of those grounds upon the judge, rather

[40]"The 10 day rule has been an anachronism since 1963, when Congress abolished formal terms of court for United States district courts. See 28 U.S.C. § 138." *Liteky v. United States*, 510 U.S. 540, 560 (1994) (Kennedy, J. concurring).



Appellate Case: 07-3071 Page: 147 Date Filed: 11/26/2007 Entry ID: 3375881

than requiring recusal only in response to a party affidavit. *Liteky v. United States*, 510 U.S. 540, 548 (1994). It is also true that neither statute sets up an automatic right to judicial disqualification:

> [i]n assessing the reasonableness of a challenge to his impartiality, each judge must be alert to avoid the possibility that those who would question his impartiality are, in fact, seeking to avoid the consequences of his expected adverse decision. Disqualification for lack of impartiality must have a *reasonable* basis. Nothing in [the legislative history of §455] should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a "reasonable fear" that the judge will not be impartial. Litigants ought not to have to face a judge where there is a reasonable question of impartiality, but they are not entitled to judges of their own choice. S.Rep. No. 93-419, 93d Cong., 1st Sess. 1973, p.5.

*Ouachita National Bank v. Tosco Corp.,* 686 F.2d 1291, 1300 (8th Cir. 1982) (emphasis in original) (quoting H.R. Rep. No. 1453, *reprinted in* 1974 U.S. Code Cong. & Ad. News 6351, 6355).

Once a motion to disqualify is filed under § 144, however, the judge must pass on the sufficiency of the affidavit, but not the truth of the matters asserted. *See e.g., Henderson v. Dept. of Public Safety and Corrections*, 901 F.2d 1288, 1296 (5th Cir. 1990). A legally sufficient affidavit must be material and must be stated with particularity. The facts must be such that, if true, they would convince a reasonable person that a bias exists. *Id*. The previous requirement that the affidavit establish facts that show the bias is personal and not judicial appears to have been abolished



Appellate Case: 07-3071 Page: 148 Date Filed: 11/26/2007 Entry ID: 3375881

by the Supreme Court in *Liteky*.[41] The Court, in *Liteky*, found that, while an "extrajudicial source" is the common basis for establishing a disqualifying bias, it is not the exclusive reason a predisposition can be wrongful or inappropriate:

> A favorable or unfavorable predisposition can also deserve to be characterized as "bias" or "prejudice" because, even though it springs from the facts adduced or the events occurring at trial, it is *so extreme as to display clear inability to render fair judgment*.

*Liteky*, 510 U.S. at 551 (emphasis added). Indeed, "the extrajudicial source doctrine is not a *per se* rule and, thus, is neither a necessary nor a sufficient condition for recusal. Instead, the source of bias is one factor a judge should consider in recusal." T. Citera, "Supreme Court Review: A Look at the Extrajudicial Source Doctrine under 28 U.S.C. 455, *Liteky v. United States*, 114 S. Ct. 1147 (1994)," 85 J. CRIM. L. & CRIMINOLOGY 1114 (1995) (footnotes and citations omitted).

In addition to the constitutional guarantee, 28 U.S.C. § 144, and 28 U.S.C. § 455(b), Appellant also invoked 28 U.S.C. § 455, a statute which traces its antecedents to 1792. 13A Wright, Miller & Cooper, *Federal Practice and Procedure* (2nd Ed. 1984), § 3541 at 550. ("Federal Practice and Procedure".) See also, *Liteky*, *supra*, 510 U.S. at 543-48 where the Court traced the history of federal recusal statutes.

---

[41]In *Liteky,* the Court had to consider whether the so-called "extrajudicial source doctrine" applied as well to § 455(a). Recasting it as an "extrajudicial factor" rather than a dogmatic doctrine, the Court applied it to § 455(a).



Appellate Case: 07-3071 Page: 149 Date Filed: 11/26/2007 Entry ID: 3375881

Specifically, Appellant relied on § 455(a) which, as amended in 1974, provides as follows:

> Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

The 1974 amendments to § 455 – particularly the amendment which became § 455(a) – worked what the Wright treatise describes as "a drastic change in the practice in the federal courts." Wright, et al., FEDERAL PRACTICE AND PROCEDURE (2006 Supp.) § 3549 at p. 920. In *Liteky*, the Supreme Court described the 1974 revision as making "massive changes" in the law governing recusal. *Liteky*, 540 U.S. at 546. Prior to 1974, language in the predecessor to § 455(a) had been interpreted as imposing on a trial judge an affirmative duty to sit on all cases unless a compelling reason to recuse was presented. By enacting § 455(a), Congress explicitly intended to overrule the so-called "duty-to-sit" cases in favor of a less stringent standard that would, in turn, promote greater public confidence in the impartiality of the judiciary. *In re Drexel Burnham Lambert, Inc*., 861 F.2d 1307, 1313 (2d Cir. 1988); Federal Practice and Procedure, *supra*, *id*. at p. 962; see also, Comment, "Questioning the Impartiality of Judges: Disqualifying Federal District Court Judges Under 28 U.S.C. § 455(a)," 60 TEMPLE L.Q. 697, 701 n.30 (1987). The purpose of the 1974 re-working of § 455 was to "'broaden and clarify the grounds for judicial disqualification.'" *Liljeberg v. Health Services Acquisition Corp*., 486 U.S. 847, 849 (1988), in order "to promote

public confidence in the integrity of the judicial process." *Liljeberg*. 486 U.S. at 860.

The standard to be applied to § 455(a) motions is an objective one. The inquiry is not whether a litigant honestly and truthfully believes that a judge lacks impartiality. Neither is the standard whether the judge is in fact impartial or even whether the judge in question honestly and truthfully so believes. *Hall v. Small Business Administration*, 695 F.2d 175, 178-79 (5th Cir.1983). Instead, the situation is viewed from the perspective of an objective observer. As summarized by the Supreme Court in *Liteky*,

> [W]hat matters is not the reality of bias or prejudice but its appearance. Quite simply and quite universally, recusal was required [pursuant to § 455(a)] whenever "impartiality might reasonably be questioned."

*Liteky*, 510 U.S. at 548. This approach is fully consistent with the legislative purpose since the simple existence of reasonable questions regarding a judge's impartiality undermines public confidence in both the judiciary and the judicial process – including the outcome of capital habeas proceedings such as this one – whether or not the judge's impartiality is truly compromised. As stated in *Liljeberg*:

> [P]eople who have not served on the bench are often all too willing to indulge suspicions and doubts concerning the integrity of judges. The very purpose of § 455(a) is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible.

*Liljeberg*, 486 U.S. at 864-65 (footnote omitted).



Appellate Case: 07-3071 Page: 151 Date Filed: 11/26/2007 Entry ID: 3375881

In *Apple v. Jewish Hosp. and Medical Center*, 829 F.2d 326 (2d Cir. 1987), the Court ruled that "the substantive standard for recusal is whether a reasonable person, knowing all the facts, would conclude that the court's impartiality might reasonably be questioned." *Id*. at 333; see also, *United States v. Pitera*, 5 F.3d 624, 626 (2d Cir. 1993); *United States v. Lovaglia*, 954 F.2d 811, 814-15 (2d Cir. 1992), *United States v. Pepper & Potter, Inc.*, 677 F.Supp. 123, 125-26 (E.D.N.Y. 1988). In *In re IBM Corp*., 45 F.3d 641, 643 (2d Cir. 1995), the Court quoted with approval from *In re Drexel Burnham Lambert, Inc*., supra, that, "the test to be applied is an objective one which assumes that a reasonable person knows and understands all the relevant facts." At a second point in its IBM opinion, the Second Circuit reiterated that the key to applying an objective standard is that the mythical objective observer must be "fully informed as to the circumstances . . ." that give rise to the recusal issue. 45 F.3d at 644. Moreover, the standard is broadest – that is most tending to favor recusal – when, as in this case, the challenge is brought under 455(a) as distinct from other statutes and/or sub-sections of 455(a). Liljeberg, 486 U.S. at 860 n.8 (Making reference to "the broader coverage of 455(a) . . . ."); *United States v. Sibia*, 624 F. 2d 864, 867 (9th Cir., 1980); *United States v. Wolfson;* 558 F.2d 59, 63 (2d Cir. 1977); *Lamborn v. Dittmer*, 726 F.Supp. 510 (S.D.N.Y. 1989).

A judge is required to maintain actual impartiality and, as important, the appearance of impartiality. Disqualification may be required even when there is no

actual bias or prejudice. *In re Kansas Public Employees Retirement System*, 85 F.3d 1353 (8th Cir. 1996). "[The] appearance of impartiality is virtually as important as the fact of impartiality." *United States v. Singer*, 575 F.Supp. 63, 67 (D. Minn. 1983). Accordingly,

> "[A] judge … ought to consider how his participation in a given case looks to the average person on the street. Use of the word 'might' in the statute was intended to indicate that disqualification should follow if the reasonable man, were he to know all the circumstances, would harbor doubts about the judge's impartiality."

*United States v. Poludniak*, 657 F.2d 948, 954 (8th Cir. 1981), *quoting Potashnick v. Port City Construction Co.,* 609 F.2d 1101, 1111 (5th Cir.), *cert. denied*, 449 U.S. 820 (1980); *accord United States v. Honken,* 381 F.Supp.2d 936, 970 (N.D. IA 2005) (the question is whether an objective, disinterested observer fully informed of the underlying facts, would entertain significant doubt that justice would be done absent recusal).

Cases under § 455 are driven by their facts and circumstances. *Honken, supra.* This is not to say, however, that analogous cases are irrelevant to the equation. In *Alexander v. Primerica Holdings,* 10 F.3d 155 (3rd Cir. 1993), for example, the petitioners claimed that the trial judge, Judge Lechner, had prejudged their case because of "his pique at having been reversed" by the court of appeals on numerous occasions during the litigation of a hotly-contested class action lawsuit and because



Appellate Case: 07-3071 Page: 153 Date Filed: 11/26/2007 Entry ID: 3375881

of his alleged animus towards petitioners' counsel. *Id.* at 158. Petitioners sought to have Judge Lechner disqualified, as Appellant does here, pursuant to § 455(a). *Id.* at 161. In granting the motion the Third Circuit stated:

> For purposes of § 455(a) disqualification, it does not matter whether the district court judge actually harbors any bias against a party or the party's counsel. This is so because § 455(a) concerns not only fairness to individual litigants, but, equally important, it concerns *the public's confidence in the judiciary*, which may be irreparably harmed if a case is allowed to proceed before a judge who appears to be tainted.

*Id.* at 162 (emphasis added) (citation and quotation omitted). After independently reviewing the record, the Third Circuit felt impelled to conclude that the outcome of this case "would be shrouded [in] suspicion" if Judge Lechner were to continue to preside as trier of the fact. *Id.* at 163.

> This is not to say that the record discloses actual bias on Judge Lechner's part. Quite to the contrary, we have made, and make, no such determination. What we do decide, however, is that *the record suffices to establish that Judge Lechner's impartiality may reasonably be questioned*.

*Id.* (emphasis added).

In this case, had the Court simply denied Appellant's requests for additional investigative and expert assistance, Appellant would have no basis for a challenge to the Court's impartiality. But this is not a case where Appellant is simply a litigant unhappy with a ruling. *See, e.g., Little Rock School District v. Pulaski County*

*Special School,* 839 F.2d 1296, 1302 (8th Cir 1988) ("Not surprisingly, the parties have generally discovered grounds for disqualification at approximately the same time that the district court ruled for their adversaries on the merits."). The basis for the motion was that, in denying the requests for funding, the Court revealed that it had pre-judged the merits of the case despite having heard no evidence regarding trial counsel's strategies or effectiveness. One would be hard-pressed indeed to posit a clearer example of a judge displaying, at the very least, the appearance of a lack of impartiality. Nor is there any factual dispute as to the Court's position, since the lack of impartiality is established in an order issued by the Court itself. Those observations plainly established the appearance of bias. The Court's impartiality was open to reasonable questions, and therefore, the Court should have recused itself from further participation in this case.

At the very least, as stated earlier, the failure to recuse was error that would be subject to debate among reasonable jurists and is, as well, an issue that deserves further encouragement in this capital case. Accordingly a COA should issue on this ground as well.



Appellate Case: 07-3071 Page: 155 Date Filed: 11/26/2007 Entry ID: 3375881

## CONCLUSION

For the reasons set forth above, a certificate of appealability should issue with regard to the above-specified issues, together with any additional relief the Court may deem just or proper.

Respectfully submitted,


/s/ Gary E. Brotherton
Legal Writes, LLC
2101 Chapel Plaza Court, Suite 13
Columbia, MO 65202-3381
(573)875-1571
(573)875-1572 (fax)
gebrotherton@legalwritesllc.com

/s/ David A. Ruhnke
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
(973)744-1000
(973)746-1490
davidruhnke@ruhnkeandbarrett.com

Co-counsel to Appellant, Keith Nelson


Filed electronically: St. Louis, Missouri
November 26, 2007

## CERTIFICATE OF SERVICE

This will certify that, on today's date, November 26, 2007, Appellant's counsel served this motion and supporting addendum upon the United States by filing the documents via this Court's ECF system.

/s/ David A. Ruhnke
DAVID A. RUHNKE