UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

No 07-03071

---

KEITH D. NELSON,

Appellant,

vs.

UNITED STATES OF AMERICA,

Appellee.

---

# ADDENDUM TO MOTION FOR CERTIFICATE OF APPEALABILITY

---

SUBMITTED BY:

Gary E. Brotherton, Esquire
Legal Writes, LLC
2101 Chapel Plaza Court, Suite 13
Columbia, MO 65202-3381
(573)875-1571
(573)875-1572 (fax)
gebrotherton@legalwritesllc.com

David A. Ruhnke, Esquire
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
(973)744-1000
(973)746-1490
davidruhnke@ruhnkeandbarrett.com

Co-counsel to Appellant, Keith Nelson

TABLE OF CONTENTS OF ADDENDUM

District court docket sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1

Notice of appeal (June 10, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A10

Penalty-phase verdict sheet (November 28, 2001) . . . . . . . . . . . . . . . . . . . . . . A12

Motion pursuant to 28 U.S.C. § 2255 November 6, 2007) . . . . . . . . . . . . . . . . A22

Motion for expert and investigative assistance, re Jill Miller, MSSW
and Michael Gelbort, Ph.D. (July 10, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . A41

Motion for expert and investigative assistance, supplemental
funding re Jill Miller, MSSW (October 30, 2005) . . . . . . . . . . . . . . . . . . . . . . A58

Motion for expert and investigative assistance, re Xavier Amador, Ph.D.
(November 23, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A79

Order denying motions for expert and investigative assistance
(February 28, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A92

Motion to unseal *ex parte* applications (June 2, 2006) . . . . . . . . . . . . . . . . . . A93

Motion of expert and investigative assistance, re Dan Clark
and Natalie Novick Brown, Ph.D. (June 19, 2006) . . . . . . . . . . . . . . . . . . . . . A98

Affidavit of Natalie Novice Brown, Ph.D. (06/19/2006) . . . . . . . . . . . . . . . . A104

Order unsealing *ex parte* motions (July 10, 2006) . . . . . . . . . . . . . . . . . . . . . A107

Order denying 2255 motion and motion to recuse (November 21, 2006) . . . . A108

Motion for expert and investigative assistance,
supplemental funding re Dr. Brown (February 7, 2007) . . . . . . . . . . . . . . . . . A110

Supplemental affidavit of Natalie Novick Brown, Ph.D.
(December 4, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A114



Appellate Case: 07-3071 Page: 2 Date Filed: 11/26/2007 Entry ID: 3375881

Order denying motion brought pursuant to F.R.Civ.P. 59 (April 13, 2007) . . . A119

Order denying motion for certificate of appealability (September 4, 2007) . . . A125

Memorandum re Order denying motion for
certificate of appealability (September 4, 2007) . . . . . . . . . . . . . . . . . . . . . . . . A126

APPEAL, CLOSED

# U.S. District Court
# United States District Court for the Western District of Missouri (Kansas City)
# CIVIL DOCKET FOR CASE #: 4:04-cv-08005-FJG

Nelson v. USA
Assigned to: Chief District Judge Fernando J. Gaitan, Jr
Cause: 28:2255 Motion to Vacate / Correct Illegal Sentenc

Date Filed: 11/10/2004
Date Terminated: 11/21/2006
Jury Demand: None
Nature of Suit: 535 Death Penalty - Habeas Corpus
Jurisdiction: U.S. Government Defendant

**Movant**

**Keith D Nelson** represented by

**David A. Ruhnke**
Ruhnke & Barrett
47 Park Street
Montclair, NJ 07042
(973) 744-1000
Fax: (973) 746-1490
Email: davidruhnke@ruhnkeandbarrett.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gary E. Brotherton**
Legal Writes, LLC
2101 Chapel Plaza Court
Suite 13
Columbia, MO 65203
(573) 875-1571
Fax: (573) 875-1572
Email: gebrotherton@legalwritesllc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer Herndon**
224 Hwy 67 North
#122
Florissant, Mo 63031
(3134) 831-5531
Fax: (314) 831-5645
Email: jenifer@ix.netcom.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Susan M Hunt**

819 Walnut
Suite 210
Kansas City, MO 64106
816-221-4588
Fax: 816-222-0856
Email: shunt5733@aol.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Respondent**

**United States of America** represented by

**Matt Jeffrey Whitworth**
United States Attorney's Office
400 E. 9th Street
5th Floor
Kansas City, MO 64106
(816)426-4122
Fax: (816)426-4210
Email: matt.whitworth@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sheryle L Jeans**
United States Attorney's Office
400 E 9th St
Kansas City, MO 64106
816-426-4218
Fax: 816-426-3126
Email: sheryle.jeans@usdoj.gov
*LEAD ATTORNEY*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/10/2004 | 1 | MOTION to appoint counsel pursue post conviction remedies filed byJennifer Herndon on behalf of Keith D Nelson Suggestions in opposition/response due by 11/29/2004 unless otherwise directed by the court (Attachments: # 1 Exhibit A# 2 Exhibit B)(Sullivan, Tanya) (Entered: 12/13/2004) |
| 11/22/2004 | 2 | RESPONSE to motion re 1 MOTION to appoint counsel filed by Sheryle L Jeans on behalf of Respondent United States of America. Reply suggestions due by 12/7/2004 unless otherwise directed by the court (Related document(s)1) (Sullivan, Tanya) (Entered: 12/13/2004) |
| 12/01/2004 | 3 | REPLY SUGGESTIONS to motion re 1 MOTION to appoint counsel filed by Susan Hunt on behalf of Movant Keith D Nelson. (Related document(s)1) (Sullivan, Tanya) (Entered: 12/13/2004) |
| 12/14/2004 | 4 | ORDER granting 1 motion to appoint counsel. Appointed David A Ruhnke for Keith D Nelson and Gary E. Brotherton for Keith D Nelson. Signed by Judge Fernando J. Gaitan Jr. on December 14, 2004. (Jones, |

NELSON ADDENDUM A2

| | | |
|---|---|---|
| | | Robin) (Entered: 12/14/2004) |
| 12/20/2004 | 5 | MOTION for attorney fees filed byGary E. Brotherton on behalf of Keith D Nelson Suggestions in opposition/response due by 1/4/2005 unless otherwise directed by the court (Brotherton, Gary) (Entered: 12/20/2004) |
| 01/31/2005 | 6 | ORDER granting 5 petitioner's motion regarding billing procedures, setting of an hourly rate of compensation, and to permit interim billing for appointed counsel. (Enss, Rhonda) (Entered: 01/31/2005) |
| 03/06/2005 | 8 | MOTION for attorney fees *to increase hourly compensation* filed byDavid A. Ruhnke on behalf of Keith D Nelson Suggestions in opposition/response due by 3/21/2005 unless otherwise directed by the court (Ruhnke, David) Modified on 3/16/2005 to reflect motion granted per #10(Enss, Rhonda). (Entered: 03/06/2005) |
| 06/23/2005 | 14 | NOTICE (SEALED) by Keith D Nelson *of motion to permit counsel access to sealed documents of record* (Ruhnke, David) (Entered: 06/23/2005) |
| 08/26/2005 | 17 | ORDER re [14] filed by Keith D Nelson - movant's sealed ex parte motion to allow post-conviction counsel access to sealed documents is granted as to those documents filed by defendant and his counsel only. Movant is directed to seek leave of Court to access sealed documents filed by the government or sealed Court orders addressing sealed government filings. Movant may fax the Court and counsel for government his request for access to specific documents. (Enss, Rhonda) (Entered: 08/26/2005) |
| 08/30/2005 | 19 | Amended ORDER re #17 - movant's sealed ex parte motion to allow post-conviction counsel access to sealed documents (#14) is granted as to those documents in Case No. 99-00303-CR filed by defendant and his counsel only. Movant is directed to seek leave of Court to accses sealed documents filed by government or sealed court orders addressing sealed government filings in Case No. 99-00303-CR. (Enss, Rhonda) (Entered: 08/30/2005) |
| 09/15/2005 | 21 | NOTICE (SEALED) by Keith D Nelson *Motion to Photocopy Sealed and Ex Parte Motions filed by the Defense and the Corresponding Orders in United States v Keith Nelson* (Brotherton, Gary) (Entered: 09/15/2005) |
| 11/06/2005 | 25 | MOTION to set aside judgment *pursuant to 28 USC sec. 2255* filed byDavid A. Ruhnke on behalf of Keith D Nelson Suggestions in opposition/response due by 11/21/2005 unless otherwise directed by the court (Ruhnke, David) (Entered: 11/06/2005) |
| 11/14/2005 | 26 | SUGGESTIONS in support re 25 MOTION to set aside judgment *pursuant to 28 USC sec. 2255* filed by David A. Ruhnke on behalf of Movant Keith D Nelson. (Attachments: # 1 Appendix to memorandum of law in support of motion brought pursuant to 28 USC sec. 2255)(Related document(s)25) (Ruhnke, David) (Entered: 11/14/2005) |
| 11/18/2005 | 27 | NOTICE of appearance by Matt Jeffrey Whitworth on behalf of United |

NELSON ADDENDUM A3

| | | |
|---|---|---|
| | | States of America (Whitworth, Matt) (Entered: 11/18/2005) |
| 11/18/2005 | 28 | MOTION for extension of time to file response/reply filed byMatt Jeffrey Whitworth on behalf of United States of America Suggestions in opposition/response due by 12/5/2005 unless otherwise directed by the court (Whitworth, Matt) (Entered: 11/18/2005) |
| 12/05/2005 | 30 | RESPONSE to motion re 28 MOTION for extension of time to file response/reply filed by David A. Ruhnke on behalf of Movant Keith D Nelson. Reply suggestions due by 12/20/2005 unless otherwise directed by the court (Related document(s)28) (Ruhnke, David) (Entered: 12/05/2005) |
| 12/08/2005 | 32 | ORDER sustaining #28 government's motion for extension of time until 1/20/06 at 5:00 p.m. to file response to movant's 2255 motion. (Enss, Rhonda) (Entered: 12/08/2005) |
| 12/08/2005 | | Set/Reset Deadlines as to 25 MOTION to set aside judgment *pursuant to 28 USC sec. 2255*. Suggestions in opposition/response due by 1/20/2006 at 5:00 p.m. unless otherwise directed by the court (Enss, Rhonda) (Entered: 12/08/2005) |
| 01/18/2006 | 33 | MOTION for extension of time to file response/reply *to movant's 2255 motion* filed byMatt Jeffrey Whitworth on behalf of United States of America Suggestions in opposition/response due by 2/2/2006 unless otherwise directed by the court (Whitworth, Matt) (Entered: 01/18/2006) |
| 01/25/2006 | 34 | ORDER sustaining 33 government's motion for extension of time until 2/21/06 to file response to movant's 2255 motion. Signed by Judge Fernando J. Gaitan Jr. on 1/25/06. (Enss, Rhonda) (Entered: 01/25/2006) |
| 01/25/2006 | | Set/Reset Deadlines as to 25 MOTION to set aside judgment *pursuant to 28 USC sec. 2255*. Suggestions in opposition/response due by 2/21/2006 unless otherwise directed by the court (Enss, Rhonda) (Entered: 01/25/2006) |
| 02/21/2006 | 36 | MOTION for extension of time to file response/reply *to movant's 2255 motion* filed byMatt Jeffrey Whitworth on behalf of United States of America Suggestions in opposition/response due by 3/8/2006 unless otherwise directed by the court (Whitworth, Matt) (Entered: 02/21/2006) |
| 02/23/2006 | 38 | ORDER sustaining 36 respondent's motion for extension of time until 2/24/06 at 4:00 p.m. to file response. Signed by Judge Fernando J. Gaitan Jr. on 2/23/06. (Enss, Rhonda) (Entered: 02/23/2006) |
| 02/23/2006 | | Set/Reset Deadlines as to 25 MOTION to set aside judgment *pursuant to 28 USC sec. 2255*. Suggestions in opposition/response due by 2/24/2006 unless otherwise directed by the court (Enss, Rhonda) (Entered: 02/23/2006) |
| 02/24/2006 | 39 | SUGGESTIONS in opposition re 25 MOTION to set aside judgment *pursuant to 28 USC sec. 2255* filed by Matt Jeffrey Whitworth on behalf of Respondent United States of America. Reply suggestions due by 3/13/2006 unless otherwise directed by the court (Attachments: # 1 # 2 # |

NELSON ADDENDUM A4

| | | |
|---|---|---|
| | | 3)(Related document(s)25) (Whitworth, Matt) (Entered: 02/24/2006) |
| 02/28/2006 | 40 | MOTION for extension of time *,with consent, to file suggestions in reply* filed byDavid A. Ruhnke on behalf of Keith D Nelson Suggestions in opposition/response due by 3/15/2006 unless otherwise directed by the court (Ruhnke, David) (Entered: 02/28/2006) |
| 02/28/2006 | 41 | ORDER sustaining 40 movant's motion for extension of time until 5/12/06 to reply to 2255 motion. Signed by Judge Fernando J. Gaitan Jr. on 2/28/06. (Enss, Rhonda) (Entered: 02/28/2006) |
| 02/28/2006 | | Set/Reset Deadlines as to 25 MOTION to set aside judgment *pursuant to 28 USC sec. 2255*. Reply suggestions due by 5/12/2006 unless otherwise directed by the court (Enss, Rhonda) (Entered: 02/28/2006) |
| 04/17/2006 | 43 | MOTION for extension of time , *with consent, to reply to answer* filed by David A. Ruhnke on behalf of Keith D Nelson Suggestions in opposition/response due by 5/2/2006 unless otherwise directed by the court (Ruhnke, David) (Entered: 04/17/2006) |
| 04/20/2006 | 45 | ORDER sustaining 43 movant's second motion for extension of time until 7/12/06 to file reply to 2255 motion. Signed by Judge Fernando J. Gaitan Jr. on 4/20/06. (Enss, Rhonda) (Entered: 04/20/2006) |
| 04/20/2006 | | Set/Reset Deadlines as to 25 MOTION to set aside judgment *pursuant to 28 USC sec. 2255*. Reply suggestions due by 7/12/2006 unless otherwise directed by the court (Enss, Rhonda). (Entered: 04/20/2006) |
| 06/02/2006 | 47 | MOTION to unseal document filed by David A. Ruhnke on behalf of Keith D Nelson Suggestions in opposition/response due by 6/19/2006 unless otherwise directed by the court (Ruhnke, David) (Entered: 06/02/2006) |
| 06/19/2006 | 48 | NOTICE (SEALED) by Keith D Nelson *for expert and investigative assistance* (Attachments: # (1) # (2) # (3))(Ruhnke, David) (Entered: 06/19/2006) |
| 07/06/2006 | 49 | MOTION for extension of time , *with consent, to reply to answer filed by the United States* filed by David A. Ruhnke on behalf of Keith D Nelson Suggestions in opposition/response due by 7/21/2006 unless otherwise directed by the court (Ruhnke, David) (Entered: 07/06/2006) |
| 07/10/2006 | 50 | ORDER granting 47 movant's motion to unseal certain ex parte motions filed by the defense and the corresponding orders entered in both United States v Nelson and Nelson v. United States. The Court orders the numbered documents referenced in movant?s motion (Doc. #47) unsealed. Movant's third motion for an extension of time to reply to the answer filed by the United States (Doc. #49), filed July 6, 2006, is granted. Movant shall file his reply to respondent's answer and cross-motion no later than August 21, 2006. Signed by Judge Fernando J. Gaitan Jr. on 7/10/06. (Enss, Rhonda) (Entered: 07/10/2006) |
| 07/11/2006 | 51 | ORDER(SEALED) granting [48] movant's sealed ex parte motion for expert and investigative assistance. Signed by Judge Fernando J. Gaitan |

NELSON ADDENDUM A5

| | | |
|---|---|---|
| | | Jr. on 7/11/06. (Enss, Rhonda) (Entered: 07/11/2006) |
| 07/12/2006 | | ***Remark: Document #51 was emailed to David A. Ruhnke and Gary E. Brotherton (Kee, Georgia) (Entered: 07/12/2006) |
| 08/21/2006 | 52 | REPLY SUGGESTIONS to motion re 25 MOTION to set aside judgment *pursuant to 28 USC sec. 2255 , Movant's reply to government's suggestions in opposition* filed by David A. Ruhnke on behalf of Movant Keith D Nelson. (Attachments: # 1 Compilation of federal death verdicts# 2 Compilation of federal life verdicts)(Related document(s)25) (Ruhnke, David) (Entered: 08/21/2006) |
| 08/21/2006 | 53 | MOTION to disqualify judge filed by David A. Ruhnke on behalf of Keith D Nelson Suggestions in opposition/response due by 9/5/2006 unless otherwise directed by the court (Attachments: # 1 Affidavit Certification, 28 USC 144, of good-faith# 2 Affidavit Movant's sworn 144 declaration)(Ruhnke, David) (Entered: 08/21/2006) |
| 08/31/2006 | 54 | MOTION for extension of time to file response/reply *to Nelson's motion to disqualify and recuse the Honorable Fernando J. Gaitan, Jr., from further participation in this matter* filed by Matt Jeffrey Whitworth on behalf of United States of America Suggestions in opposition/response due by 9/15/2006 unless otherwise directed by the court (Whitworth, Matt) (Entered: 08/31/2006) |
| 09/12/2006 | 55 | ORDER granting 54 respondent's motion for extension of time to file response to 53 MOTION to disqualify judge. Suggestions in opposition/response due by 9/19/2006 unless otherwise directed by the court. Signed by Judge Fernando J. Gaitan Jr. on 9/12/06. (Enss, Rhonda) (Entered: 09/12/2006) |
| 09/18/2006 | 56 | SUGGESTIONS in opposition re 53 MOTION to disqualify judge filed by Matt Jeffrey Whitworth on behalf of Respondent United States of America. Reply suggestions due by 10/3/2006 unless otherwise directed by the court (Related document(s)53) (Whitworth, Matt) (Entered: 09/18/2006) |
| 09/29/2006 | 57 | Consent MOTION for extension of time to file response/reply *to government's response in opposition to motion to disqualify Judge Gaitan* filed by David A. Ruhnke on behalf of Keith D Nelson Suggestions in opposition/response due by 10/16/2006 unless otherwise directed by the court (Ruhnke, David) (Entered: 09/29/2006) |
| 10/10/2006 | 58 | MOTION to clarify *the court's order of July 10, 2006 - Document No. 50* filed by Matt Jeffrey Whitworth on behalf of United States of America Suggestions in opposition/response due by 10/25/2006 unless otherwise directed by the court (Attachments: # 1 # 2 # 3)(Whitworth, Matt) (Entered: 10/10/2006) |
| 10/23/2006 | 59 | ORDER granting 57 movant's motion for extension of time to file reply to 53 MOTION to disqualify judge. Reply suggestions due by 11/24/2006 unless otherwise directed by the court. Signed by Judge Fernando J. Gaitan Jr. on 10/23/06. (Enss, Rhonda) (Entered: |

NELSON ADDENDUM A6

| | | |
|---|---|---|
| | | 10/23/2006) |
| 10/24/2006 | 60 | REPLY SUGGESTIONS to motion re 53 MOTION to disqualify judge filed by David A. Ruhnke on behalf of Movant Keith D Nelson. (Related document(s)53) (Ruhnke, David) (Entered: 10/24/2006) |
| 11/21/2006 | 61 | ORDER that movant's motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. 2255 (Doc. #25), filed November 6, 2005, and motion to disqualify (Doc. #53), filed August 21, 2006, are denied. The Court further finds that the issues presented by movant are resolvable by the record and, therefore, no evidentiary hearing will be granted. Signed by Judge Fernando J. Gaitan Jr. on 11/21/06. (Enss, Rhonda) (Entered: 11/21/2006) |
| 11/21/2006 | 62 | CLERK'S JUDGMENT (Enss, Rhonda). (Entered: 11/21/2006) |
| 12/05/2006 | 63 | MOTION to set aside judgment *and and for any and all other relief permitted by F.R.Civ.P. 59* filed by David A. Ruhnke on behalf of Keith D NelsonSuggestions in opposition/response due by 12/20/2006 unless otherwise directed by the court. (Attachments: # 1 Affidavit of Natalie Novik Brown, Ph.D.)(Ruhnke, David) (Entered: 12/05/2006) |
| 12/21/2006 | 64 | MOTION for extension of time to file response/reply *to movant's motion for relief* filed by Matt Jeffrey Whitworth on behalf of United States of AmericaSuggestions in opposition/response due by 1/5/2007 unless otherwise directed by the court. (Whitworth, Matt) (Entered: 12/21/2006) |
| 01/03/2007 | 65 | ORDER granting 64 government's motion for extension of time to file response to 63 movant's MOTION to set aside judgment *and and for any and all other relief permitted by F.R.Civ.P. 59*.Suggestions in opposition/response due by 1/3/2007 unless otherwise directed by the court. Signed by Judge Fernando J. Gaitan Jr. on 1/3/07. (Enss, Rhonda) (Entered: 01/03/2007) |
| 01/03/2007 | 66 | SUGGESTIONS in opposition re 63 MOTION to set aside judgment *and and for any and all other relief permitted by F.R.Civ.P. 59* filed by Matt Jeffrey Whitworth on behalf of Respondent United States of America. Reply suggestions due by 1/18/2007 unless otherwise directed by the court (Related document(s)63) (Whitworth, Matt) (Entered: 01/03/2007) |
| 01/06/2007 | 67 | MOTION for extension of time to file response/reply *to Rule 59 motion* filed by Gary E. Brotherton on behalf of Keith D NelsonSuggestions in opposition/response due by 1/22/2007 unless otherwise directed by the court. (Brotherton, Gary) (Entered: 01/06/2007) |
| 01/10/2007 | 68 | ORDER granting 67 movant's motion for extension of time to file reply to 63 movant's MOTION to set aside judgment *and and for any and all other relief permitted by F.R.Civ.P. 59* Reply suggestions due by 2/20/2007 unless otherwise directed by the court Signed by Judge Fernando J. Gaitan Jr. on 1/10/07. (Enss, Rhonda) (Entered: 01/10/2007) |
| 02/14/2007 | 70 | Second MOTION for extension of time *to file Reply regarding Movant's Rule 59 motion* filed by Gary E. Brotherton on behalf of Keith D Nelson. |

| | | |
|---|---|---|
| | | Suggestions in opposition/response due by 3/1/2007 unless otherwise directed by the court. (Brotherton, Gary) (Entered: 02/14/2007) |
| 02/15/2007 | 71 | ORDER granting 70 movant's motion for extension of time to 3/22/07 to file reply. Signed by Judge Fernando J. Gaitan Jr. on 2/15/07. (Enss, Rhonda) (Entered: 02/15/2007) |
| 03/22/2007 | 74 | REPLY SUGGESTIONS to motion re 63 MOTION to set aside judgment *and and for any and all other relief permitted by F.R.Civ.P. 59* filed by David A. Ruhnke on behalf of Movant Keith D Nelson. (Related document(s)63) (Ruhnke, David) (Entered: 03/22/2007) |
| 04/13/2007 | 75 | ORDER denying 63 petitioner's motion for relief pursuant to FRCF 59. Signed by Judge Fernando J. Gaitan Jr. on 4/13/07. (Enss, Rhonda) (Entered: 04/13/2007) |
| 06/10/2007 | 79 | MOTION for certificate of appealability filed by David A. Ruhnke on behalf of Keith D Nelson. Suggestions in opposition/response due by 6/25/2007 unless otherwise directed by the court. (Ruhnke, David) (Entered: 06/10/2007) |
| 06/10/2007 | 80 | NOTICE OF APPEAL by Keith D Nelson. Filing fee $ 455. (Ruhnke, David) (Entered: 06/10/2007) |
| 06/25/2007 | 81 | SUGGESTIONS in opposition re 79 MOTION for certificate of appealability filed by Matt Jeffrey Whitworth on behalf of Respondent United States of America. Reply suggestions due by 7/12/2007 unless otherwise directed by the court (Related document(s)79) (Whitworth, Matt) (Entered: 06/25/2007) |
| 07/10/2007 | 83 | Consent MOTION for extension of time to file response/reply *re COA application* filed by David A. Ruhnke on behalf of Keith D Nelson. Suggestions in opposition/response due by 7/26/2007 unless otherwise directed by the court. (Ruhnke, David) (Entered: 07/10/2007) |
| 07/17/2007 | 84 | ORDER granting 83 movant's motion for extension of time to file reply re 79 MOTION for certificate of appealability. Movant shall file his reply to respondent's opposition to movant's motion for certificate of appealability no later than July 30, 2007. Reply suggestions due by 7/30/2007 unless otherwise directed by the court Signed by Judge Fernando J. Gaitan Jr. on 7/17/07. (Enss, Rhonda) (Entered: 07/17/2007) |
| 07/30/2007 | 85 | REPLY SUGGESTIONS to motion re 79 MOTION for certificate of appealability *in response to government's opposition* filed by David A. Ruhnke on behalf of Movant Keith D Nelson. (Related document(s)79) (Ruhnke, David) (Entered: 07/30/2007) |
| 09/04/2007 | 86 | ORDER denying 79 motion for certificate of appealability. Signed by Judge Fernando J. Gaitan Jr. on September 4, 2007. (Jones, Robin) (Entered: 09/04/2007) |
| 09/04/2007 | 88 | TRANSMISSION of Notice of Appeal Supplement to US Court of Appeals, 8th Circuit via electronic mail. Related document 79 MOTION for certificate of appealability, 80 Notice of Appeal. (Crespo, Wil) |

NELSON ADDENDUM A8

| | | |
|---|---|---|
| | | (Entered: 09/04/2007) |
| 09/05/2007 | | ***Appeal Receipt of Notice of Appeal and supporting documents received by USCA on: Wed Sep 5 08:31:06 CDT 2007 (Court of Appeals1, ) (Entered: 09/05/2007) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 11/04/2007 15:17:51 | | | |
| **PACER Login:** | cj0459 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 4:04-cv-08005-FJG |
| **Billable Pages:** | 5 | **Cost:** | 0.40 |

NELSON ADDENDUM A9

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| KEITH D. NELSON, | : | |
| Movant, | : | |
| vs. | : | 4:04-cv-8005(JFG) |
| UNITED STATES OF AMERICA, | : | |
| Respondent. | : | |

# NOTICE OF APPEAL

PLEASE TAKE NOTICE that Movant, Keith D. Nelson, by his undersigned counsel, hereby appeals to the United States Court of Appeals for the Eighth Circuit from the decision of the district court, Hon. Fernando F. Gaitan, Jr., Chief Judge, entered on November 21, 2006, denying a motion brought pursuant to 28 U.S.C. § 2255 to set aside Movant's conviction and sentence of death, and of the order entered on April 13, 2007, denying Movant's motion pursuant to F.R.Civ.P. 59 seeking a new trial or other appropriate relief. A motion for a certificate of appealability has been filed with the district court on this date.

. Respectfully submitted,

/s/ Gary E. Brotherton
Gary E. Brotherton
2102 Chapel Plaza Court, Suite 13
Columbia, MO 65202-3381
(573)875-1571
(573)875-1572
gebrotherton@legalwritesllc.com
Co-counsel to Movant, Keith Nelson

/s/ David A. Ruhnke
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
(973)744-1000
(973)746-1490 (fax)
davidruhnke@ruhnkeandbarrett.com
Co-counsel to Movant, Keith Nelson

CERTIFICATE OF SERVICE

On today's date, the undersigned counsel served this notice upon the United States by filing via ECF.

/s/ David A. Ruhnke
DAVID A. RUHNKE

Electronically filed: Kansas City Missouri
June 10, 2007

# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
vs. ) Case No. 99-00303-01-CR-W-2
)
KEITH DWAYNE NELSON, )
)
Defendant. )

## SPECIAL VERDICT FORM

### I. AGE OF DEFENDANT

Instructions: Answer "YES" or "NO." Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that:

The defendant Keith Dwayne Nelson was eighteen years of age or older at the time of the offense.

YES X

NO ____

[redacted]
Foreperson

Instructions: If you answered "NO" with respect to the determination in this section, then stop your deliberations, cross out Sections II, III, IV, V and VI of this form, and proceed to Section VII. Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the

manner in which he or she reached his or her decision. You should then advise the courtroom deputy that you have reached a decision.

If you answered "YES" with respect to the determination in this Section I, proceed to Section II which follows.

## II. REQUISITE MENTAL STATE

Instructions: Answer "YES" or "NO."

1. Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant intentionally killed Pamela Butler.

YES X

NO ____

[redacted]
Foreperson

Instructions: If you answered "NO" with respect to the determination in this section, then stop your deliberations, cross out Sections III, IV, V and VI of this form, and proceed to Section VII. Each juror should carefully read the statement in Section VII and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the courtroom deputy that you have reached a decision.

If you answered "YES" with respect to the determination in this Section II, proceed to Section III which follows.

## III. STATUTORY AGGRAVATING FACTORS

Instructions: For each of the following, answer "YES" or "NO."

1. Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant committed the offense during a kidnaping?

YES X

NO _______

[redacted]
Foreperson

2. Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant committed the offense after substantial planning and premeditation?

YES X

NO _______

[redacted]
Foreperson

3. Do you, the jury, unanimously find that the defendant committed the offense in an especially heinous, cruel and depraved manner in that the offense involved torture or serious physical and mental abuse to Pamela Butler?

YES X

NO _______

[redacted]
Foreperson

4. Do you the jury, unanimously find that the victim Pamela Butler was particularly vulnerable due to her youthful age of 10 years?

YES X

NO ______

[redacted]
Foreperson

Instructions: If you answered "NO" with respect to all of the Statutory Aggravating Factors in this Section III, then stop your deliberations, cross out Sections IV, V and VI of this form, and proceed to Section VII of this form. Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the courtroom deputy that you have reached a decision.

If you found the requisite age in Section I, the requisite mental state in Section II and answered "Yes" with respect to one or more of the aggravating factors in this Section III, proceed to Section IV which follows.

## IV. NON-STATUTORY AGGRAVATING FACTORS

Instructions: For each of the following, answer "YES" or "NO."

1. Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant is a future danger in that he would commit criminal acts of violence that would constitute a continuing threat to society?

YES X

NO ______

[redacted]
Foreperson

2. Do you the jury, unanimously find that the defendant has a significant criminal history?

YES X

NO ______

[redacted]
Foreperson

Instructions: Regardless of whether you answered "YES" or "NO" with respect to the Non-Statutory Aggravating Factors in this Section IV, proceed to Section V, which follows.

## V. MITIGATING FACTORS

Instructions: For each of the following mitigating factors, indicate, in the space provided, the number of jurors who have found the existence of that mitigating factor to be proven by a preponderance of the evidence.

A finding with respect to a mitigating factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who agree that the factor has been established. Further, any juror may also weigh a mitigating factor found by another juror, even if he or she did not also find that factor to be mitigating. The non-statutory mitigating factors the defendant asserts he has proved by a preponderance of the evidence are:

A. Non-Statutory Mitigating Factors

1. Being subjected to physical and emotional abuse as a small child permanently altered Keith Dwayne Nelson's psyche and personality and detracted from his ability to be a successful and insightful adult.

Number of jurors who so find 1

2. Many years of gross neglect and a lack of parental supervision contributed greatly to Keith Dwayne Nelson's own sense of self-worthlessness and depression.

Number of jurors who so find 0.

3. Despite his own deprived childhood, Keith Dwayne Nelson has shown affection, good judgment and love in caring for the young son of his former girlfriend, Kerri Dillion.

Number of jurors who so find 0.

4. Keith Dwayne Nelson has been a devoted and caring son to his mother, Nancy Nelson.

Number of jurors who so find 0.

5. Keith Dwayne Nelson has been a loyal and faithful brother to his four siblings.

Number of jurors who so find 0.

6. In the past, Keith Dwayne Nelson has been a hardworking and dedicated employee to his boss, and a financially responsible boyfriend to his girlfriend and her son while they all lived together.

Number of jurors who so find 0.

7. Keith Dwayne Nelson has admitted his guilt and pleaded guilty to the murder of Pamela Butler without any promise or expectation of leniency.

Number of jurors who so find 0.

8. Keith Dwayne Nelson will be of low risk of violent behavior in prison and can live the rest of his life peacefully and productively if allowed to die of old age behind bars.

Number of jurors who so find 0

9. Keith Dwayne Nelson can be a positive influence on the life of his young son, counseling, teaching and caring for the boy as he grows up over the ensuing decades.

Number of jurors who so find 0.

10. If allowed to live, Keith Dwayne Nelson can remember and agonize over the death of Pamela Butler which he caused on October 12, 1999 and in the process of many years of remorse and contrition, he will become a better person than the young man who caused her death.

Number of jurors who so find 0.

The following extra spaces are provided to write in additional mitigating factors, if any, found by any one or more jurors. If none, write "NONE" and line out the extra spaces with a large "X." If more space is needed, write "CONTINUED" and use the reverse side of this page.

_. NONE _____________________________________________________.

Number of jurors who so find ________.

_. ________________________________________________________.

Number of jurors who so find ________.

_. ________________________________________________________.

Number of jurors who so find ________.

Instructions: Proceed to Sections VI and VII which follow.

## VI. DETERMINATION

Based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death:

A. Death Sentence

We determine, by unanimous vote, that a sentence of death shall be imposed.

YES ✓

NO ________

If you answer "YES," sign your names here, and then proceed to Section VII. If you answer "NO," the foreperson alone should sign, and you should proceed to Section VI(B):

[redacted]

FOREPERSON

Date: November 28, 2001

B. Sentence of Life in Prison Without Possibility of Release

We determine, by unanimous vote, that a sentence of life imprisonment without possibility of release shall be imposed.

YES ________

NO ________

If you answer "YES," sign your names here, and then proceed to Section VII.

____________ ____________

____________ ____________

____________ ____________

____________ ____________

____________ ____________

____________ ____________
FOREPERSON

Date: November __, 2001





Appellate Case: 07-3071 Page: 23 Date Filed: 11/26/2007 Entry ID: 3375881

## VII. CERTIFICATION

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or the victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation regarding a sentence for the crime in question regardless of the race, color, religious beliefs, national origin, or sex of the defendant, or the victim.

[redacted] FOREPERSON

Date: November 28, 2001





Appellate Case: 07-3071 Page: 24 Date Filed: 11/26/2007 Entry ID: 3375881

C:\Case Files\Nelson\Motion to vacate sentence 11-06-2005.wpd

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| KEITH D. NELSON, | : | |
| Movant, | : | |
| vs. | : | 4:04-cv-8005(JFG) |
| UNITED STATES OF AMERICA, | : | |
| Respondent. | : | |

MOTION, BROUGHT PURSUANT TO 28 U.S.C. § 2255,
TO VACATE THE CONVICTION AND SENTENCE IMPOSED[1]

COMES NOW Keith D. Nelson ("Movant"), by his undersigned counsel, and moves this Court, pursuant to 28 U.S.C. § 2255, to vacate, set aside, and/or correct his conviction and sentence of death since each was imposed in violation of the United States Constitution or the laws of the United States. Movant seeks a hearing on all disputed issues of fact. Movant reserves the right to amend this petition in accordance with law. Movant is presently confined in the United States Penitentiary, Terre Haute, Indiana. In support of this motion, Movant states the following:

1. The judgment of conviction and sentence which are the subjects of this challenge were entered in the United States District Court for the Western District of Missouri, located in Kansas City, Missouri. The case was docketed as *United States v. Keith D. Nelson*, 4:99-cr-00303-FJG-ALL.

[1]This motion substantially follows the format of the standard form appended to the Rules Governing Section 2255 Proceedings for the United States District Courts. *See* Rule 2(c). The standard form admonishes that a 2255 motion should be limited to a statement of the "specific facts which support [a] claim" and that a 2255 motion should "not argue or cite law."

2. On October 25, 2001, Movant entered a plea of guilty to count one of the indictment. On November 28, 2001, the jury empaneled for the purposes of assessing penalty recommended imposition of a sentence of death. Judgment was imposed in accordance with the jury's verdict on March 12, 2002, and Movant was sentenced to death together with a monetary penalty of $100. At the time of sentencing, count two of the indictment was dismissed on motion of the Government.

3. As noted in ¶ 2 above, Movant was sentenced to death.

4. Count one of the indictment charged Movant with kidnapping resulting in death, in violation of 18 U.S.C. § 1201; count two of the indictment charged Movant with aggravated sexual abuse, in violation of 18 U.S.C. § 2241.

5. Movant entered a guilty plea to count one.

6. Movant went to trial before a jury on the issue of penalty.

7. Movant did not testify at his trial or at any hearings.

8. Movant appealed his conviction and sentence to the United States Court of Appeals for the Eighth Circuit.

9. Movant's direct appeal was docketed in the Eighth Circuit as No. 02-1757. On October 22, 2003, Movant's conviction and sentence were affirmed. *United States v. Nelson*, 347 F.3d 701 (8th Cir. 2003.) Movant raised the following issues on direct appeal:[2] (1) the district court conducted an inadequate *voir dire* of the jury; (2) Movant's motion for a change of venue was erroneously denied; (3) the district court erroneously denied defense challenges for-cause as to five prospective jurors and erroneously granted prosecution for-cause challenges as to three jurors; (4) certain aspects of the penalty-phase jury instructions did not

---

[2]The briefing filed on Movant's behalf in the Eighth Circuit speaks for itself and the following summary is not intended to substitute for the specific contents of those briefs.

fairly and accurately state the applicable law; and (5), certain of the victim-impact evidence should not have been admitted. On November 8, 2004, the Supreme Court of the United States denied *certiorari* review under Docket No. 03-10620. *Nelson v. United States*, 125 S.Ct. 486 (2004).

10. Movant has filed no other post-judgment motions, petitions, or applications concerning this sentence and judgment of conviction.

11. Movant presents the following grounds for relief and reiterates his demand for an evidentiary hearing on all factual issues:

A. Ground one: Movant was denied the effective assistance of trial counsel, a right guaranteed by the Sixth Amendment to the United States Constitution and the laws of the United States, because in each and every instance cited below, the performance of Movant's defense counsel, individually and/or cumulatatively, fell below an objective standard of reasonableness under prevailing professional norms, and there is a reasonable probability that, but for counsels' unprofessional errors, the result of the proceeding would have been different in that at least one juror would have struck a different balance. In support of this ground, Movant states as follows:

(1) Movant's case was characterized by numerous changes of counsel. There were times when Movant had no counsel who met the qualifications required by 18 U.S.C. § 3005 as being "learned in the law applicable to capital cases . . . ." The following summarizes the history of Movant's representation by counsel in the district court:

- Immediately following Movant's arrest on October 17, 1999, he was represented by a "volunteer" retained attorney, Daniel L. Franco, who has since been disbarred. Thereafter, the Court appointed the Federal Public Defender (effective October 21, 1999), Susan Hunt, Esquire (effective November 2, 1999), and William E. Shull, Esquire (effective November 2, 1999)..

- Larry C. Pace, Esquire, of the Federal Public Defender, remained in the case for approximately 10 months. On July 28, 2000, Movant filed a motion to withdraw Mr. Pace as Movant's counsel. The motion was granted on August 21, 2000, although the actual order was apparently not entered on the docket until March 2, 2001.

- On September 6, 2000, Movant filed a notice with the Court that Mr. Franco had been discharged as Movant's counsel. An order withdrawing Mr. Franco was entered on the docket on March 2, 2001.

- With regard to Mr. Shull, an order was docketed on November 14, 2000 denying Movant's request to withdraw Mr. Shull as counsel. (There does not appear to be a docket entry for the motion itself.) Thereafter, on February 20, 2001, an order was docketed granting Mr. Shull's oral motion to withdraw as Movant's counsel.

- On the same date as Mr. Shull's withdrawal, February 20, 2001, Patrick Berrigan, Esquire was appointed as counsel to Movant

- For the purposes of this motion, Movant's trial-level attorneys will be referred to simply as "defense counsel."

(2) Defense counsel failed to conduct an adequate mitigation investigation, an investigation that should have, but did not, consist of efforts to discover all reasonably available mitigating evidence and to rebut any aggravating evidence to be introduced by the Government. A properly-conducted mitigation investigation would have yielded significant evidence in mitigation.

(3) In the Spring of 2001, a mitigation investigator appointed by the Court to assist defense counsel in preparation of the case advised defense counsel that the mitigation investigation was incomplete and that there was substantial investigation that remained to be completed. Despite this warning, defense counsel did not take the steps required to

complete the mitigation investigation. By the Fall of 2001, with the trial date imminent, defense counsel were aware that an adequate mitigation investigation had not been conducted, that the investigation was incomplete, and that a substantial amount of additional time was required in order to complete an adequate investigation. Despite this knowledge, and despite a specific request from Movant that his counsel seek to adjourn the trial because counsel were not ready to proceed, no such motion was made.

(4) Despite the availability of court-authorized funding, defense counsel failed to conduct an adequate investigation of Movant's mental health, including a failure to conduct a neuropsychological examination and/or to have Movant examined by a qualified clinical psychologist or psychiatrist. A properly-conducted mental-health investigation would have yielded significant clinical findings of mental illness. A properly-conducted neuropsychological examination would have revealed that Movant shows indications of frontal lobe disturbance/dysfunction, which is a circumstance that affects Movant's everyday thinking and reasoning capacities, and that testing Movant would have shown that his brain does not conform with what is seen in individuals with normal functioning brains, and that his overall testing performance was consistent with and indicative of brain dysfunction.

(5) The failure of defense counsel to conduct a timely and adequate mental-health investigation lead counsel to instruct Movant that he should decline to submit to mental-health testing by Government experts,

advice that was followed by Movant, resulting in a court order barring Movant from presenting any mitigating evidence relating to his mental health.

(6) Defense counsel failed to elicit a complete and accurate family story from Nancy Nelson, Movant's mother, because she was uncomfortable talking about her childhood and the manner in which Movant and his brothers were raised. Counsel knew that Dr. Mark Cunningham would later describe a family history of abuse as a risk factor affecting subsequent generations. Nevertheless, counsel "agreed" not to ask Nancy Nelson uncomfortable questions, the answers to which would have provided the foundation for the presence of significant risk factors in Movant's childhood.

(7) Defense counsel failed to file appropriate pre-trial motions challenging the capital aspects of Movant's case.

(8) Defense counsel failed to conduct an adequate *voir dire* of prospective jurors on, among other issues, the prospective jurors' views regarding capital punishment and the exposure of potential jurors to publicity regarding Movant's then recent suicide attempt.

(9) Defense counsel told the jury in opening statements that Movant was born a month premature, suffered from low birth-weight and respiratory distress, but that "he recovered just fine." Counsel's assertion was based on an inadequate investigation of Movant's life history, including consultation with appropriate experts and utilization of hospital records in possession of the defense. When Dr. Mark Cunningham testified

that these were risk factors, the jury understood them not to be present in Movant since he had "recovered just fine."

(10) Defense counsel failed to call William R. Criss, Shift Supervisor for Corrections Corporation of America, to testify. Counsel knew that Criss could have testified that, as early as January 20, 2000, Movant wanted to take responsibility for his actions in this case. After talking to his girlfriend, Movant became emotional and stated he wanted to "do something right for the first time in [his] life." Such testimony would have refuted the Government's view that Movant was emotional with his girlfriend only because he was sorry he had gotten caught.

(11) Defense counsel asked Kenneth Nelson about his intelligence but failed to make an offer of proof after the District Court told him the Court had heard enough and to move on. The omitted evidence was critical to showing that Kenneth Nelson had a protective factor that Movant simply did not have – *i.e.*,a native intelligence which opened doors for Kenneth.

(12) Defense counsel failed to object when the District Court admitted testimony about a knife taken from Movant's kitchen. This testimony had no tendency to prove or disprove any fact in issue; rather, the testimony simply diverted the jurors' attention away from the issue at hand – should Movant live or die.

(13) Defense counsel failed to object when the District Court allowed testimony that Paul Wilt had won an award from the Kansas City, Kansas Police Department, "as a testament to [his] quick thinking or

quick action in this case." This evidence had no tendency to prove or disprove any fact in issue; rather, it served only to divert the jurors' attention away from the issues surrounding the only question the jurors had to answer – to wit: should Movant live or die?

(14) Defense counsel failed to elicit from Dr. Thomas Young, Medical Examiner, that his initial findings indicated: (1) that it would be "difficult" to determine whether the victim's hymenal tear was the result of a fresh injury; and (2) that, without positive results from the rape kit, "no determination of sexual assault can be conclusively made." This evidence would have explained refuted or undercut the Government's theory that Movant sexually assaulted the victim at the time of the murder.

(15) Defense counsel failed to make appropriate objections at trial, including, but not limited to, the following:

(a) Once the jury was sworn, defense counsel failed to object to the case proceeding as a capital case since the requisite elements of capital murder were not contained in the indictment.

(b) Defense counsel failed to object to comments in the Government's opening that the Government sought the death penalty in Movant's case "without reservation" or "without hesitation" implying that the Government had undertaken a comparison of Movant's case with other potentially capital cases and that Movant's case was, in the opinion of the Government prosecutors, worse than those other case and, therefore, more deserving of a sentence of death.

(c) Defense counsel failed to object to comments in the Government's opening that Movant would present "a continuing threat to society," implying erroneously that Movant might some day be released from confinement.

(d) Defense counsel agreed pretrial not to object to certain prefatory hearsay statements about which Agent Cullen Scott would

testify. This agreement resulted in the Government presenting hearsay testimony at will, using Agent Scott as something of a narrator for its case from beginning to end. Such hearsay was not admissible under any exception to the rule and its use deprived Movant of his Sixth Amendment right to confront his accusers.

(e) Defense counsel failed to object to numerous inflammatory and improper comments in the Government's initial and rebuttal summations, and failed to request a mistrial or a new trial based on blatantly improper comments, including, but not limited to, the following:

<u>The initial summation</u>:

- Argument that the jury should vote for death because, "If this crime doesn't call for the death penalty, what crime does?"
- Argument that the jury should vote for death because, "We need to protect our children. We need to send a message to guys like the defendant . . . ."
- Argument that the death penalty should be imposed because, "The community cries out for justice."
- Argument that legally appropriate and relevant mitigating evidence was "all this excuse testimony" and a "guilt trip."
- Argument that the jury should impose a death penalty because the Government recommended it "without reservation."

<u>Rebuttal summation</u>:

- Argument that the case was about the "slaughter" of "our children."
- Argument that denigrated legally appropriate and relevant mitigating evidence as "an excuse," "the blame game," "the abuse excuse," and an effort by defense counsel to claim the crime was "somebody else's fault."
- Argument that the mitigating evidence was not worthy of jury consideration since it didn't "explain why" the crime occurred.

- Argument that described Movant as "a rotten human being."

- Argument that personally denigrated defense counsels' efforts to persuade the jury of mitigating evidence as "a smoke screen" and an attempt to "divert [the jury] from what this case is really about, the slaughter of an innocent."

- Argument that personally denigrated defense counsels' efforts to persuade the jury of mitigating evidence as masking counsels' true motive, *i.e.*, "What they want you to do is have him escape justice."

- Argument that equated mercy with weakness.

- Argument that described Movant as "evil at his core."

- Argument that invited jurors to rely on the prosecution's experience by telling the jury that, "There is no clearer call for the death penalty than there is in this case," and, later, "If not him, who? If not now, when? If killing and raping a kid isn't enough, then we don't need a death penalty. We don't need a death penalty."

- Argument that suggested that the jury should impose a sentence of death since the jury "represent[ed] the people of the United States in this case . . . ."

- Argument that instructed the jurors to close their eyes and re-live the horrors of the victim's last hours, calling upon the jury to "Think about . . . what that little girl was thinking," and to imagine,"What was she thinking?," and to, "Imagine what she experienced in that last part of her life," and to "Close your eyes, and . . . envision [the abduction and murder]."

- Argument that a verdict of death was the only just verdict and that the jury was "the dispensers of justice," and that the victim's mother "Waits for you to give her some justice. And justice in this case can only be had by imposing a sentence of death," essentially suggesting to the jury, *inter alia* that a sentence of death should be imposed because that's what the victim's survivors wished.

- Argument that, "[T]he death penalty was enacted for crimes like this."

(16) Defense counsel failed to call a highly-qualified forensic pathologist, Thomas L. Bennett, M.D., who was present in the courthouse and prepared to testify that the physical findings at autopsy did not support a conclusion that the victim had been sexually penetrated. Dr. Bennett was prepared to testify that the opening in the hymen's mid-part discovered at autopsy is a normal condition for young girls and "any statements offering that there are injuries [to the vaginal vault] are directly in conflict with the forensic evidence." The emotional center-piece of the Government's case for death was the alleged rape of the victim, and Dr. Bennett could have and would have refuted that evidence. Without Dr. Bennett's testimony, the Government was able to argue in closing, with no evidence presented to the contrary, that the hymen was unnaturally torn, as a result of the victim's sexual assault by Movant, while drawing the jury's attention to the graphic and disturbing post-mortem photographs, and pointing, "right there and right there."

(17) Defense counsel failed to object when the Government asked Penny Butler, the victim's sister, if she was scared as she testified. The child's fear had no tendency to prove or disprove any fact in issue; rather, it served only to inflame the passions and prejudices of the jury by implying that Movant had scared Penny twice – once during the kidnapping and once during the trial.

(18) Defense counsel advised and convinced Movant to plead guilty to count one of the indictment in exchange for the Government dismissing count

two of the indictment and letting the defense argue that Movant had accepted responsibility for his actions, a contention that was unanimously rejected by the jury To reach this agreement, Movant was required to waive any post-conviction challenge as to the guilty plea. This is an unenforceable condition and trial counsel were placed in a conflicted position when they advised Movant to accept the conditions of the offer while ostensibly avoiding post-conviction review of the reasonableness of that advice as it pertained to Movant's decision to enter a guilty plea.

(19) Defense counsel failed to argue in Movant's motion for a new trial that the District Court had been in error in refusing to let the defense ask a witness, Fred Lawrence, whether the Bureau of Prisons was equipped to handle the security of Movant. To bolster its theory that Movant was a future danger to society, the Government had elicited from Lawrence that Movant posed a security risk, and the defense should have been permitted to explain, deny, refute, or lessen the impact of that testimony.

(20) Defense counsel failed to argue in Movant's motion for a new trial that the District Court had erred in refusing to let the defense ask Roger Moore, Jr., why two inmates would have claimed that he had called Movant a "sissy" or a "punk." This evidence was not being offered to prove the truth of Moore's statement, but rather to show that he made them. The evidence was necessary to put the altercation with Moore into context by showing that Moore had been goading and taunting

Movant.

(21) Defense counsel failed to argue in Movant's motion for new trial that the District Court abused its discretion in letting the Government present evidence through a witness, Bruce Roberts, that an inmate had told Roberts that Movant had threatened to harm the inmate's five-year old daughter. This alleged statement of Movant was never disclosed to the defense. Further, this was precisely the class of evidence that the District Court precluded Movant from presenting through Roger Moore, Jr.

(22) There are additional instances of prejudicial ineffective assistance of defense counsel which individually, and cumulatively in combination with other instances of ineffective assistance, denied Movant the Sixth Amendment's guarantee of the effective assistance of counsel.

B. Ground two: Movant was denied the effective assistance of appellate counsel, a right guaranteed by the Fifth and Sixth Amendments to the United States Constitution and the laws of the United States. In each instance cited below, among others, the performance of Movant's appellate counsel fell below an objective standard of reasonableness under prevailing professional norms, and there is a reasonable probability that, but for counsels' unprofessional errors, individually and/or cumulatively, the result of the appellate proceeding would have been different. In support of this ground, Movant states as follows:

(1) At the time Movant's brief was prepared and filed by appellate counsel, neither of his appellate counsel had conducted an adequate review of the record or the applicable law in order to determine which issues should be presented on Movant's behalf. Despite this lack of

preparedness, appellate counsel knowingly filed an inadequate brief instead of seeking additional time from the Court of Appeals in which to prepare an adequate brief on Appellant's behalf.

(2) Appellate counsel failed to brief and argue the following issues, which individually or in combination, undercut confidence in the reliability of the outcome:

(a) Appellate counsel failed to argue on appeal that the indictment was inadequate as not alleging the requisite elements of capital murder, including Movant's age, his state-of-mind at the time of the offense, and the existence of aggravating factors.

(b) Appellate counsel failed to argue on appeal that the District Court abused its discretion in admitting numerous disturbing, gruesome, and inflammatory photographs. While such photographs may have had some tendency to prove issues of fact relevant to a guilt-phase trial, this was simply a penalty phase case where the defense did not contest the manner or nature of death.

(c) Appellate counsel failed to argue on appeal numerous instances of improper closing argument by the Government, including, but not limited to, the following:

The initial summation:

- Argument that the jury should vote for death because, "If this crime doesn't call for the death penalty, what crime does?"
- Argument that the jury should vote for death because, "We need to protect our children. We need to send a message to guys like the defendant . . . ."
- Argument that the death penalty should be imposed because, "The community cries out for justice."
- Argument that legally appropriate and relevant mitigating evidence was "all this excuse testimony" and a "guilt trip."
- Argument that the jury's verdict was simply a recommendation and, "You're not killing anybody . . . ."

This improper argument diminished the jurors' sense of responsibility and the Government's final notation that "If you recommend the death penalty it will happen" did not purge the taint of the improper argument. There was a contemporaneous objection below and a mistrial motion premised on this remark.

- Argument that the jury should impose a death penalty because the Government recommended it "without reservation."

Rebuttal summation:

- Argument that the case was about the "slaughter" of "our children."
- Argument that denigrated legally appropriate and relevant mitigating evidence as "an excuse," "the blame game," "the abuse excuse," and an attempt to claim the crime was "somebody else's fault."
- Argument that the mitigating evidence was not worthy of jury consideration since it didn't "explain why" the crime occurred.
- Argument that described Movant as "a rotten human being."
- Argument that personally denigrated defense counsels' efforts to persuade the jury of mitigating evidence as "a smoke screen" and an attempt to "divert [the jury] from what this case is really about, the slaughter of an innocent."
- Argument that personally denigrated defense counsels' efforts to persuade the jury of mitigating evidence as masking counsels' true motive, *i.e.*, "What they want you to do is have him escape justice."
- Argument that equated mercy with weakness.
- Argument that described Movant as "evil at his core."
- Argument that invited jurors to rely on the prosecution's experience by telling the jury that, "There is no clearer call for the death penalty than there is in this case," and, later, "If not him, who? If not now, when? If killing and

raping a kid isn't enough, then we don't need a death penalty. We don't need a death penalty."

- Argument that suggested that the jury should impose a sentence of death since the jury "represented] the people of the United States in this case . . . .."

- Argument that instructed the jurors to close their eyes and re-live the horrors of the victim's last hours, calling upon the jury to "Think about . . . what that little girl was thinking," and to imagine,"What was she thinking?," and to "Imagine what she experienced in that last part of her life," and to "close your eyes, and . . . envision [the abduction and murder]."

- Argument that instructed the jury that a verdict of death was the only just verdict and that the jury was "the dispensers of justice" and that the victim's mother "waits for you to give her some justice. And justice in this case can only be had by imposing a sentence of death," essentially suggesting to the jury, *inter alia* that a sentence of death should be imposed because that's what the victim's survivors wished.

- Argument that, "[T]he death penalty was enacted for crimes like this."

(d) Appellate counsel failed to argue on appeal that the District Court abused its discretion in overruling defense counsel's objections that Agent Scott's hearsay testimony was merely cumulative to the anticipated testimonies of Penny Butler, Casey Butler, Paul Wilt, David Cunningham, Steven Underwood, Patti Griffith, Robert Howell and Lauri Torrez, and that the testimony violated the Confrontation Clause of the Sixth Amendment.

(e) Appellate counsel failed to argue on appeal that the District Court abused its discretion in not declaring a mistrial during Dr. Mark Cunningham's testimony when the Government alleged that mitigation didn't really matter in the context of the murder of a ten year old girl.

(f) Appellate counsel failed to argue on appeal that the District Court erred in finding that Officer Keith did not interrogate Movant when he looked Movant "dead in the eye," when a bystander asked, "What about the girl?" This "look" was designed to elicit an incriminating response; indeed, Officer Keith agreed that he hoped to get an answer from Movant.

(g) Appellate counsel failed to argue on appeal that the District Court erred in letting the Government ask Penny Butler if she was scared as she testified. Penny's fear had no tendency to prove or disprove any fact in issue; rather, it served only to inflame the passions and prejudices of the jury by implying that Movant had scared Penny twice – once during the kidnapping and once during the trial.

(h) Appellate counsel failed to argue on appeal that the District Court abused its discretion and erred in refusing to let the defense ask Fred Lawrence whether the Bureau of Prisons was equipped to handle the security of Movant. To bolster its theory that Movant was a future danger to society, the Government elicited from Lawrence that Movant poses a security risk, and the defense should have been allowed to explain, deny or refute that testimony.

(i) Appellate counsel failed to argue on appeal that the District Court abused its discretion and erred in refusing to let the defense ask Roger Moore, Jr., why two inmates would have claimed that he had called Movant a "sissy" or a "punk." This evidence was not being offered to prove the truth of Moore's statement, but rather to show that he made them. Such evidence was necessary to put the altercation with Moore into context by showing that Moore had been goading Movant.

(j) Appellate counsel failed to argue on appeal that the District Court abused its discretion and erred in letting the Government present evidence through Bruce Roberts that an inmate had told him that Movant had threatened to harm the inmate's five year old daughter. This alleged statement of Movant was never disclosed to the defense. Further, this was precisely the class of evidence that the District Court precluded Movant from presenting through Roger Moore, Jr.

(k) Appellate counsel failed to argue on appeal that the District Court abused its discretion and erred in admitting testimony about an unrelated knife taken from Movant's kitchen. This testimony had no tendency to prove or disprove any fact in issue; rather, it simply diverted the jurors' attention away from the issue at hand – should Movant live or die.

(l) Appellate counsel failed to argue on appeal that the District Court abused its discretion and erred when it admitted testimony that Paul Wilt had won an award from the Kansas City, Kansas Police Department, "as a testament to [his] quick thinking or quick action in this case." This evidence had no tendency to prove or disprove any fact in issue; rather, it served only to

divert the jurors' attention away from the issues surrounding the only question the jurors had to answer – to wit: should Movant live or die.

(m) Appellate counsel failed to argue on appeal other meritorious issues that individually, or cumulatively, denied Movant the effective assistance of appellate counsel.

WHEREFORE, Movant seeks from this Court: (1) an order pursuant to 28 U.S.C. § 2255 requiring the Government to answer this petition; (2) an order setting a status conference at which time a briefing, discovery and hearing schedule can be established; and (3), an order vacating the present judgment since it was imposed in violation of the United States Constitution and the laws of the United States.

Respectfully submitted,

/s/ Gary E. Brotherton
1390 Boone Industrial Drive, Suite 120
Columbia, MO 65202-3381
(573)875-1571
(573)875-1572 (fax)
gebrotherton@legalwritesllc.com
Co-counsel to Movant, Keith Nelson

/s/ David A. Ruhnke
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
(973)744-1000
(973)746-1490
davidruhnke@ruhnkeandbarrett.com
Co-counsel to Movant, Keith Nelson

Dated: Columbia, Missouri
Montclair, New Jersey
November 6, 2005

VERIFICATION

Movant, Keith D. Nelson, states, pursuant to penalties of perjury, 28 U.S.C. § 1746, that the foregoing is true and correct.

/s/ Keith D. Nelson
KEITH D. NELSON

CERTIFICATE OF SERVICE

Although service of a motion brought pursuant to 28 U.S.C. § 2255 is not required until the Court has made a preliminary ruling that the files and records of the case do not conclusively bar relief, Movant's counsel, in anticipation of such a ruling, has served this motion on today's date upon the United States by filing via ECF.

/s/ David A. Ruhnke
DAVID A. RUHNKE

Dated: Columbia, Missouri
Montclair, New Jersey
November 6, 2005

SUBMITTED *EX PARTE* AND UNDER SEAL

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| KEITH D. NELSON, | : | |
| Petitioner, | : | |
| vs. | : | 4:04-cv-8005(JFG) |
| UNITED STATES OF AMERICA, | : | |
| Respondent. | : | |

PETITIONER KEITH NELSON'S SEALED *EX PARTE* MOTION FOR
EXPERT AND INVESTIGATIVE ASSISTANCE

COMES NOW Petitioner Keith D. Nelson, by his undersigned counsel, and moves this Court for an order approving the appointment of two individuals – Michael Gelbort, Ph.D. and Jill Miller, MSSW – to provide expert and investigative assistance in this case.[1] The grounds for the motion are set forth in the following numbered paragraphs. Permission is also sought to maintain this motion as an *ex parte* filing and under seal.

[1]Dr. Gelbort is a clinical psychologist with a speciality in neuropsychology. Ms. Miller is a highly respected and sought after mitigation specialist with extensive experience in capital litigation in general and federal capital cases in particular. Their respective curricula vitae are filed herewith as attachments to this motion.

1. This is a motion for the appointment of two individuals to provide expert and investigative assistance in connection with this post-conviction challenge to Petitioner's sentence of death. The motion is brought pursuant to 21 U.S.C. § 848(q)(10)(B), and the guarantees of the Fifth, Sixth and Eighth Amendments to the United States Constitution. The motion discusses defense strategy, reveals privileged attorney-client conversations, discloses otherwise privileged conversations with Petitioner's trial counsel as well as an expert appointed to assist at the trial phase and, as such, contains privileged material and attorney work-product. Chapter VI of the Guidelines for Administration of the Criminal Justice Act ("CJA Guidelines") governs representation in federal capital cases, including habeas corpus cases challenging a sentence of death. Those Guidelines state that requests of this nature, as well as overall budget proposals, should be considered *ex parte* and under seal. *See* Guideline at § 6.02F, stating, "Courts are encouraged to require appointed counsel to submit (*ex parte*) a proposed initial litigation budget . . ." In May 1998, a sub-committee of the Committee on Defender Services of the Judicial Conference of the United States, chaired by Hon. James R. Spencer, U.S.D.J., released a report and recommendations on the cost and quality of defense representation in federal death penalty cases. *See*, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (hereinafter cited as "Spencer Committee Report").[2] In discussing case

---

[2]The recommendations made in the Spencer Committee Report were adopted by the Judicial Conference of the United States on September 15, 1998. A copy of the Spencer Committee Report is available through the federal judiciary's web-site: www.uscourts.gov.

budgeting, the Spencer Committee Report recommended that such budgets "be submitted ex parte and maintained permanently under seal," observing that, "A case budget requires counsel to spell out the overall litigation plan for the case. Consequently, it is an extremely sensitive document and contains privileged information." Spencer Committee Report at p. 56. The same may be said of this application. Permission is therefore sought, pursuant to 21 U.S.C. § 848(q)(9), to submit this application *ex parte* and under seal of the Court.

2. In November 2001, Keith D. Nelson ("Petitioner") was sentenced to death in this Court. On direct appeal, the sentence of death was affirmed. *United States v. Nelson*, 347 F.3d 701 (8th Cir. 2003). On November 8, 2004, the United States Supreme Court denied Petitioner's *certiorari* petition. *Nelson v. United States*, 125 S.Ct. 486 (2004). On December 14, 2004, this Court, Hon. Fernando J. Gaitain, Jr., U.S.D.J., appointed Gary E. Brotherton, Esquire and David A. Ruhnke, Esquire, to represent Petitioner on a petition for *habeas corpus* to be brought pursuant to 28 U.S.C. § 2255. That petition must be filed on or before November 8, 2005.

3. By this application, undersigned counsel move for the appointment of two experts to assist counsel in investigating and assessing one aspect of the 2255 petition. In particular, it is likely that Petitioner's present counsel will file a petition that alleges, as one ground for relief, ineffective assistance of counsel in the investigation and preparation of Petitioner's penalty-phase case.[3]

[3] Since Petitioner entered a guilty plea, the only issue presented to the jury was penalty.

4. Petitioner's present counsel are engaged in an ongoing investigation and review of the entire circumstances of this case. That review shows that the mitigation investigation of the case was woefully incomplete at the time the case went to trial. Petitioner's review also shows that his trial counsel, despite having obtained authorization from the Court to have Petitioner examined by mental-health professionals, including a neuropsychologist, did not do so and, in fact, Petitioner was not evaluated by a mental health professional until October 2001, shortly before his trial was to begin.[4] Despite presenting with a history of head injuries and other difficulties, Petitioner was never evaluated for organic brain damage or other cognitive dysfunction. Petitioner was prepared to cooperate in that evaluation. Finally, the investigation conducted by Petitioner's present counsel also reveals that the decision by Petitioner to refuse to meet with the Government's chosen mental-health processionals came at the suggestion of trial counsel in an ill-conceived effort to create trial error and an appellate issue. This latter assertion has been confirmed by both Petitioner and trial counsel.

5. A review of the history of this case shows that Susan Hunt, Esquire, was the only attorney who represented Petitioner in the case from its beginnings. Immediately following Petitioner's arrest on October 17, 1999, he was represented by a "volunteer" retained attorney, Daniel L. Franco, who has since been disbarred. Thereafter, the Court

[4]The evaluation and testimony of Mark Cunningham, Ph.D., was limited to historical "risk factors" and whether Petitioner would present a danger if confined for ;life.

appointed the Federal Public Defender (effective October 21, 1999), Ms. Hunt (effective November 2, 1999), and William E. Shull, Esquire (effective November 2, 1999). Thereafter, the following occurred with regard to Petitioner's representation by counsel:

- Larry C. Pace, Esquire, of the Federal Public Defender, remained in the case for approximately 10 months. On July 28, 2000, Petitioner filed a motion to withdraw Mr. Pace as counsel. The motion was granted on August 21, 2000, although the actual order was apparently not entered until March 2, 2001.

- On September 6, 2000, Petitioner filed a notice with the Court that Mr. Franco had been discharged as attorney of record. An order withdrawing Mr. Franco was actually entered on March 2, 2001.

- With regard to Mr. Shull, an order was entered on November 14, 2000 denying Petitioner's request to withdraw Mr. Shull as counsel. (There does not appear to be a docket entry for the motion itself.) Thereafter, on February 20, 2001, an order was entered granting Mr. Shull's oral motion to withdraw as Petitioner's counsel.

- On the same date as Mr. Shull's withdrawal, February 20, 2001, Patrick Berrigan, Esquire was appointed as counsel to Petitioner.

Mr. Berrigan and Ms. Hunt ultimately served as Petitioners trial counsel. Petitioner's trial commenced approximately just nine months after Mr. Berrigan's entry into the case.

6. One side-effect of the numerous changes of counsel was that no coordinated penalty-phase investigation was begun until early in 2001, when Tena Francis was appointed by the Court to serve as Petitioner's mitigation specialist. Based upon conversations with Ms. Francis and with trial counsel, it appears that her work on the case was coordinated primarily through Ms. Hunt, although Ms. Francis does have notes of conversations with Mr. Berrigan. It appears further that both Ms. Francis and Ms. Hunt believed it was important

to have Petitioner evaluated by a neuropsychologist or similarly-qualified professional in order to assess Petitioner for organic brain damage and/or other cognitive dysfunction. Despite the fact that an application for funding such an examination was made and granted by this Court, that examination never took place. It is the view of Petitioner's present counsel that the decision not to have a neuropsychological examination conducted cannot be justified as a reasonable strategy decision. While it may have been reasonable not to offer such evidence, depending on the results of the evaluation, that decision could not be made in a vacuum, *i.e.*, without having the examination results. It is for this reason that Petitioner now seeks the appointment of Michael Gelbort, Ph.D., to conduct a neuropsychological examination of Petitioner.

7. Dr. Gelbort is based in Chicago, in relatively close proximity to Petitioner's present place of confinement, Terre Haute, Indiana, and is prepared to undertake a neuropsychological evaluation of Petitioner promptly upon approval of this application. A neuropsychological examination consists of a review of pertinent history and records, an in-person evaluation, and the administration of a battery of standardized tests. The testing and evaluation process typically takes 8 to 10 hours to complete. Dr. Gelbort's hourly rate is $250 and he estimates that reviewing relevant records, conducting the examination, scoring the results, and preparing a report, will take him approximately 30 hours. Thus, authorization is sought for up to $7,500 for testing and a report, plus reasonable travel expenses. Dr. Gelbort will have to administer the testing at the federal death row, housed within the United

States Penitentiary at Terre Haute. Dr. Gelbort will be required to stay overnight in the Terre Haute area. If the appointment is approved by the Court, travel and lodging will be arranged, via National Travel Service, at government rates. Without this testing, the decision of trial counsel to forgo a neuropsychological examination for which funding had been authorized cannot be assessed for its impact on the second prong of the issue of effective assistance of counsel, *i.e.*, whether, assuming significant findings, the results of the examination would have made a difference to one or more jurors.[5]

8. Regarding the mitigation investigation, Ms. Francis was only in the case for nine months before the case came to trial. Both Ms. Francis and Ms. Hunt, in interviews, have confirmed that the investigation was incomplete at the time the trial began. For her part, Ms. Francis has informed Petitioner's present counsel that she had not come close to completing the investigation. In August of 2001 – approximately three months before the trial commenced – Ms. Francis prepared an affidavit for Petitioner's trial counsel outlining the tasks she felt that she needed to accomplish in order complete her work and estimating that she would need approximately 220 hours to do what was necessary to complete the investigation. Ms. Francis felt strongly that trial counsel should seek an adjournment of the trial date. At approximately the same time, Mr. Berrigan underwent heart surgery. Petitioner

---

[5]In the federal system, a jury that is non-unanimous for death spares a defendant's life. *Jones v. United States*, 527 U.S. 1 (1999). In *Wiggins v. Smith*, 123 S.Ct. 2527 (2003), the Court explained that, under such a system, the prejudice prong of *Strickland* is satisfied where "there is a reasonable probability that at least one juror would have struck a different balance." *Id*. at 2543.

agreed that an adjournment should be requested. After a discussion among all counsel, however, no such motion was made. It is Ms. Francis' recollection that she was asked to do very little work on the case thereafter. It is Petitioner's view that the decision not to seek an adjournment in the face of an incomplete mitigation case was not tactically reasonable.

9. Among the major areas left undone were the gathering of a family history of Petitioner's paternal family. There were numerous interviews and follow-up interviews that never took place. Ms. Francis spent very little time with Petitioners and believes that more time was required. Also left undone was an assessment as to whether Petitioner, as a result of his mother's alcohol abuse, had been born with Fetal Alcohol Syndrome ("FAS"). No effort was made to gather family photographs which may have shown the physical symptoms of FAS. Ms. Francis is unclear as to whether she acquired the records surrounding Petitioner's birth and social service files that would have demonstrated that the hospital where Petitioner was born, and retained for some time after his birth, did not want to release him to his mother since she had failed to visit Petitioner ion the hospital and was seen as unfit to be a parent. Ms. Francis does not believe she spent an adequate amount of time interviewing Petitioner, having seen him only once over the curse of two days. She believes she should have spent time investigating the circumstances of the juvenile facilities in Texas where Petitioner was confined as well as the facilities in Texas where Petitioner was incarcerated as a young adult. In short, the mitigation investigation conducted in this case fell far short of what is required. The responsibility to see that an adequate investigation is

conducted is, in the final analysis, counsel's. The failure to conduct an adequate mitigation investigation can amount to ineffective assistance of counsel. In order to establish that proposition, however, it is necessary for Petitioner's counsel to present results of a complete investigation in order to demonstrate what could have been presented had the investigation been completed. Otherwise, Petitioner would be unable to satisfy the "prejudice" prong of his Sixth Amendment claim.

10. This application seeks the appointment of Jill Miller, MSSW, to conduct and complete the mitigation investigation that was left half-completed by Ms. Francis and, by virtue of their responsibility for the overall presentation of the case, Petitioner's trial counsel. Ms. Miller is an extraordinarily talented mitigation specialist. Petitioner seeks up to 200 hours of time at an hourly rate of $110 per hour.[6] Ms. Miller, upon appointment, will conduct in depth interviews with Petitioner and with members of his family, on both the maternal and paternal sides. She will attempt to locate critical life history records that were not acquired by trial counsel in their incomplete investigation. She will also seek to

---

[6]This figure is not out of line for top level mitigation specialists. Ms. Miller has been authorized by United States District Court Judges to bill at this rate in numerous federal death penalty cases. She is also regularly been paid this rate by various Federal Public Defender offices which do not have to seek court approval for expert and investigative services in capital cases but pay experts out of their own budgets. Undersigned counsel David A. Ruhnke recently had the gratifying experience of working with Ms. Miller in a New Jersey capital case, on post-conviction, where the trial judge, in vacating the sentence of death, quoted at length from Ms. Miller's report, praised her work, and described her as, "An exceptionally gifted mitigation expert." *State v. Robert W. Morton*, Burlington County Ind.No. 93-09-0492-I (N.J. Superior Court 6/28/2005), Hon. Cornelius P. Sullivan, J.S.C., opinion vacating death penalty.

document and determine the presence or not of FAS. She will investigate the paternal side of Petitioner's family and will complete and supplement the investigation of other aspects of Petitioner life. In short, Ms. Miller will undertake and complete the mitigation investigation that should have been done in this case before Petitioner's life was placed in the balance before a jury.

______11. The task of defending a capital case, and preparing a case in mitigation, is unfamiliar to most courts and most attorneys, no matter how experienced in the area of criminal law. In 1983 Professor Gary Goodpaster published an article entitled, "The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases," 58 N.Y.U.L.REV. 299 (1983). In the article, Professor Goodpaster discussed the role of the advocate in a death-penalty case in the following terms:

> As an advocate, . . . defense counsel has the related but distinct function of attempting to persuade the jury to exercise mercy. Defense counsel therefore has both the opportunity and the duty to present potentially beneficial mitigating evidence and to attempt to convince the sentencer that, notwithstanding the defendant's guilt, he or she is a person who should not die. Once the defendant has been found guilty of a capital crime, a life sentence is counsel's only remaining advocacy goal. As an advocate for life, counsel must attempt to demonstrate that mitigating factors outweigh aggravating factors and must present the sentencer with the most persuasive possible case for mercy.

58 N.Y.U.L.REV. at 318. In his article, the author also outlined the steps an attorney handling a capital case should follow, including the absolute duty of trial counsel "to investigate the client's life history, and emotional and psychological make-up, as well as the

substantive case and defenses" noting further that, "The importance of this investigation, and the thoroughness and care with which it is conducted, cannot be overemphasized." *Id.* at 324. In describing the nature of such an investigation, Professor Goodpaster emphasized both its difficulty and time-consuming nature:

> Such investigations present more obstacles than those conducted in furtherance of an ordinary criminal defense, primarily because of the difficulty in locating relevant witnesses. Over the years, the witnesses who are acquainted with the defendant are likely to have become geographically dispersed and more difficult to trace than guilt-phase witnesses. Indeed, constructing a mitigating case on the basis of the life-history investigation is perhaps best viewed as a successive winnowing process: the attorney's investigator tracks down all mitigating leads; the attorney next interviews the most promising contacts and then chooses to call some of them at the penalty phase of the trial in accordance with a coherently developed strategy.

*Id.*

12. In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court established the now familiar two-prong test for evaluating claims that defense attorneys in criminal cases did not provide the effective assistance of counsel guaranteed by the Sixth Amendment to the United States Constitution. First, counsel's performance must fall "below an objective standard of reasonableness," *Strickland*, 466 U.S. at 680, and second, there must be a "reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different." *Id.* at 693-94. The first prong of *Strickland* is met where, in light of all the circumstances of the case, counsel's "acts or omissions were outside the range of professionally competent assistance." *Id.* at 690. *See*

*also, Burger v. Kemp*, 483 U.S. 776, 795 (1987); *United States v. Kauffman*, 109 F.3d 186, 190 (3d Cir. 1997). The second prong of *Strickland* is met where, but for counsel's unprofessional performance, there is a reasonable probability that the "result" of the proceeding would have been different.[7] *Kauffman*, 109 F.3d at 190 (quoting *United States v. Nino,* 878 F.2d 702, 711 (3d Cir. 1989).

13. There is, of course, no specific set of rules for judging reasonable performance. *Strickland*, 466 U.S. at 688-89. Instead, "[i]n any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances," *Strickland*, 466 U.S. at 688, although "[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides."[8] *Strickland*, 466 U.S. at 688.

14. It is the heart of this application that Petitioner's trial counsel could not have made a reasonable tactical judgment not to offer the results of a neuropsychological

---

[7]As noted earlier, in the context of a capital case where a non-unanimous jury spares a defendant's life, which is the situation in the federal system, the prejudice prong of *Strickland* requires proof only of "a reasonable probability that at least one juror would have struck a different balance." *Wiggins v. Smith,* 123 S.Ct. at 2543.

[8]In *Wiggins*, and more recently in *Rompilla*, the Court specifically cited the American Bar Association's 1989 "Standards for the Appointment and Performance of Counsel in Death Penalty Cases" as providing a guide to "'determining what is reasonable.'" *Wiggins*, 123 S.Ct. at 2537, quoting *Strickland*, 466 U.S. at 688. In interpreting *Wiggins*, at least one court has concluded that the 2003 revision of those guidelines should control since the 2003 Guidelines "simply explain in greater detail the 1989 Guidelines," especially in the area of "the obligations of counsel to investigate mitigating evidence." *Hamblin v. Mitchell*, 354 F.3d 482 (6th Cir. 2003).

evaluation without having conducted such an evaluation. Similarly, in the absence of a competed investigation, Petitioner's trial counsel could not have made reasonable tactical judgments about the scope and nature of the case in mitigation that would be presented. Of particular import here, courts have found counsel's performance unreasonable in cases challenging a failure to present evidence favorable to a defendant, where counsel failed to make "reasonable investigations or to make a reasonable decision that makes particular investigation unnecessary," *Strickland*, 466 U.S. at 691; *see also, Rompilla v. Beard*, 125 S.Ct. 2456 (2005); *Williams v. Taylor*, 529 U.S. 362, 396 (2000); *Mayfield v. Woodford*, 270 F.3d 915 (9th Cir. 2001) (en banc); *Coleman v. Mitchell*, 268 F.3d 417 (6th Cir. 2001); *Ainsworth v. Woodford*, 268 F.3d 868 (9th Cir. 2001); *Jermyn v. Horn*, 266 F.3d 257, 312 (3d Cir. 2001); *Carter v. Bell*, 218 F.3d 581, 596 (6th Cir. 2000); *Smith v. Stewart*, 189 F.3d 1004, 1008 (9th Cir. 1999) (9th Cir. 1999); *Berryman v. Morton*, 100 F.3d 1089, 1101 (3d Cir. 1996); *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995); *Workman v. Tate*, 957 F.2d 1339, 1345 (6th Cir. 1992); *Kenley v. Armontrout,* 937 F.2d 1298, 1309 (8th Cir. 1991).

15. The American Bar Association's guidelines for counsel in death penalty cases have come to play an increasingly important role in assessing the performance of counsel in a capital case. The 2003 guidelines set forth the following about investigation and preparation:

> GUIDELINE 10.7 – INVESTIGATION
>
> A. Counsel at every stage have an obligation to conduct through and independent investigations relating to the issues of both guilt and penalty.

<u>GUIDELINE 10.10.1– TRIAL PREPARATION OVERALL</u>

A. As the investigations mandated by Guideline 10.7 produce information, trial counsel should formulate a defense theory. Counsel should seek a theory that will be effective in connection with both guilt and Penalty, and should seek to minimize any inconsistencies.

In disusing the scope of the investigation to be undertaken pursuant to Guideline 10.7, the ABA Commentary states the following:

> Because the sentencer in a capital case must consider in mitigation, "anything in the life of the defendant which might militate against the appropriateness of the death penalty for the defendant," "Penalty Phase preparation requires extensive and generally unparalleled investigation into personal and family history." In the case of the client, this begins with the moment of conception. Counsel needs to explore:
>
> (1) Medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage);
>
> (2) Family and social history (including physical, sexual or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment and peer influence); other traumatic events such as exposure to criminal violence, the loss fo a loved one or a natural disaster, experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (*e.g.*, failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities);
>
> (3) Educational history (including achievement, performance, behavior and activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof and activities;

(4) Military service, (including length and type of service, conduct, special training, combat exposure, health and mental health services);

(5) Employment and training history (including skills and performance, and barriers to employability);

(6) Prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding clinical services).

ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (Rev. Ed. 2003).

16. The importance of the ABA Guidelines is illustrated by *Wiggins* where the Court specifically cited the ABA's 1989 Standards as the benchmark for "'determining what is reasonable'" to expect of counsel in a capital case. *Wiggins*, 123 S.Ct. at 2537, quoting *Strickland*, 466 U.S. at 688. *Wiggins* thus stands squarely for the proposition that the "prevailing professional norms" by which the performance of counsel in a capital case is measured are those set forth in the ABA Guidelines. *Wiggins* also stated the following with regard to defense counsel's obligations to preparing and, more importantly, *investigate*, a case in mitigation:

> Investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) . . . . Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources.

*Wiggins*, 123 S.Ct. at 2537 (emphasis in original).[9] More recently, in *Rompilla v. Beard*, 125 S.Ct. 2456 (2005), the Court found that the Petitioner had not received effective assistance of counsel at the penalty-phase of his Pennsylvania capital case, reversing the United States Court of Appeals for the Third Circuit. In the course of the opinion, the Supreme Court re-emphasized the importance of defense counsel conducting a full penalty-phase investigation. In describing the case before it, the majority observed that, "This case, like some others recently, looks to norms of adequate investigation in preparing for the sentencing phase of a capital trial . . . ." The Court also, once again, emphasized and reiterated the importance of the American Bar Association's Guidelines on criminal cases in general and capital cases in particular in resolving a claim of ineffective assistance of counsel. *See* discussion, *id*., at nn.6, 7.

17. Petitioner's counsel understand fully that they are seeking significant resources by this application. However, as the United States Supreme Court has made very clear, the failure of counsel in a capital case to conduct an adequate investigation can be the essence of ineffective assistance. *Rompilla v. Beard*, *supra*; *Wiggins v. Smith*, *supra*; *Williams v. Taylor*, *supra*. By this application, Petitioner, through his counsel, seeks access to the

---

[9]The Summer 2003 edition of the Hofstra Law Review contains a complete rendition of the 2003 ABA Guidelines, together with the official commentary and accompanying scholarly articles regarding the Guidelines themselves and issues concerning the defense of death penalty cases. *See*, "The Guiding Hand of Counsel: ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases," 31 HOFSTRA L.REV. 903-1211 (2003).

resources necessary to show that his sentence of death should be set aside.

WHEREFORE, Petitioner's counsel request that this Court appoint Dr. Gelbort and Ms. Miller for the purposes outlined above.

Respectfully submitted,

RUHNKE & BARRETT
47 Park Street
Montclair, New Jersey 07042
(973)744-1000
(973)746-1490
davidruhnke@ruhnkeandbarrett.com
Co-counsel to Petitioner

By: /s/ David A. Ruhnke
DAVID A. RUHNKE
Co-counsel to Petitioner

Dated: Columbia, Missouri
Montclair, New Jersey
July 10, 2005

SUBMITTED *EX PARTE* AND UNDER SEAL

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| KEITH D. NELSON, | : | |
| Petitioner, | : | |
| vs. | : | 4:04-cv-8005(JFG) |
| UNITED STATES OF AMERICA, | : | |
| Respondent. | : | |

PETITIONER KEITH NELSON'S SEALED *EX PARTE* MOTION FOR
EXPERT AND INVESTIGATIVE ASSISTANCE

COMES NOW Petitioner Keith D. Nelson, by his undersigned counsel, and moves this Court for an order approving additional time for a previously-approved expert, Jill Miller, MSSW. The grounds for the motion are set forth in the following numbered paragraphs.[1] Permission is also sought to maintain this motion *ex parte* and under seal.

[1]Counsel will dispense with the procedural history of this case.



Appellate Case: 07-3071 Page: 61 Date Filed: 11/26/2007 Entry ID: 3375881

1. This motion is brought pursuant to 21 U.S.C. § 848(q)(10)(B), and the guarantees of the Fifth, Sixth and Eighth Amendments to the United States Constitution. The motion discusses defense strategy, reveals privileged conversations, and contains protected attorney work-product. Permission is therefore sought, pursuant to 21 U.S.C. § 848(q)(9), to submit this application *ex parte* and under seal of the Court. This Court has granted previous orders permitting applications of this nature to be filed and maintained under seal.

2. On July 10, 2005, counsel to Petitioner filed a sealed and *ex parte* motion seeking, *inter alia*, the appointment of Jill Miller, MSSW to provide expert and investigative assistance in connection with this post-conviction challenge to Petitioner's sentence of death. Ms. Miller is a highly experienced and respected mitigation specialist.[2] The application sought prior approval of up to 200 hours, plus reasonable expenses, at an hourly rate of $110. On August 30, 2005, this Court granted the application in part, authorizing compensation for Ms. Miller up to $7,500, plus reasonable travel expenses. At the hourly rate of $110, this translated into just over 68 hours. In granting the application in part, this Court noted that

---

[2]In that same application, Petitioner's counsel sought the appointment of a neuropsychologist. That application was granted. The neuropsychologist in question, Michael M. Gelbort, Ph.D., has since examined Petitioner and has reported significant findings, namely that Petitioner "shows indications of frontal lobe disturbance/dysfunction," a circumstance that affects "[Petitioner's] everyday thinking and reasoning capacities," and that the test results show that Petitioner does not "conform with what is seen in individuals with normal functioning brains," and that his overall testing performance "is consistent with and indicative of brain dysfunction." As the Court knows from prior filings, even though Petitioner's counsel had funds authorized to conduct a neuropsychological examination, none was ever conducted.

if additional hours proved necessary, a supplemental application would have to be filed which, if approved by this Court, would have to undergo further review by the Chief Judge of the Eighth Circuit or his designee. *See* 21 U.S.C. § 848(q)(9)(B). This application seeks approval of an additional 250 hours. The request for these additional hours is prompted by the reality that the mitigation investigation conducted in this case was inadequate in almost every respect.

3. Petitioner's present counsel are engaged in an ongoing investigation and review of the entire circumstances of this case. It is counsel's intention to file a motion brought pursuant to 28 U.S.C. § 2255 no later than Monday, November 7, 2005. One aspect of that motion will allege ineffective assistance of counsel in the preparation and presentation of a case in mitigation on behalf of Petitioner. In fact, as both of Petitioner's trial have conceded, the mitigation investigation of this case was woefully incomplete at the time the case went to trial.

4. The record of this case reflects numerous changes in counsel. Susan Hunt, Esquire, was the only attorney who represented Petitioner in the case from its beginnings. Immediately following Petitioner's arrest on October 17, 1999, he was represented by a "volunteer" retained attorney, Daniel L. Franco, who has since been disbarred. Thereafter, the Court appointed the Federal Public Defender (effective October 21, 1999), Ms. Hunt (effective November 2, 1999), and William E. Shull, Esquire (effective November 2, 1999). Thereafter, the following occurred with regard to Petitioner's representation by counsel:

- Larry C. Pace, Esquire, of the Federal Public Defender, remained in the case for approximately 10 months. On July 28, 2000, Petitioner filed a motion to withdraw Mr. Pace as counsel. The motion was granted on August 21, 2000, although the actual order was apparently not entered until March 2, 2001.

- On September 6, 2000, Petitioner filed a notice with the Court that Mr. Franco had been discharged as attorney of record. An order withdrawing Mr. Franco was actually entered on March 2, 2001.

- With regard to Mr. Shull, an order was entered on November 14, 2000 denying Petitioner's request to withdraw Mr. Shull as counsel. (There does not appear to be a docket entry for the motion itself.) Thereafter, on February 20, 2001, an order was entered granting Mr. Shull's oral motion to withdraw as Petitioner's counsel.

- On the same date as Mr. Shull's withdrawal, February 20, 2001, Patrick Berrigan, Esquire was appointed as counsel to Petitioner.

Mr. Berrigan and Ms. Hunt ultimately served as Petitioners trial counsel. Petitioner's trial commenced approximately just nine months after Mr. Berrigan's entry into the case. As will be demonstrated during an evidentiary hearing in this matter, one side-effect of the numerous changes of counsel was that no effort at pursuing a coordinated penalty-phase investigation was begun until late 2000 and early 2001, when Tena Francis was appointed by the Court to serve as Petitioner's mitigation specialist. Ms. Francis has informed Petitioner's present counsel that, when the case came to trial, she had not come close to completing the investigation. In August of 2001 – approximately three months before the trial commenced – Ms. Francis prepared an affidavit for Petitioner's trial counsel outlining the tasks she felt that she needed to accomplish in order to complete her work, estimating at the time that she would need approximately 220 hours to complete the investigation. Ms. Francis felt strongly

that trial counsel should seek an adjournment of the trial date. At approximately the same time, Mr. Berrigan underwent heart surgery. Petitioner himself agreed that an adjournment should be requested and specifically asked his counsel to request an adjournment. After a discussion among all counsel, however, no such motion was made. It is Ms. Francis' recollection that she was asked to do very little work on the case thereafter. It is Petitioner's view that the decision not to seek an adjournment in the face of an incomplete mitigation case was not tactically reasonable.

5. Ms. Miller has reviewed numerous relevant documents, conferred with Petitioner's current counsel, and met with Petitioner at USP/Terre Haute for a five-hour interview. Petitioner's present counsel have little doubt that they will be able to convince this Court, at an evidentiary hearing, that Petitioner's counsel failed to represent him adequately in the preparation and representation of the mitigation case. In order to fulfill their burden of establishing prejudicial ineffective assistance, however, it is vital that the mitigation case is, for the first time, thoroughly investigated so that it may be effectively presented during the hearing which, realistically speaking, must be conducted before this Court.

6. Ms. Miller has prepared a confidential memorandum to counsel outlining the inadequacies of the initial mitigation investigation, summarizing her work to date, and outlining in specific terms what needs to be accomplished in order for this Court to have a complete picture of an adequately investigated and prepared mitigation case. To date, Ms.

Miler has reviewed the following materials:

- Decision of the Eighth Circuit in U.S. vs. Keith Nelson
- Transcripts of pre-trial proceedings
- Transcript of the plea hearing
- Penalty phase transcript, including verdict
- Verdict form
- File of Tena Francis, including: witness interview memos; social history draft; chronology; correspondence; memos to counsel; billing records; copies of photo pages from school yearbooks; and research materials on neurological impairment, schizophrenia, attachment disorder, fetal alcohol syndrome and juvenile institutionalization
- Memos and investigative reports of Dan Grothaus, Grothaus investigation
- Investigative memos and witness interview summaries by Ron Ninemire of the Office of the Federal Public Defender
- Letter by Ron Ninemire dated 09/14/2000 to Susan Hunt, Esquire, detailing things needed to be done in investigation
- Some interview memos authored by Susan Hunt
- Correspondence from Susan Hunt to Tena Francis, including fax covers
- Juvenile Records – Three volumes containing juvenile court, juvenile detention and Texas Youth Commission records (may not be complete - need to check for medical/mental health records, which may be separate), overall records may not be complete
- Birth records, Providence and Children's Mercy Hospitals
- Medical records, John Peter Smith Hospital, 1988

- School records from White Settlement, which may be incomplete
- Report of Dr. Roger Burns, Ph.D., 1988, in juvenile records
- Southwest Missouri Mental Health Center records, 1995 - believe these were furnished by government
- Johnny Nelson's records - police, court and mental health
- Report of Dr. Daniel Foster, Psy.D., 2001

7. In addition to undertaking a review of relevant records, Ms. Miller has met with Petitioner's present counsel on three occasions and interviewed Keith Nelson for approximately five hours on October 11th. During that interview, Petitioner revealed to Ms. Miller instances in which he had been sexually victimized and exposed to sexual victimization of others. (Ms. Francis only met with Petitioner one time, an interview she describes in her own as a superficial "meet and greet" rather than a substantive session.) Ms. Miller believes, based on her training and experience, that it is likely there is additional information regarding sexual victimization and exposure to sexually deviant/inappropriate behavior that will be revealed in subsequent interviews. Ms. Miller has also consulted with Danalynn Recer of the Gulf Region Advocacy Center in Texas regarding child protective services and welfare records, and information on problems within facilities of the Texas Youth Commission. The Center has access to records relating to conditions at the facilities operated by the Texas Youth Commission that coincide with the period that Petitioner was incarcerated at those facilities.

8. During the time Petitioner was represented by the Office of the Federal Public

Defender, the investigation was conducted principally by Ron Ninemire, an investigator with that office. On September 14, 2000, at the time the Federal Public Defender was relieved as counsel, Mr. Ninemire wrote a memo to trial counsel, Susan Hunt, Esquire, outlining records and documents that needed to be located and obtained. He also identified a number of persons who needed to be interviewed. Based on Ms. Miler's review to date, it appears that some of the investigative efforts ongoing at the time were misdirected, with investigators looking in the wrong places. Among the records specified in Mr. Ninemire's September 2000 memorandum that had not been obtained were the following:

- "Background check" on family in Visalia, California (Ms. Miller believes this should include Hanford, California)

- Protection orders or other "government" contact with Nelson family in Visalia, California (should include police incident reports, welfare records re: Kenneth Morse and Nancy Nelson for Hanford, as well)

- Police and Social Service records re: arrest of Kenneth Nelson in Visalia or Sacramento (most likely Hanford)

- Battered women's shelter in Visalia (again, probably Hanford)

- Juvenile probation agents and juvenile police officer in White Settlement

- School records from Amsterdam, Missouri

- Any Missouri Division of Family Services records re: Nancy, Keith or the other children (Ms. Miler believes this should be Kansas, where the family lived during Petitioner's first five years, though there may be something in Missouri for the period of time that Petitioner was hospitalized at Mercy following his birth)

- "Juvenile facility" at Booneville (Ms. Miller believes Petitioner was in an adult correctional facility there which would be in Mo. DOC records, there is a need

to be sure he had no juvenile arrests/confinements after his move to Missouri in 1991)

- Pre-school records in "Sacramento" (Again, most likely Hanford)

- Division of Family Services in Texas, any complaints (this would be the CPS records when family was in White Settlement - some efforts were made to obtain these, but Ms. Francis turned the effort over to Ms. Hunt, who apparently did not follow through)

9. In addition to the "red flag" raised by Mr. Ninemire's departing letter, Ms. Francis also tried to keep trial counsel apprised of the shortcomings of the mitigation investigation. In a memorandum dated June 13, 2001, Ms. Francis identified the following records that still needed to be obtained. At this point, the trial was scheduled to begin in approximately 120 days.

- Texas Child Protective Services (a form needed to be signed by Nancy and a copy of her driver's license obtained - this information was sent to Susan Hunt twice.)

- Records from women's shelter in California and police department records from California re: Kenneth Nelson

- Paul Nelson's mental health records

- All educational, medical and mental health records for Petitioner's brothers

- Criminal history information for E.J. Hendricks and Mr. Mackey (Mackey described by others as a pedophile)

10. In a memorandum to defense counsel, Ms. Miller also reports the following with regard to the June 13, 2001 memorandum:

> Ms. Frances noted that Keith's juvenile and adult incarceration experiences would have been significant and needed to be

> investigated, including conditions at the facilities. She indicated in her 6-13-01 memo that this was something she was going to do, but she personally did no work on the case after that date, and nothing was done to look into this. My conversation with Danalynn Recer indicates that this is an important area of investigation, particularly for Gainesville in the TYC. Tena further indicated that more information was needed about the paternal family, particularly re: Kenneth Morse and possible mental health problems. Again, no indication of what efforts were made to do this. My review of the file indicates virtually nothing was done following this until late August, when a number of interviews were conducted by Lisa Murphy, but mostly of maternal family and school personnel in White Settlement. Tena's billing records reflect no work from 5-18-01 to 8-28-01, though memos indicate that some work was done in late May and early June. There is no billing after September 6, 2001, so apparently counsel did not involve mitigation staff after that date.

In that same memorandum, Ms. Miller notes that there are other records that may be relevant and obtainable. These include the following:

- Medical and mental health records for Nancy Nelson's extended family
- Records or information on mental illness in paternal family
- Information re: Kenneth Morse's alcohol and drug abuse
- Information on Kenneth Morse as a police informant
- Social Services records for family in Missouri (should include Kansas)
- Women's shelter records in or near Rancho Cordova and Visalia, CA
- Section 8 Housing records in White Settlement
- Mental Health/Mental Retardation in Tarrant County (1988 - Keith and Nancy referred there by juvenile authorities)

- University Psychology, Fort Worth - Nancy and Keith seen there in 1988
- Nancy Nelson's school records
- Nancy Nelson's employment records
- Information on the suicide of Nancy's boyfriend
- Pre-natal and birth records for all of Nancy's children
- Kansas and Missouri Juvenile Probation records for Keith (1988-89)
- Mark Frey, Social Worker, KS. Dept of Soc. & Rehab. Services
- Information on the death of Kenneth Morse's father - may have died in a motor vehicle accident in which Kenneth was the driver and was DUI
- Social Services records at Mercy Hospital following Keith's birth
- Hospital records for Nancy Nelson when admitted under the name of Karen Morse (Kenneth's sister) in 1975
- Police report in Kansas when Nancy went to station to get away from Kenneth (1979)
- Welfare records in Hanford, California
- Nancy's medical records in White Settlement
- Special education records in White Settlement and Amsterdam, Mo.( It is significant that the school records obtained from White Settlement had at least two memos indicating that the records were not complete, and that special education records were kept separate; transfer credits from Miami HS indicated that Keith was in resource classes; the fact that counsel knew that Keith was in special education is significant; that this was an indicator of brain dysfunction; and that there were records they didn't have, which would have, by law, included testing and assessment.)
- GED verification
- Records re: Keith in counseling with Cindy Phillips, Family and Individual

Counseling (1990)

- John Peter Smith Hospital, all inpatient, ER and outpatient clinic records re: Keith (apparently received routine health care there)

- Records of Dr. Pretz, Kansas City, Mo; he delivered all Nelson children

- Nancy Nelson's criminal history, including probation records

- Everything that can be found on Kenneth Morse's criminal history, including indecent liberties charges, arrests not prosecuted (especially if not prosecuted because he was working as an informant). If possible, the court-ordered mental examinations from a recent case in Missouri.

12. In terms of what Ms. Miller needs to accomplish in the immediate short run, she has advised counsel as follows:

> Initially, my continued work should focus on the most important records and documents that were not obtained, e.g. child protective services and social services records in Kansas, Texas, and possibly California; special education records from all schools; social services records from Mercy Hospital in KC, Mo. Investigation of conditions and abuses in TYC, including the facility at Gainseville is another important area; as is conditions in the prison (s) in Missouri in which Keith was held. Kenneth Morse needs to be interviewed. More information is needed about him, including his cognitive and mental functioning, and alcohol and drug use. More information is needed from and about Nancy, including alcohol use during pregnancy, prenatal care, and neglect of the children. An accurate and complete chronology needs to be prepared. Keith's history of sexual victimization and exposure to sexually perverse or inappropriate conduct by others needs to be further explored. I will need to meet with him again. Documentation and corroboration of mental illness on both sides of the family may be helpful.

10. The mitigation investigation conducted in this case fell far short of what is required. The responsibility to see that an adequate investigation is conducted was, in the

final analysis, trial counsel's. It is now well-settled that the failure to conduct an adequate mitigation investigation can amount to ineffective assistance of counsel. In order to establish that proposition, however, it is now incumbent on Petitioner's counsel to present the results of a complete investigation. Otherwise, as stated, Petitioner will be unable to satisfy the "prejudice" prong of his Sixth Amendment claim.

13. This application seeks further hours for Jill Miller, MSSW, to conduct and complete the mitigation investigation that was left half- (or less) completed by Petitioner's trial counsel. Petitioner seeks up to 250 hours of additional time at an hourly rate of $110 per hour.[3] Ms. Miller, upon appointment, will continue to conduct in depth interviews with Petitioner and with members of his family, on both the maternal and paternal sides. She will attempt to locate critical life history records that were not acquired by trial counsel in their incomplete investigation. She will also seek to document and determine the presence or not of Fetal Alcohol Syndrome. She will investigate the paternal side of Petitioner's family and will complete and supplement the investigation of other aspects of Petitioner life. In short,

---

[3]This figure is not out of line for top level mitigation specialists. Ms. Miller has been authorized by United States District Court Judges to bill at this rate in numerous federal death penalty cases. She is also regularly been paid this rate by various Federal Public Defender offices which do not have to seek court approval for expert and investigative services in capital cases but pay experts out of their own budgets. Undersigned counsel David A. Ruhnke recently had the gratifying experience of working with Ms. Miller in a New Jersey capital case, on post-conviction, where the trial judge, in vacating the sentence of death, quoted at length from Ms. Miller's report, praised her work, and described her as, "An exceptionally gifted mitigation expert." *State v. Robert W. Morton*, Burlington County Ind.No. 93-09-0492-I (N.J. Superior Court 6/28/2005), Hon. Cornelius P. Sullivan, J.S.C., opinion vacating death penalty.

Ms. Miller will undertake and complete the mitigation investigation that should have been done in this case before Petitioner's life was placed in the balance before a jury.

______14. In 1983 Professor Gary Goodpaster published an article entitled, "The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases," 58 N.Y.U.L.REV. 299 (1983). In the article, Professor Goodpaster discussed the role of the advocate in a death-penalty case in the following terms:

> As an advocate, . . . defense counsel has the related but distinct function of attempting to persuade the jury to exercise mercy. Defense counsel therefore has both the opportunity and the duty to present potentially beneficial mitigating evidence and to attempt to convince the sentencer that, notwithstanding the defendant's guilt, he or she is a person who should not die. Once the defendant has been found guilty of a capital crime, a life sentence is counsel's only remaining advocacy goal. As an advocate for life, counsel must attempt to demonstrate that mitigating factors outweigh aggravating factors and must present the sentencer with the most persuasive possible case for mercy.

58 N.Y.U.L.REV. at 318. In his article, the author also outlined the steps an attorney handling a capital case should follow, including the absolute duty of trial counsel "to investigate the client's life history, and emotional and psychological make-up, as well as the substantive case and defenses" noting further that, "The importance of this investigation, and the thoroughness and care with which it is conducted, cannot be overemphasized." *Id.* at 324. In describing the nature of such an investigation, Professor Goodpaster emphasized both its difficulty and time-consuming nature:

> Such investigations present more obstacles than those conducted in furtherance of an ordinary criminal defense,

> primarily because of the difficulty in locating relevant witnesses. Over the years, the witnesses who are acquainted with the defendant are likely to have become geographically dispersed and more difficult to trace than guilt-phase witnesses. Indeed, constructing a mitigating case on the basis of the life-history investigation is perhaps best viewed as a successive winnowing process: the attorney's investigator tracks down all mitigating leads; the attorney next interviews the most promising contacts and then chooses to call some of them at the penalty phase of the trial in accordance with a coherently developed strategy.

*Id.*

15. In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court established the now familiar two-prong test for evaluating claims that defense attorneys in criminal cases did not provide the effective assistance of counsel guaranteed by the Sixth Amendment to the United States Constitution. First, counsel's performance must fall "below an objective standard of reasonableness," *Strickland*, 466 U.S. at 680, and second, there must be a "reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different." *Id.* at 693-94. The first prong of *Strickland* is met where, in light of all the circumstances of the case, counsel's "acts or omissions were outside the range of professionally competent assistance." *Id.* at 690. *See also, Burger v. Kemp*, 483 U.S. 776, 795 (1987); *United States v. Kauffman*, 109 F.3d 186, 190 (3d Cir. 1997). The second prong of *Strickland* is met where, but for counsel's unprofessional performance, there is a reasonable probability that the "result" of the proceeding would have been different.[4]

---

[4]In the context of a capital case where a non-unanimous jury spares a defendant's life, which is the situation in the federal system, the prejudice prong of *Strickland* requires proof



NELSON ADDENDUM A72

Appellate Case: 07-3071 Page: 75 Date Filed: 11/26/2007 Entry ID: 3375881

*Kauffman*, 109 F.3d at 190 (quoting *United States v. Nino,* 878 F.2d 702, 711 (3d Cir. 1989).

16. There is, of course, no specific set of rules for judging reasonable performance. *Strickland*, 466 U.S. at 688-89. Instead, "[i]n any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances," *Strickland*, 466 U.S. at 688, although "[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides."[5] *Strickland*, 466 U.S. at 688.

17. It is the heart of this application that Petitioner's trial counsel, in the absence of a competed mitigation investigation, could not have made reasonable tactical judgments about the scope and nature of the case in mitigation that would be presented. Of particular import here, is that numerous courts have found counsel's performance unreasonable in cases challenging a failure to present evidence favorable to a defendant, where counsel failed to make "reasonable investigations or to make a reasonable decision that makes particular investigation unnecessary." *Strickland*, 466 U.S. at 691; *see also, Rompilla v. Beard*, 125

---

only of "a reasonable probability that at least one juror would have struck a different balance." *Wiggins v. Smith,* 123 S.Ct. at 2543.

[5]In *Wiggins*, and more recently in *Rompilla*, the Court specifically cited the American Bar Association's 1989 "Standards for the Appointment and Performance of Counsel in Death Penalty Cases" as providing a guide to "'determining what is reasonable.'" *Wiggins*, 123 S.Ct. at 2537, quoting *Strickland*, 466 U.S. at 688. In interpreting *Wiggins*, at least one court has concluded that the 2003 revision of those guidelines should control since the 2003 Guidelines "simply explain in greater detail the 1989 Guidelines," especially in the area of "the obligations of counsel to investigate mitigating evidence." *Hamblin v. Mitchell*, 354 F.3d 482 (6th Cir. 2003).



Appellate Case: 07-3071 Page: 76 Date Filed: 11/26/2007 Entry ID: 3375881

S.Ct. 2456 (2005); *Williams v. Taylor*, 529 U.S. 362, 396 (2000); *Mayfield v. Woodford*, 270 F.3d 915 (9th Cir. 2001) (en banc); *Coleman v. Mitchell*, 268 F.3d 417 (6th Cir. 2001); *Ainsworth v. Woodford*, 268 F.3d 868 (9th Cir. 2001); *Jermyn v. Horn*, 266 F.3d 257, 312 (3d Cir. 2001); *Carter v. Bell*, 218 F.3d 581, 596 (6th Cir. 2000); *Smith v. Stewart*, 189 F.3d 1004, 1008 (9th Cir. 1999) (9th Cir. 1999); *Berryman v. Morton*, 100 F.3d 1089, 1101 (3d Cir. 1996); *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995); *Workman v. Tate*, 957 F.2d 1339, 1345 (6th Cir. 1992); *Kenley v. Armontrout,* 937 F.2d 1298, 1309 (8th Cir. 1991).

18. The American Bar Association's guidelines for counsel in death penalty cases have come to play an increasingly important role in assessing the performance of counsel in a capital case. The 2003 guidelines set forth the following about investigation and preparation:

> GUIDELINE 10.7 – INVESTIGATION
>
> A. Counsel at every stage have an obligation to conduct through and independent investigations relating to the issues of both guilt and penalty.
>
> GUIDELINE 10.10.1– TRIAL PREPARATION OVERALL
>
> A. As the investigations mandated by Guideline 10.7 produce information, trial counsel should formulate a defense theory. Counsel should seek a theory that will be effective in connection with both guilt and Penalty, and should seek to minimize any inconsistencies.

In disusing the scope of the investigation to be undertaken pursuant to Guideline 10.7, the ABA Commentary states the following:

> Because the sentencer in a capital case must consider in mitigation, "anything in the life of the defendant which might

militate against the appropriateness of the death penalty for the defendant," "Penalty Phase preparation requires extensive and generally unparalleled investigation into personal and family history." In the case of the client, this begins with the moment of conception. Counsel needs to explore:

(1) Medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage);

(2) Family and social history (including physical, sexual or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment and peer influence); other traumatic events such as exposure to criminal violence, the loss fo a loved one or a natural disaster, experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (*e.g.*, failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities);

(3) Educational history (including achievement, performance, behavior and activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof and activities;

(4) Military service, (including length and type of service, conduct, special training, combat exposure, health and mental health services);

(5) Employment and training history (including skills and performance, and barriers to employability);

(6) Prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding clinical services).

ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (Rev. Ed. 2003).

19. The importance of the ABA Guidelines is illustrated by *Wiggins* where the Court specifically cited the ABA's 1989 Standards as the benchmark for "'determining what is reasonable'" to expect of counsel in a capital case. *Wiggins*, 123 S.Ct. at 2537, quoting *Strickland*, 466 U.S. at 688. *Wiggins* thus stands squarely for the proposition that the "prevailing professional norms" by which the performance of counsel in a capital case is measured are those set forth in the ABA Guidelines. *Wiggins* also stated the following with regard to defense counsel's obligations to prepare and, more importantly, *investigate*, a case in mitigation:

> Investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) . . . . Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources.

*Wiggins*, 123 S.Ct. at 2537 (emphasis in original).[6] More recently, in *Rompilla v. Beard*, 125 S.Ct. 2456 (2005), the Court found that the Petitioner had not received effective assistance of counsel at the penalty-phase of his Pennsylvania capital case, reversing the United States

[6]The Summer 2003 edition of the Hofstra Law Review contains a complete rendition of the 2003 ABA Guidelines, together with the official commentary and accompanying scholarly articles regarding the Guidelines themselves and issues concerning the defense of death penalty cases. *See*, "The Guiding Hand of Counsel: ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases," 31 HOFSTRA L.REV. 903-1211 (2003).

Court of Appeals for the Third Circuit. In the course of the opinion, the Supreme Court re-emphasized the importance of defense counsel conducting a full penalty-phase investigation. In describing the case before it, the majority observed that, "This case, like some others recently, looks to norms of adequate investigation in preparing for the sentencing phase of a capital trial . . . ." The Court also emphasized and reiterated the importance of the American Bar Association's Guidelines on criminal cases in general and capital cases in particular in resolving a claim of ineffective assistance of counsel. *See* discussion, *id*., at nn.6, 7.

20. Petitioner's counsel understand fully that they are seeking additional significant resources by this application. However, as the United States Supreme Court has made very clear, the failure of counsel in a capital case to conduct an adequate investigation can be the essence of ineffective assistance. *Rompilla v. Beard*, *supra*; *Wiggins v. Smith*, *supra*; *Williams v. Taylor*, *supra*. By this application, Petitioner, through his counsel, seeks access to the resources necessary to show that his sentence of death should be set aside.

WHEREFORE, Petitioner's counsel request that this Court approve this application for subsequent review by the Chief Judge, or his designee, in the Eighth Circuit.

Respectfully submitted,

/s/ Gary E. Brotherton
1390 Boone Industrial Drive, Suite 120
Columbia, MO 65202-3381
(573)875-1571
(573)875-1572 (fax)
gebrotherton@legalwritesllc.com
Co-counsel to Keith Nelson

/s/ David A. Ruhnke
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
(973)744-1000
(973)746-1490
davidruhnke@ruhnkeandbarrett.com
Co-counsel to Keith Nelson

Dated: Columbia, Missouri
Montclair, New Jersey
October 30, 2005

SUBMITTED *EX PARTE* AND UNDER SEAL

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| KEITH D. NELSON, | : | |
| Petitioner, | : | |
| vs. | : | 4:04-cv-8005(JFG) |
| UNITED STATES OF AMERICA, | : | |
| Respondent. | : | |

PETITIONER KEITH NELSON'S SEALED *EX PARTE* MOTION FOR
EXPERT AND INVESTIGATIVE ASSISTANCE

COMES NOW Petitioner Keith D. Nelson, by his undersigned counsel, and moves this Court for an order appointing Xavier Amador, Ph.D. to provide expert assistance in this post-conviction challenge to Petitioner's conviction and sentence of death. Dr. Amador is a highly qualified, experienced, and respected clinical psychologist. Petitioner seeks approval of 50 hours of services, at an hourly rate of $250, and reasonable expenses. A copy of Dr. Amador's c.v. is filed as an attachment to this motion. The grounds for the motion are

set forth in the following numbered paragraphs.[1] Permission is also sought to maintain this motion *ex parte* and under seal.

1. This motion is brought pursuant to 21 U.S.C. § 848(q)(10)(B), and the guarantees of the Fifth, Sixth and Eighth Amendments to the United States Constitution. The motion discusses defense strategy, reveals privileged conversations, and contains protected attorney work-product. Permission is therefore sought, pursuant to 21 U.S.C. § 848(q)(9), to submit this application *ex parte* and under seal of the Court. This Court has granted previous orders permitting applications of this nature to be filed and maintained under seal.

2. This Court previously approved the appointment of Michael M. Gelbort, Ph.D., a qualified neuropsychologist, to examine Petitioner. That examination took place on October 5, 2005. As a result of his examination, Dr. Gelbort found evidence of frontal lobe disturbance/dysfunction in Petitioner's brain and that Petitioner's test scores did not conform with what is seen in individuals with normal functioning brains. Dr. Gelbort has recommended to Petitioner's counsel that Petitioner be seen and evaluated by a clinical psychologist, especially one experienced in diagnosing schizophrenia.

3. Several days after Dr. Gelbort's evaluation, Petitioner was interviewed in depth for five hours by Jill Miller, MSSW, a mitigation specialist whose services have been approved by this Court. Ms. Miller is trained in the detection of symptoms of mental illness but is not qualified to diagnose mental illness. Ms. Miller also believes strongly that

---

[1] Counsel will dispense with the procedural history of this case.

Petitioner should be evaluated by a qualified clinical psychologist and endorses Dr. Gelbort's suggestion that the clinical psychologist be someone with a speciality in schizophrenia.

4. Schizophrenia, and its various manifestations, is of particular interest in Petitioner's case. Schizophrenia has a strong hereditary component. Petitioner's four brother s were all fathered by the same man. Two of Petitioner's brothers – Johnny and Paul – have been diagnosed with schizophrenia. Johnny, who is eight months older than Petitioner, has been diagnosed as a paranoid schizophrenic, is presently serving a life sentence in Texas for murder, and had been found incompetent to stand trial for a long period of time. Petitioner's brother Paul, who is 17 months younger than Petitioner, is currently on medication and being treated for schizophrenia. He reportedly experiences visual and auditory hallucinations. There is moreover, schizophrenia found on the maternal side of Petitioner's family. (Petitioner's trial counsel never developed any information at all about the paternal side of the family.)

5. The present status of this case is that n November 6, 2005, Petitioner's counsel filed a motion pursuant to 28 U.S.C. § 2255 seeking to set aside Petitioner's conviction and sentence. The Government, in a motion presently pending before this Court, has requested that it be allowed until January 20, 2006 to reply to the 2255 motion. (Petitioner's counsel have advised the Government that there is no objection to the request for additional time.) One aspect of the 2255 motion filed on November 6 is that Petitioner's trial counsel were ineffective in failing to explore the issue of Petitioner's mental health. Despite having secured court-approved funding to undertake such an evaluation, Petitioner's counsel failed



Appellate Case: 07-3071 Page: 84 Date Filed: 11/26/2007 Entry ID: 3375881

entirely to have him examined by a neuropsychologist and only had him seen by a clinical psychologist in early October 2001, shortly before trial was scheduled to commence.[2] That psychologist, Daniel V. Foster, Psy.D., later filed a report, in the form of an affidavit, noting that his initial contacts with Petitioner had been "spent in trust building and history taking" and that "numerous additional factors clarifying Mr. Nelson's current mental status could have been presented . . ." had Dr. Foster been allowed "to further evaluate and subsequently testify . . . ." Dr. Foster's incomplete interview of Petitioner was the essence of too little too late.

6. In 1983, Professor Gary Goodpaster published an article entitled, "The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases," 58 N.Y.U.L.REV. 299 (1983). In the article, Professor Goodpaster discussed the role of the advocate in a death-penalty case in the following terms:

> As an advocate, . . . defense counsel has the related but distinct function of attempting to persuade the jury to exercise mercy. Defense counsel therefore has both the opportunity and the duty to present potentially beneficial mitigating evidence and to attempt to convince the sentencer that, notwithstanding the defendant's guilt, he or she is a person who should not die. Once the defendant has been found guilty of a capital crime, a life sentence is counsel's only remaining advocacy goal. As an

---

[2]Shortly thereafter, on October 18, 2001, this Court entered an order barring Petitioner from presenting mental health evidence if he did not cooperate with the Government's experts. At an evidentiary hearing in this matter, Petitioner's present counsel are prepared to prove, through the testimony of Petitioner's two trial attorneys, that Petitioner's refusal to cooperate with the Government's mental-health experts came at the advice of his attorneys. In essence, not having explored the issue of Petitioner's mental health, there was nothing to lose by refusing to see the Government's experts.

> advocate for life, counsel must attempt to demonstrate that mitigating factors outweigh aggravating factors and must present the sentencer with the most persuasive possible case for mercy.

58 N.Y.U.L.REV. at 318. In his article, the author also outlined the steps an attorney handling a capital case should follow, including the absolute duty of trial counsel "to investigate the client's life history, *and emotional and psychological make-up*, as well as the substantive case and defenses" noting further that, "The importance of this investigation, and the thoroughness and care with which it is conducted, cannot be overemphasized." *Id.* at 324 (emphasis added). Despite this long-established performance standard, Petitioner's trial counsel failed to meet their obligations to make a serious and focused inquire into the status of Petitioner's mental health.

7. In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court formulated the now familiar two-prong approach for evaluating claims that defense attorneys in criminal cases did not provide the level of assistance guaranteed by the Sixth Amendment to the United States Constitution. First, counsel's performance must fall "below an objective standard of reasonableness," *Strickland*, 466 U.S. at 680, and second, there must be a "reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different." *Id.* at 693-94.[3] The first prong of *Strickland* is met where, in light of all the circumstances of the case, counsel's "acts or omissions were outside the range of professionally competent assistance." *Id.* at 690. *See also, Burger v. Kemp*, 483

---

[3]On November 14, 2005, Petitioner's counsel filed an extensive memorandum outlining the law of ineffective assistance of counsel and the controlling legal standards.



Appellate Case: 07-3071 Page: 86 Date Filed: 11/26/2007 Entry ID: 3375881

U.S. 776, 795 (1987); *United States v. Kauffman*, 109 F.3d 186, 190 (3d Cir. 1997). The second prong of *Strickland* is met where, but for counsel's unprofessional performance, there is a reasonable probability that the "result" of the proceeding would have been different.[4] *Kauffman*, 109 F.3d at 190 (quoting *United States v. Nino,* 878 F.2d 702, 711 (3d Cir. 1989).

8. There is, of course, no specific set of rules for judging reasonable performance. *Strickland*, 466 U.S. at 688-89. Instead, "[i]n any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances," *Strickland*, 466 U.S. at 688, although "[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides."[5] *Strickland*, 466 U.S. at 688.

9. It is the heart of this application that Petitioner's trial counsel, in the absence of a complete exploration of Petitioner's mental health could not have made reasonable tactical judgments about the scope and nature of the case in mitigation that would be

---

[4]In the context of a capital case where, as in the federal system, a non-unanimous jury spares a defendant's life, the prejudice prong of *Strickland* requires proof only of "a reasonable probability that at least one juror would have struck a different balance." *Wiggins v. Smith,* 123 S.Ct. at 2543.

[5]In *Wiggins*, and more recently in *Rompilla*, the Court specifically cited the American Bar Association's 1989 "Standards for the Appointment and Performance of Counsel in Death Penalty Cases" as providing a guide to "'determining what is reasonable.'" *Wiggins*, 123 S.Ct. at 2537, quoting *Strickland*, 466 U.S. at 688. In interpreting *Wiggins*, at least one court has concluded that the 2003 revision of those guidelines should control since the 2003 Guidelines "simply explain in greater detail the 1989 Guidelines," especially in the area of "the obligations of counsel to investigate mitigating evidence." *Hamblin v. Mitchell*, 354 F.3d 482 (6th Cir. 2003).

presented. Neither were trial counsel in a position to determine whether it would be advantageous to cooperate with the Government's mental-health experts. Of particular import here, is that numerous courts have found counsel's performance unreasonable in cases challenging a failure to present evidence favorable to a defendant, where counsel failed to make "reasonable investigations or to make a reasonable decision that makes particular investigation unnecessary." *Strickland*, 466 U.S. at 691; *see also, Rompilla v. Beard*, 125 S.Ct. 2456 (2005); *Williams v. Taylor*, 529 U.S. 362, 396 (2000); *Mayfield v. Woodford*, 270 F.3d 915 (9th Cir. 2001) (en banc); *Coleman v. Mitchell*, 268 F.3d 417 (6th Cir. 2001); *Ainsworth v. Woodford*, 268 F.3d 868 (9th Cir. 2001); *Jermyn v. Horn*, 266 F.3d 257, 312 (3d Cir. 2001); *Carter v. Bell*, 218 F.3d 581, 596 (6th Cir. 2000); *Smith v. Stewart*, 189 F.3d 1004, 1008 (9th Cir. 1999) (9th Cir. 1999); *Berryman v. Morton*, 100 F.3d 1089, 1101 (3d Cir. 1996); *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995); *Workman v. Tate*, 957 F.2d 1339, 1345 (6th Cir. 1992); *Kenley v. Armontrout,* 937 F.2d 1298, 1309 (8th Cir. 1991).

10. The American Bar Association's guidelines for counsel in death penalty cases have come to play an increasingly important role in assessing the performance of counsel in a capital case. The 2003 guidelines set forth the following about investigation and preparation:

GUIDELINE 10.7 – INVESTIGATION

A. Counsel at every stage have an obligation to conduct through and independent investigations relating to the issues of both guilt and penalty.

GUIDELINE 10.10.1– TRIAL PREPARATION OVERALL

A. As the investigations mandated by Guideline 10.7 produce information, trial counsel should formulate a defense theory. Counsel should seek a theory that will be effective in connection with both guilt and Penalty, and should seek to minimize any inconsistencies.

In disusing the scope of the investigation to be undertaken pursuant to Guideline 10.7, the ABA Commentary states the following:

> Because the sentencer in a capital case must consider in mitigation, "anything in the life of the defendant which might militate against the appropriateness of the death penalty for the defendant," "Penalty Phase preparation requires extensive and generally unparalleled investigation into personal and family history." In the case of the client, this begins with the moment of conception. Counsel needs to explore:
>
> (1) Medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage);
>
> (2) Family and social history (including physical, sexual or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment and peer influence); other traumatic events such as exposure to criminal violence, the loss fo a loved one or a natural disaster, experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (*e.g.*, failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities);
>
> (3) Educational history (including achievement, performance, behavior and activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof and activities;
>
> (4) Military service, (including length and type of service, conduct, special training, combat exposure, health and mental health

services);

(5) Employment and training history (including skills and performance, and barriers to employability);

(6) Prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding clinical services).

ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (Rev. Ed. 2003).

11. The importance of the ABA Guidelines is illustrated by *Wiggins* where the Court specifically cited the ABA's 1989 Standards as the benchmark for "'determining what is reasonable'" to expect of counsel in a capital case. *Wiggins*, 123 S.Ct. at 2537, quoting *Strickland*, 466 U.S. at 688. *Wiggins* thus stands squarely for the proposition that the "prevailing professional norms" by which the performance of counsel in a capital case is measured are those set forth in the ABA Guidelines. *Wiggins* also stated the following with regard to defense counsel's obligations to prepare and, more importantly, *investigate*, a case in mitigation:

> Investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) . . . . Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources.

*Wiggins*, 123 S.Ct. at 2537 (emphasis in original).[6] More recently, in *Rompilla v. Beard*, 125 S.Ct. 2456 (2005), the Court found that the Petitioner had not received effective assistance of counsel at the penalty-phase of his Pennsylvania capital case, reversing the United States Court of Appeals for the Third Circuit. In the course of the opinion, the Supreme Court re-emphasized the importance of defense counsel conducting a full penalty-phase investigation. In describing the case before it, the majority observed that, "This case, like some others recently, looks to norms of adequate investigation in preparing for the sentencing phase of a capital trial . . . ." The Court also emphasized and reiterated the importance of the American Bar Association's Guidelines on criminal cases in general and capital cases in particular in resolving a claim of ineffective assistance of counsel. *See* discussion, *id*., at nn.6, 7.

12. In discussing the issue of mental health, the ABA Guidelines are specific and emphatic:

> In particular, mental health experts are essential to defending capital cases. Neurological and psychiatric impairment, combined with a history of physical and sexual abuse, are common among persons convicted of violent offenses on death Evidence concerning the defendant's mental status is relevant to numerous issues that arise at various junctures during the proceedings, including competency to stand trial, sanity at the

---

[6]The Summer 2003 edition of the Hofstra Law Review contains a complete rendition of the 2003 ABA Guidelines, together with the official commentary and accompanying scholarly articles regarding the Guidelines themselves and issues concerning the defense of death penalty cases. *See*, "The Guiding Hand of Counsel: ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases," 31 HOFSTRA L.REV. 903-1211 (2003).

time of the offense, capacity to intend or premeditate death, ability to comprehend Miranda warnings, and competency to waive constitutional rights. The Constitution forbids the execution of persons with mental retardation, making this a necessary area of inquiry in every case. Further, the defendant's psychological and social history and his emotional and mental health are often of vital importance to the jury's decision at the punishment phase. Creating a competent and reliable mental health evaluation consistent with prevailing standards of practice is a time-consuming and expensive process. Counsel must compile extensive historical data, as well as obtain a thorough physical and neurological examination. Diagnostic studies, neuropsychological testing, appropriate brain scans, blood tests or genetic studies, and consultation with additional mental health specialists may also be necessary.

Counsel's own observations of the client's mental status, while necessary, can hardly be expected to be sufficient to detect the array of conditions (e.g., post-traumatic stress disorder, fetal alcohol syndrome, pesticide poisoning, lead poisoning, schizophrenia, mental retardation) that could be of critical importance. Accordingly, Subsection A(2) mandates that at least one member of the defense team (whether one of the four individuals constituting the smallest allowable team or an additional team member) be a person qualified by experience and training to screen for mental or psychological disorders or defects and recommend such further investigation of the subject as may seem appropriate.

Although mental health issues are so ubiquitous in capital defense representation that the provision of resources in that area should be routine, it bears emphasis that every situation will also have its own unique needs. The demands of each case - and each stage of the same case - will differ. Jurisdictions must therefore construe this Guideline broadly, keeping in mind the superior opportunity of defense counsel to determine what assistance is needed to provide high quality legal representation under the particular circumstances at hand and counsel's need to explore the potential of a variety of possible theories. For example, it might well be appropriate for counsel to retain an



Appellate Case: 07-3071 Page: 92 Date Filed: 11/26/2007 Entry ID: 3375881

> expert from an out-of-state university familiar with the cultural context by which the defendant was shaped or a professional who is skilled at retrieving elusive paper or electronic records. While resources are not unlimited, of course, jurisdictions should also be mindful that sufficient funding early in a case may well result in significant savings to the system as a whole.

Commentary to Guideline 4.1, 31 HOFSTRA L. REV., *supra*, at 956-57 (footnotes omitted).

13. Petitioner's counsel understand fully that they are seeking additional significant resources by this application. However, as the United States Supreme Court has made very clear, the failure of counsel in a capital case to conduct an adequate investigation, whether that takes place in the in the context of family history or mental health, can be the essence of ineffective assistance. *Rompilla v. Beard*, *supra*; *Wiggins v. Smith*, *supra*; *Williams v. Taylor*, *supra*. By this application, Petitioner, through his counsel, seeks access to the resources necessary to show that his sentence of death should be set aside. It will avail Petitioner little if his present counsel succeed in establishing that his trial counsel fell below prevailing norms in the nature of their investigation of Petitioner's mental health, if Petitioner's present counsel cannot also show that the failure was of consequence.



Appellate Case: 07-3071 Page: 93 Date Filed: 11/26/2007 Entry ID: 3375881

WHEREFORE, Petitioner's counsel request that this Court approve this application and/or, if deemed necessary, for subsequent review by the Chief Judge, or his designee, in the Eighth Circuit.

Respectfully submitted,

/s/ Gary E. Brotherton
1390 Boone Industrial Drive, Suite 120
Columbia, MO 65202-3381
(573)875-1571
(573)875-1572 (fax)
gebrotherton@legalwritesllc.com
Co-counsel to Keith Nelson

/s/ David A. Ruhnke
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
(973)744-1000
(973)746-1490
davidruhnke@ruhnkeandbarrett.com
Co-counsel to Keith Nelson

Dated: Columbia, Missouri
Montclair, New Jersey
November 23, 2005

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Keith D. Nelson, | | ) |
| | Movant, | ) |
| vs. | | ) No. 04-8005-CV-W-FJG |
| United States of America, | | ) Crim. No. 99-0303-01-CR-W-FJG |
| | Respondent. | ) |

# ORDER

The *ex parte* motion for permission to photocopy all sealed and *ex parte* motions filed by the defense and the corresponding orders entered in *United States v. Nelson* (Doc. #21), filed September 15, 2005, is granted.

Petitioner Keith Nelson's sealed *ex parte* motion for expert and investigative assistance (Doc. #24), filed October 30, 2005, is denied.

Petitioner Keith Nelson's sealed *ex parte* motion for expert and investigative assistance (Doc. #29), filed November 23, 2005, is denied.

Petitioner Keith Nelson's sealed *ex parte* motion for expert and investigative assistance (Doc. #31), filed December 5, 2005, is denied.

The above-referenced motions have been denied because the Court does not agree with the assertions therein. Appellate counsel, with the benefit of hindsight, is attempting to vilify trial counsel's judgment on trial strategy. In reality, trial counsel's conduct and strategy far exceed those standards of Strickland v. Washington, 466 U.S. 669 (1984). Further, the resources requested by counsel in these motions are not likely to lead to a different result. Mr. Nelson received a fair trial. Appellate counsel is reminded that excessive expenditures of judicial resources have their limits.

/s/Fernando J. Gaitan, Jr.
United States District Judge

Dated: February 28, 2006
Kansas City, Missouri



Appellate Case: 07-3071 Page: 95 Date Filed: 11/26/2007 Entry ID: 3375881

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| KEITH D. NELSON, | ) | |
| Movant, | ) | |
| | ) | |
| vs. | ) | 4:04-cv-8005(FJG) |
| | ) | Crim. No. 99-0303-01CR-W-FJG |
| UNITED STATES OF AMERICA, | ) | |
| Respondent. | ) | |

Motion to Unseal Certain *Ex Parte* Motions filed by the Defense and the Corresponding Orders Entered in both *United States v. Nelson* and *Nelson v. United States*

COMES NOW Keith D. Nelson, by his attorneys David A. Ruhnke and Gary E. Brotherton, for an order unsealing certain *ex parte* motions filed by the defense, together with the corresponding sealed orders, in *United States v. Nelson,* No. 4:99-cr-00303-FJG ("the criminal case") and in this case ("the 2255 case"). The grounds for this motion are set forth in the following numbered paragraphs:

1. On November 6, 2005, Movant filed a motion pursuant to 28 U.S.C. § 2255 to set aside his judgment of conviction and sentence of death. Among the grounds alleged in the motion are that counsel in the criminal case failed to provide effective representation. The United States, in answering the motion, has taken the position that counsel were effective in representing Movant. Movant's present counsel now seek an order to unseal



Appellate Case: 07-3071 Page: 96 Date Filed: 11/26/2007 Entry ID: 3375881

certain *ex parte* motions for expert, investigative and other assistance filed in connection with the criminal case. These have previously been made available to Movant's counsel, but not to the United States. Additionally, in order to show the efforts made by counsel in the 2255 proceeding to establish the prejudice prong of *Strickland v. Washington*, counsel also seek an order unsealing certain applications, and the Court's rulings on those applications, regarding the funding of expert, investigative and other assistance in the 2255 proceeding.

2. Counsel explicitly waive any work-product claim regarding the applications made during the criminal case and the post-conviction 2255 proceeding.

3. Undersigned counsel cannot fully litigate trial counsel's ineffectiveness without referencing the following sealed motions and orders in the underlying criminal case:

a. Document 68 (mitigation specialist);
b. Document 70 (Order);
c. Document 85 (travel money);
d. Document 90 (interim payment);
e. Document 111 (travel money);
f. Document 117 (paralegal assistance);
g. Document 123 (funding for psychological exam);
h. Document 125 (funding for psychological exam);
   Document 139 (Order)
i. Document 126 (Order);
j. Document 131 (funding for DNA testing);
   Document 170 (Order);
k. Document 139 (funding for psychologist);
l. Document 147 (funding for crime scene investigator);
   Document 169 (Order)
m. Document 150 (funding for paralegal);
   Document 165 (Order);
n. Document 152 (travel money);
o. Document 161 (funding for mitigation investigator);
p. Document 163 (funding for psychologist);
   Document 175 (Order);
q. Document 165 (funding for paralegal);
r. Document 167 (funding for neuropsychiatrist);

s. Document 170 (travel money);
t. Document 174 (funding for investigator);
u. Document 177 (funding for venue analysis);
v. Document 180 (funding for pathologist);
Document 210 (Order);
w. Document 192 (travel money);
x. Document 217 (travel money);
Document 218 (Order);
y. Document 229 (travel money);
Document 227 (Order);
z. Document 248 (travel money);
aa. Document 250 (travel money);
bb. Document 257 (travel money);
cc. Document 274 (funding for psychologist);
dd. Document 280 (travel money);
ee. Document 298 (travel money);
ff. Document 303 (travel money);
gg. Document 314 (funding for psychologist); and
hh. Document 353 (travel money).

4. It is also necessary for present counsel to unseal certain of their motions for the funding of expert and investigative assistance in the 2255 case and the corresponding orders:

a. Document 15 – Motion filed 7/10/2005 funding for neuropsychologist and mitigation specialist;
b. Document 20 – Order entered 8/30/2005
c. Document 24 – Motion filed 10/30/2005 for additional funding for mitigation specialist;
d. Document 29 – Motion filed 11/23/2005 for funding clinical psychologist; and
e. Document 31 – Motion filed 12/5/2205 for funding legal expert.
f. Order entered 2/28/2006.

5. The above-described motions, and corresponding orders, were sealed at the request of the defense in order to put indigent defendants in the same position as defendants who are able to hire private counsel – *i.e.*, since private counsel's investigation and strategy would not be known by the government, neither should appointed counsel's investigation and strategy. In the present posture of the case – especially in light of the allegations of

ineffective representation – the case is in a different posture and the need for sealing the motions and order is no longer present.

6. Trial counsel's penalty-phase preparation and investigation is directly at issue in this 2255 action, and the reasonableness of that investigation cannot be measured without reference to what funding was requested and when and how that funding was utilized. Also at issue is whether, assuming ineffective representation, the prejudice prong of *Strickland* has been established. This requires an examination of efforts made by 2255 counsel to hire appropriate experts to establish prejudice.

WHEREFORE, Movant seeks an order from this Court unsealing certain *ex parte* motions filed by the defense and the corresponding sealed orders entered by the Court in both the criminal case and the 2255 case, and for such other relief as this Court deems just and proper.

Respectfully submitted,

/s/ David A. Ruhnke
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
(973)744-1000
(973)746-1490
davidruhnke@ruhnkeandbarrett.com
Co-counsel to Movant, Keith Nelson

/s/ Gary E. Brotherton
2101 Chapel Plaza Court, Ste. 13
Columbia, MO 65203
(573)875-1571
(573)875-1572 (fax)
gebrotherton@legalwritesllc.com
Co-counsel to Movant, Keith Nelson

CERTIFICATE OF SERVICE

This will certify that, on today's date, this motion was served upon the United States by filing via ECF.

/s/ David A. Ruhnke
DAVID A. RUHNKE

Dated: Columbia, Missouri
Montclair, New Jersey
June 2, 2006

SUBMITTED *EX PARTE* AND UNDER SEAL

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| KEITH D. NELSON, | : | |
| Movant, | : | |
| vs. | : | 4:04-cv-8005(JFG) |
| UNITED STATES OF AMERICA, | : | |
| Respondent. | : | |

MOVANT KEITH NELSON'S SEALED *EX PARTE* MOTION FOR
EXPERT AND INVESTIGATIVE ASSISTANCE

COMES NOW Movant Keith D. Nelson, by his undersigned counsel, and moves this Court for an order approving funding for an investigator and for an expert in Fetal Alcohol Spectrum Disorder. The grounds for the motion are set forth in the following numbered paragraphs.[1] Permission is also sought to maintain this motion *ex parte* and under seal.

[1]Counsel will dispense with the procedural history of this case, which has been set forth in other pleadings, including the § 2255 motion to vacate Mr. Nelson's conviction and sentence of death..





Appellate Case: 07-3071 Page: 101 Date Filed: 11/26/2007 Entry ID: 3375881

1. This motion is brought pursuant to 21 U.S.C. § 848(q)(10)(B), and the guarantees of the Fifth, Sixth and Eighth Amendments to the United States Constitution. The motion discusses defense strategy, reveals privileged conversations, and contains protected attorney work-product. Permission is therefore sought, pursuant to 21 U.S.C. § 848(q)(9), to submit this application *ex parte* and under seal of the Court. This Court has granted previous orders permitting applications of this nature to be filed and maintained under seal.

**A. Appointment of Private Investigator Dan Clark**

2. Movant seeks the appointment of a private investigator for the limited purpose of locating and interviewing Movant's father, Kenneth Morse. One component of the challenges brought to this conviction and sentence of death is the failure of trail counsel to conduct a complete mitigation investigation. A sub-component of that failure involves the fact that Movant's trial counsel did not interview Movant's father or prepare a social history of Movant's paternal family. There are indications that many of Movant's paternal relatives suffered from various disabilities, including pervasive, multi-generational mental illness and substance abuse.

3. As part of their ongoing investigation, Movant's present counsel were able to locate information concerning Mr. Morse, specifically that he had been arrested recently on charges within the State of Missouri. His counsel in that case had requested a mental health evaluation to determine competence. It appears further that Mr. Morse was placed on probation but then disappeared. Within the past two weeks, Mr. Morse was seen by

Movant's mother in downtown Kansas City. He did not see Mrs. Nelson. Mrs. Nelson believes he may be staying with relatives or associates in a particular location in Kansas City.

4. Dan Clark is a licensed private investigator based in Kansas City, Missouri, who has been appointed, on a regular basis, to assist in federal criminal cases in the Western District of Missouri pursuant to the Criminal Justice Act. (His c.v. is submitted herewith as Attachment 1.) Although Mr. Clark's normal hourly rate is $75, he accepts CJA appointments at an hourly rate of $60. Based on the information provided by Mrs. Nelson, Mr. Clark believes he can locate and interview Mr. Morse without difficulty. Approval of up to 40 hours is requested, although it is entirely possible the interview can be accomplished in fewer hours.

**B. Natalie Novick Brown, Ph.D.**

5. Although Movant's counsel and/or mitigation investigator Tena Francis strongly suspected that Movant suffered from Fetal Alcohol Syndrome/Fetal Alcohol Effect ("FAS/FAE"), no clinical follow-up was conducted and Movant was never assessed for the presence of FAS/FAE or, to utilize the current correct diagnostic terminology Fetal Alcohol Spectrum Disorder ("FASD."). Additionally, as noted in earlier submissions, no neuropsychological examination was conducted prior to Movant's trial even though the Court had approved such funding. A subsequent neuropsychological examination, utilizing an expert approved by this Court as part of the § 2255 challenge to the conviction and sentence of death, revealed significant abnormal brain functioning. The neuropsychologist who

conducted that examination, Michael Gelbort, Ph.D., is of the opinion that the brain abnormalities he found could be the direct result of, and are consistent with, FASD. However, Dr. Gelbort does not consider himself qualified or expert in the diagnosis and detection of FASD. Dr. Gelbort has recommended strongly that a professional capable of assessing for FASD conduct such an assessment.

6. In addition to Dr. ?Gelbort's recommendation, Movant's counsel have reviewed childhood photographs that display, to a layperson's eye, the facial features typically identified with children who suffer the effects of FASD. Additionally, Movant's mother reports that she is a regular and heavy user of alcohol, although she denies ingesting alcohol when she was pregnant with Movant. Even a cursory review of the literature, however, as well as discussions with a forensic social worker and Dr. Brown, suggest it is not uncommon at all for mothers whose children suffer from FASD to deny drinking alcohol during pregnancy. Mrs. Nelson, in particular, has made numerous statements to the effect that she does not want to be "blamed" for her son's actions in this case.

7. As noted in a recent bulletin from the Centers for Disease Control and Prevention:

> Prenatal exposure to alcohol during pregnancy damages the developing fetus and is a leading preventable cause of birth defects and developmental disabilities. Children exposed to alcohol during fetal development can suffer multiple negative effects, including physical and cognitive deficits. Although the number and severity of negative effects can range from subtle to serious, they are always lifelong.



Appellate Case: 07-3071 Page: 104 Date Filed: 11/26/2007 Entry ID: 3375881

Centers for Disease Control and Prevention: "Guidelines for Identifying and Referring Persons With Fetal Alcohol Syndrome," MMWR 2005; 54 (No. RR 11) at p. 2 (10/28/2005).

8. By this application, Movant seeks the appointment of Natalie Novick Brown, Ph.D., a nationally-known expert clinician and researcher in the field of FASD. Attachment 3 to this application is Dr. Brown's affidavit in which she describes the steps she would need to take in order to determine whether there is sufficient evidence of FASD to proceed from a records review to further testing, to include a potential MRI. As noted in the affidavit:

> FASD evaluation and diagnosis involves a three-step process that is most cost-effective if done in a sequential manner. The first step involves analysis of original source documents (i.e., birth and early medical records, early school records, childhood photographs) and results of any neurological and/or neuropsychological testing on the subject that document his physical size and growth (Criterion 1 for an FASD diagnosis), facial characteristics (Criterion 2), and neuro-behavioral functioning (Criterion 3). If this analysis yields a likelihood of FASD, the second step in the process is Magnetic Resonance Imaging (MRI) of the corpus collosum to determine if there is physical evidence of brain damage that would produce the characteristics observed in Criterion 3. If there is such brain damage, the third step is synthesis of these data to explain the contribution of FASD to the subject's behavioral history.

9. Dr. Brown estimates that the records review and report-writing described above can be completed in approximately 20 hours. Her hourly rate is $225. Thus, approval is sought to fund Dr. Brown's initial assessment at $4,500. Depending on the result of Dr. Brown's initial assessment, Movant may or may not return to the Court to seek additional funding.

WHEREFORE, Petitioner's counsel request that this Court approve this application for the funding of expert and investigative assistance.

Respectfully submitted,

/s/ Gary E. Brotherton
2101 Chapel Plaza Court, Suite 13
Columbia, Missouri 65203
(573)875-1571
(573)875-1572 (fax)
gebrotherton@legalwritesllc.com
Co-counsel to Keith Nelson

/s/ David A. Ruhnke
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
(973)744-1000
(973)746-1490
davidruhnke@ruhnkeandbarrett.com
Co-counsel to Keith Nelson

Dated: Columbia, Missouri
Montclair, New Jersey
June 19, 2006

# AFFIDAVIT OF NATALIE NOVICK BROWN, Ph.D.

I, Natalie Novick Brown, declare under penalty of perjury as follows:

1. I practice as a psychologist and am licensed in Washington State and Florida. I also am a Certified Evaluator for the Department of Corrections and Division of Developmental Disabilities in Washington State. I completed a year of postdoctoral training in the University of Washington's Fetal Alcohol and Drug Unit in 1995 and currently hold a faculty position at the University of Washington as Clinical Assistant Professor, Department of Psychiatry and Behavioral Medicine, where I consult with research staff in the Fetal Alcohol and Drug Unit. In this position, I am currently participating in a grant project where I screen individuals for fetal alcohol impairment who are referred by the Drug and Mental Health Courts in King County (Seattle), Washington. I also evaluate, diagnose, and treat individuals referred by the Division of Developmental Disabilities who are diagnosed with Fetal Alcohol Spectrum Disorders (FASD), which includes Fetal Alcohol Syndrome (FAS) and Fetal Alcohol Effects (FAE). In 1994/95, I received post-doctoral training in FASD at the University of Washington's Fetal Alcohol and Drug Unit in Seattle, Washington. Since then, I have published articles and lectured on the behavioral and developmental effects of prenatal alcohol exposure and have evaluated many individuals suffering from FASD. I also have treated a number of youth with FASD in an effort to prevent adverse life outcomes ("secondary disabilities"). In the course of this work, I have attended diagnostic trainings and

reviewed many medical evaluations involving FASD diagnoses, and I am quite familiar with the diagnostic criteria and process of evaluation. Thus, I have developed expertise in FAS/FAE through a combination of study, practice, and research.

2. I was contacted last week by Defendant's attorney David Ruhnke. Mr. Ruhnke provided some background about his client's early childhood situation and asked if I would be available to conduct a psychological analysis to determine if the Defendant met criteria for an FASD diagnosis. When I informed him of my availability, Mr. Ruhnke requested that I write this affidavit describing the process I would use in such an analysis.

3. FASD evaluation and diagnosis involves a three-step process that is most cost-effective if done in a sequential manner. The first step involves analysis of original source documents (i.e., birth and early medical records, early school records, childhood photographs) and results of any neurological and/or neuropsychological testing on the subject that document his physical size and growth (Criterion 1 for an FASD diagnosis), facial characteristics (Criterion 2), and neuro-behavioral functioning (Criterion 3). If this analysis yields a likelihood of FASD, the second step in the process is Magnetic Resonance Imaging (MRI) of the corpus collosum to determine if there is physical evidence of brain damage that would produce the characteristics observed in Criterion 3. If there is such brain damage, the third step is synthesis of these data to explain the contribution of FASD to the subject's behavioral history.

4. Given Mr. Ruhnke's description of the amount of source documents available





Appellate Case: 07-3071 Page: 108 Date Filed: 11/26/2007 Entry ID: 3375881

in this case, I estimate that the first step in this analysis could be accomplished for no more than 20 hours, which would include a preliminary report. My hourly rate for conducting such an analysis is $225. Thus, my fee for analyzing the data to determine the likelihood of an FASD diagnosis would not exceed $4500.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed in King County, Washington, on June 19, 2006.

Natalie Novick Brown, Ph.D.





Appellate Case: 07-3071 Page: 109 Date Filed: 11/26/2007 Entry ID: 3375881

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Keith D. Nelson, | | ) |
| | Movant, | ) |
| vs. | | ) No. 04-8005-CV-W-FJG |
| United States of America, | | ) Crim. No. 99-0303-01-CR-W-FJG |
| | Respondent. | ) |

## ORDER

Movant's motion to unseal certain *ex parte* motions filed by the defense and the corresponding orders entered in both *United States v Nelson* and *Nelson v. United States* (Doc. #47), is granted. The Court orders the numbered documents referenced in movant's motion (Doc. #47) unsealed.

Movant's third motion for an extension of time to reply to the answer filed by the United States (Doc. #49), filed July 6, 2006, is granted. Movant shall file his reply to respondent's answer and cross-motion no later than August 21, 2006.

/s/Fernando J. Gaitan, Jr.
United States District Judge

Dated: July 10, 2006
Kansas City, Missouri



Appellate Case: 07-3071 Page: 110 Date Filed: 11/26/2007 Entry ID: 3375881

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Keith D. Nelson, | | ) |
| | Movant, | ) |
| vs. | | ) No. 04-8005-CV-W-FJG |
| | | ) Crim. No. 99-0303-01-CR-W-FJG |
| United States of America, | | ) |
| | Respondent. | ) |

# ORDER

Movant entered a guilty plea on October 25, 2001, and was sentenced to death on March 11, 2002. He timely filed an appeal to the Eighth Circuit Court of Appeals who subsequently issued an opinion and mandate (Doc. #475) affirming the judgement of the District Court.

Now pending before this Court is movant's motion pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence (Doc. #25), filed November 6, 2005, and motion to disqualify and recuse judge (Doc. #53), filed August 21, 2006. The Court finds that it has jurisdiction over this matter.

Movant's motion pursuant to 28 U.S.C. § 2255 (Doc. #25) to vacate the conviction and sentence imposed is hereby denied for the following reasons.

The reasons movant alleges are not meritorious and not supported by the record. The claims of ineffective assistance of trial and appellate counsel fall within the broad perimeters of trial strategy. Lockhart v. Fretwell, 506 U.S. 364 (1993). Movant's decision not to make himself available for examination by the government's mental health experts precluded the use of his mental health experts. That was a decision movant made with knowledge of the consequences. The record is clear on that point and set forth in this Court's order (Doc. #403), filed November 19, 2001. While the government has requested that movant's trial and appellate counsel submit affidavits or to a hearing to further explain their reasons for this strategy, this Court finds no further record is necessary. In all of the other respects, the Court finds the government's legal

analysis provided in opposition to the movant's motion pursuant to 28 U.S.C. § 2255 (Doc. #39) to be a thorough and accurate analysis of movant's argument and adopts it by reference hereto.

Further, the movant's motion to disqualify and recuse (Doc. #53) is hereby denied. The government's response to that motion (Doc. #56) succinctly states this Court's position. The Court adopts the government's legal analysis as its own and incorporates same by reference hereto. Since the movant was unable to raise legally sufficient arguments in this 28 U.S.C. § 2255 motion (Doc. #25), by this recusal argument he seeks an end-run to get a new trial in this matter.

Movant received a fair trial. He had the benefit of trial and appellate counsel, skilled in representing persons charged with capital offenses. I know of no trial which is error free however, there were no errors in movant's trial requiring a reversal or resentence.

**JUDGMENT**

Upon review of movant's 28 U.S.C. § 2255 motion (Doc. # 25) and the government's response (Doc. #39), the Court hereby denies movant's request to vacate, set aside or correct the sentence herein. The Court also denies movant's motion to disqualify (Doc. #53). This Court believes that the arguments set forth by the respondent (Docs. #39, #56) present a thorough legal and factual analysis and adopts respondent's analysis and conclusions as its own by reference hereto.

For the aforesaid reasons movant's motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255 (Doc. #25), filed November 6, 2005, and motion to disqualify (Doc. #53), filed August 21, 2006, are denied.

The Court further finds that the issues presented by movant are resolvable by the record and, therefore, no evidentiary hearing will be granted.

/s/Fernando J. Gaitan, Jr.
Fernando J. Gaitan, Jr.
United States District Judge

Dated: November 21, 2006
Kansas City, Missouri

SUBMITTED *EX PARTE* AND UNDER SEAL

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| KEITH D. NELSON, | : | |
| Movant, | : | |
| vs. | : | 4:04-CV-8005(JFG) |
| UNITED STATES OF AMERICA, | : | |
| Respondent. | : | |

PETITIONER KEITH NELSON'S SEALED *EX PARTE* MOTION FOR EXPERT AND INVESTIGATIVE ASSISTANCE

COMES NOW Petitioner Keith D. Nelson, by his undersigned counsel, and moves this Court for an order approving additional time for a previously-approved expert, Natalie Novick Brown, Ph.D. The grounds for this motion are set forth in the following numbered paragraphs.[1] Permission is also sought to maintain this motion *ex parte* and under seal.

1. This motion is brought pursuant to 18 U.S.C. §3599(g)(2), and the

[1] Counsel will dispense with the procedural history of this case.



Appellate Case: 07-3071 Page: 113 Date Filed: 11/26/2007 Entry ID: 3375881

guarantees of the Fifth, Sixth and Eighth Amendments to the United States Constitution. The motion discusses defense strategy, reveals privileged conversations, and contains protected attorney work-product. Permission is therefore sought, pursuant to 18 U.S.C. § 3599(g)(2), to submit this application *ex parte* and under seal of the Court. This Court has granted previous orders permitting applications of this nature to be filed and maintained under seal.

2. On June 19, 2006, counsel to Petitioner filed a sealed and *ex parte* motion seeking, *inter alia*, the appointment of Natalie Novick Brown, Ph.D. to provide expert and investigative assistance in connection with this post-conviction challenge to Petitioner's sentence of death. The application sought prior approval of up to 20 hours, at an hourly rate of $225. Thus, Petitioner's initial request was for funding of $4,500 in order to obtain Dr. Brown's preliminary assessment of whether Petitioner suffers from Fetal Alcohol Spectrum Disorders. On July 11, 2006, this Court granted this motion.

3. The result of Dr. Brown's preliminary assessment strongly indicates that Petitioner does suffer from Fetal Alcohol Spectrum Disorders. An FASD diagnosis involves three separate steps. *See* Affidavit at 3. The first being a comprehensive review of birth and early childhood records. From this first step, Dr. Brown concluded that Petitioner meets each of the three criteria: Criterion 1 (growth deficiency), Criterion 2 (facial dysmorphology, and Criterion 3 (neurodevelopmental problems). *See* Affidavit at p. 4.

4. Dr. Brown has declared that further evaluation is necessary. Step two in this sequential process requires Dr. Brown to analyze expert information pertaining to

actual brain damage (e.g., MRI or SPECT scan reports, neuropsychological evaluation reports). *See* Affidavit at 4.

5. Dr. Brown estimates that she will require another 15 hours to complete this second step. Her hourly rate for this level of analysis is $250, which translates to additional funding not to exceed $3,750.

6. Petitioner's counsel understand fully that they are seeking additional significant resources by this application. However, as the United States Supreme Court has made very clear, the failure of counsel in a capital case to conduct an adequate investigation can be the essence of ineffective assistance. *Rompilla v. Beard*, 125 S.Ct. 2456 (2005); *Wiggins v. Smith*, 123 S.Ct. 2527 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000). By this application, Petitioner, through his counsel, seeks access to the resources necessary to show that his sentence of death should be set aside.

7. WHEREFORE, Petitioner, through undersigned counsel, respectfully requests that this Court grant him these additional monies to continue the investigation that this Court approved in July, 2006.

Respectfully submitted,

/s/ Gary E. Brotherton
Legal Writes, LLC
2101 Chapel Plaza Court, Suite 13
Columbia, MO 65202-3381
(573)875-1571
(573)875-1572 (fax)
gebrotherton@legalwritesllc.com
Co-counsel to Movant, Keith Nelson

/s/ David A. Ruhnke
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
(973)744-1000
(973)746-1490
davidruhnke@ruhnkeandbarrett.com
Co-counsel to Movant, Keith Nelson

Dated: Columbia, Missouri
Montclair, New Jersey
February 7, 2007

**AFFIDAVIT OF NATALIE NOVICK BROWN, Ph.D.**

I, Natalie Novick Brown, declare under penalty of perjury as follows:

1. I practice as a psychologist and am licensed in Washington State and Florida. I also am a Certified Evaluator for the Department of Corrections and Division of Developmental Disabilities in Washington State. I completed a year of postdoctoral training in the University of Washington's Fetal Alcohol and Drug Unit in 1995 and currently hold a faculty position at the University of Washington as Clinical Assistant Professor, Department of Psychiatry and Behavioral Medicine, where I consult with research staff in the Fetal Alcohol and Drug Unit. In this position, I am currently participating in a grant project where I screen individuals for fetal alcohol impairment who are referred by the Drug and Mental Health Courts in King County (Seattle), Washington. I also evaluate, diagnose, and treat individuals referred by the Division of Developmental Disabilities who are diagnosed with Fetal Alcohol Spectrum Disorders (FASD), which includes Fetal Alcohol Syndrome (FAS) and Fetal Alcohol Effects (FAE). In 1994/95, I received post-doctoral training in FASD at the University of Washington's Fetal Alcohol and Drug Unit in Seattle, Washington. Since then, I have published articles and lectured on the behavioral and developmental effects of prenatal alcohol exposure and have evaluated many individuals suffering from FASD. I also have treated a number of youth with FASD in an effort to prevent adverse life outcomes ("secondary disabilities"). In the course of this work, I have attended diagnostic trainings and reviewed many medical evaluations involving FASD diagnoses, and I am quite familiar with the diagnostic criteria and process of evaluation. Thus, I have developed expertise in FAS/FAE through a combination of study, practice, and research.

2. I have been retained by Keith Nelson's court-appointed counsel David A. Ruhnke to complete an evaluation and provide an opinion concerning whether or not Keith Nelson suffers from a Fetal Alcohol Spectrum Disorder (FASD) due to prenatal alcohol exposure. The current affidavit summarizes my preliminary review of records provided to me by Mr. Nelson's counsel.





Appellate Case: 07-3071 Page: 117 Date Filed: 11/26/2007 Entry ID: 3375881

3. FASD is an umbrella term that includes Fetal Alcohol Syndrome, Fetal Alcohol Effects, Alcohol-related Neurodevelopmental Disorder, and Alcohol-related Birth Defects. FASD is a permanent birth defect caused by maternal consumption of alcohol during pregnancy. Alcohol is a teratogen that inhibits and disrupts fetal development by causing structural and functional damage to developing organs and systems, including the brain and central nervous system. The damage starts at the cellular level, where ethanol may induce excessive cell death and disrupt cell responses to molecules that regulate neuron proliferation, migration, and differentiation. Because alcohol causes widespread damage throughout the fetus, there is a broad array of physical anomalies and neurobehavioral defects. Hence, the condition is often referred to as a "syndrome." The most serious and pervasive damage occurs in the central nervous system (CNS). Brain imaging studies over the last decade have shown that prenatal alcohol exposure causes significant malformation in structures within the brain (e.g., corpus collosum, basal ganglia, cerebellum) that are necessary for normal development and functioning (e.g., Bookstein et al., 2001, 2002a, 2002b).

4. Research has shown that prenatal alcohol exposure causes structural brain damage that affects functioning in the frontal lobe of the brain, particularly the prefrontal cortex, an area that is especially sensitive to the teratogenic effects of ethanol (e.g., Bookstein et al., 2002). Brain imaging research has found that prenatal alcohol exposure seems to target the corpus collosum in particular and is associated with a pattern of deficits in executive functioning in individuals diagnosed with FASD (Bookstein et al., 2001). Executive functions, which control impulses and channel them into pro-social rather than antisocial behavior, involve cognitive skills such as perception, social awareness, organization, planning, internal ordering, working memory, self-monitoring, inhibition, motor control, regulation of emotion, and motivation. Appropriate socialization depends on intact basic cognitive functioning (Connor et al., 2000). When executive functions are compromised by prenatal alcohol exposure or other sources of brain damage, an individual will:

- have difficulty perceiving, prioritizing, and storing information,
- have difficulty processing and retrieving that information,
- be unable to generalize and apply consequences from past actions to potential future actions,
- lack motivation and initiative,
- need external motivators such as frequent cues or guidance from others,
- be unable to perceive the effect of his/her actions on others or the social inappropriateness of those actions,
- display exaggerated emotions,
- be unable to control behaviors that stem from emotion-evoked urges, and, consequently, and
- engage in a wide range of socially (and often legally) inappropriate behaviors.

5. As noted in my previous affidavit, FASD evaluation and diagnosis involve a three-step process. The first step is analysis of original source documents (i.e., birth and early medical records, early school records, childhood photographs) and results of any neurological and/or neuropsychological testing on the subject that document his physical size and growth (Criterion 1 for an FASD diagnosis), facial characteristics (Criterion 2), and neuro-behavioral functioning (Criterion 3). Based on the initial review of original source documents sent to me by Mr. Ruhnke as well as an interview with birth mother Nancy Nelson, I believe there is a substantial possibility that Keith Nelson may suffer from a Fetal Alcohol Spectrum Disorder. When I interviewed her, Ms. Nelson denied the use of alcohol or drugs during her pregnancy with Keith Nelson. However, such denial is quite common among mothers of children diagnosed with FASD who are unable to acknowledge that their own behavior may have harmed their children. Despite her denial, she nonetheless reported multiple developmental and behavioral problems in her son Keith that are consistent with FASD and inconsistent with any explanation other than brain damage.

6. Analysis of Keith Nelson's birth and early childhood records provides evidence in support of FASD Criterion 1 (growth deficiency), Criterion 2 (facial dysmorphology), and Criterion 3, neurodevelopmental problems. These three criteria are required for a full diagnosis of Fetal Alcohol Syndrome. With respect to growth deficiency, medical records indicate that Mr. Nelson was born at least a month premature, which is sufficient to satisfy the requirement under Criterion 1. With respect to facial features, review of early childhood photographs reveals small palpebral fissures, epicantahl folds, smooth philtrum, and small upper lip. These features are sufficient to fully satisfy diagnostic requirements for Criterion 2. Regarding neurodevelopmental deficits, records indicate significant problems across multiple domains including emotion modulation, activity level, developmental progress, learning, and executive functioning (e.g., planning, initiating, organizing, and sequencing behavior; attention; inhibition; socialization; judgment; and abstract thinking).

7. The next step in the sequential diagnosis of FASD is analysis of expert information pertaining to actual brain damage (e.g., MRI or SPECT scan reports, neuropsychological evaluation reports). I estimate that this phase of my analysis could be accomplished for no more than 15 hours, which would include a full diagnostic report. My hourly rate for conducting such an analysis is $250. Thus, my fee for analyzing the data to determine whether evidence from a brain scan and/or neuropsychological testing support an FASD diagnosis would not exceed $3750.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed in King County, Washington, on December 4, 2006.

[signature]

Natalie Novick Brown, Ph.D.

References


Bookstein, F.L., Sampson, P.D., Streissguth, A.P., & Connor, P.D. (2001). Geometric morphometrics of corpus callosum and sub-cortical structures in the fetal-alcohol-affected brain. *Teratology, 64,* 4-32.

Bookstein, F.L., Streissguth, A.P., Sampson, P.D., Connor, P.D., & Barr, H.M. (2002a). Corpus callosum shape and neuropsychological deficits in adult males with heavy fetal alcohol exposure. *NeuroImage, 15,* 233-251.

Bookstein, F.L., Sampson, P.D., Connor, P.D., & Streissguth, A.P. (2002b). Midline corpus callosum is a neuroanatomical focus of fetal alcohol damage. *The Anatomical Record, 269,* 162-174.

Connor, P.D., Sampson, P.D., Bookstein, F.L., Barr, H.M., & Streissguth, A.P. (2000). Direct and indirect effects of prenatal alcohol damage on executive function. *Developmental Neuropsychology, 18,* 331-354.






Appellate Case: 07-3071 Page: 121 Date Filed: 11/26/2007 Entry ID: 3375881

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| KEITH D. NELSON,<br>Petitioner, | ) | |
| vs. | ) | 4:04-CV-8005-FJG |
| UNITED STATES OF AMERICA,<br>Respondent. | ) | |

# ORDER

Currently pending before the Court is petitioner's Motion for Relief Pursuant to Fed.R.Civ.P. 59 (Doc. # 63).

## I. BACKGROUND

On November 21, 2006, the Court denied petitioner's Motion to disqualify and recuse and petitioner's motion pursuant to 28 U.S.C. § 2255 to vacate, set aside or correct his sentence. Petitioner has now filed a Motion pursuant to Fed.R.Civ.P. 59 requesting that the Court vacate the judgment and take testimony regarding the allegations presented in the petition. Petitioner states that had the Court conducted an evidentiary hearing, he would have called the following witnesses to testify: 1) Patrick Berrigan, trial counsel; 2) Susan Hunt, trial and appellate counsel; 3) Jennifer Herndon, appellate counsel; 4) Daniel Foster, psychologist who evaluated petitioner before the trial; 5) Tena Francis, mitigation specialist; 6) Deborah Haddid, investigator who worked for Ms. Francis; 7) Jill Miller, mitigation investigator and 8) Michael Gelbort, neuropsychologist who examined petitioner in 2005. Petitioner states that many of the claims presented in his § 2255 motion focused on matters which his counsel failed to



Appellate Case: 07-3071 Page: 122 Date Filed: 11/26/2007 Entry ID: 3375881

pursue and thus this Court can assign no tactical judgment to those decisions without hearing from counsel. Additionally, petitioner states that no mental health evidence was presented at his trial and this was the result of failings by his counsel. Petitioner states that this was an area that he and his counsel were prepared to develop at the evidentiary hearing. Petitioner states that "[i]t is the heart of this application that Petitioner's trial counsel could not have made a reasonable tactical judgment not to offer the results of a neuropsychological evaluation, or other mental-health evaluations, without having conducted such evaluations in a timely fashion or, indeed, at all. Similarly, in the absence of a complete mitigation investigation, Movants' trial counsel could not have made reasonable tactical judgments about the scope and nature of the case in mitigation that would be presented." (Motion for Relief, pp. 14-15).

The Government states in response that petitioner received constitutionally effective representation at his trial and on appeal. The Government notes that extensive mitigation evidence was presented and that petitioner was represented by two very experienced trial attorneys who specialized in the field of capital litigation and criminal defense work. The Government also notes that petitioner was well represented by experienced counsel during his appeal as well. With regard to the issue of mental health, the Government notes that trial counsel and petitioner made a strategic decision not to present a mental health defense because they did not want petitioner to be subjected to the government's mental health experts. The Government also notes that trial counsel did consult with mental health experts and petitioner met with Dr. Foster, a mental health expert, prior to the beginning of trial. A record of petitioner's mental health was also made during petitioner's guilty plea on October 25, 2001.

## II. STANDARD

> A motion to alter or amend judgment pursuant to Fed.R.Civ.P. 59(e) serves the limited purpose of correcting manifest errors of law or fact or presenting newly discovered evidence. . . . It is not appropriate to use a Rule 59(e) motion to repeat arguments or to raise new arguments that could have been made before judgment. . . . District courts have broad discretion when deciding whether or not to grant a motion to amend judgment.

In re General Motors Corp. Anti-Lock Brake Products Liability Litigation, 174 F.R.D. 444, 446 (E.D.Mo. 1997), aff'd sub nom. Briehl v. General Motors Corp., 172 F.3d 623 (8th Cir. 1999)(citations and internal quotations omitted). See also, Peters v. General Service Bureau, Inc., 277 F.3d 1051,1057 (8th Cir. 2002)("Arguments and evidence which could have been presented earlier in the proceedings cannot be presented in a Rule 59(e) motion.").

28 U.S.C. § 2255 states in part:

> Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto.

"A § 2255 motion can be dismissed without a hearing if (1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." Baranski v. U.S., No. 4:05CV657 CAS, 2006 WL 472451, *3 (E.D.Mo. Feb. 27, 2006)(internal citations and quotations omitted).

## III. DISCUSSION

The Court does not believe that there were any errors or law or fact which require that the judgment entered on November 21, 2006 be altered or amended. The Court reviewed the extensive briefing provided by the parties on the § 2255 motion and additionally had the benefit of viewing the trial proceedings firsthand. As was noted in the Order, petitioner's claims of ineffective assistance of trial and appellate counsel fall within the broad parameters of trial strategy. To prevail on a claim of ineffective assistance of counsel, a movant must show that the attorney's performance fell below an objective standard of reasonableness and that the performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). The Court is to adopt an extremely deferential approach in evaluating counsel's performance. 466 U.S. at 689, 104 S.Ct. at 2065-66. There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Id. Additionally, to establish prejudice, the movant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694, 104 S.Ct. at 2068.

This is not a case where petitioner's trial counsel failed to develop any mitigation evidence or call any mitigation witnesses. The Government in its Suggestions in Opposition to petitioner's § 2255 motion, outlined the extensive mitigation evidence that was presented during the trial. (Doc. # 39, pp. 13-19). Petitioner's counsel called petitioner's mother, Nancy Nelson, Mary Smith, Nelson's aunt, Georganna Romero, another aunt, Irene Wood, a family friend, Melvin Lister, a prison guard, Lt. Bruce Roberts, a prison guard, Kenneth Nelson, Keith Nelson's brother, David Cunningham, Nelson's former employer, Steve Nelson, another brother of Keith Nelson, Gene

Thompson, a former landlord for the Nelson family, Rhonda Monroe, a former babysitter, Jennifer Monroe, daughter of Rhonda Monroe who babysat the Nelson boys, Ellen Crutsinger, former teacher, Michael Griffith, former neighbor and Homer Dear, former school principal. In addition to these witnesses, petitioner's counsel called Mark Cunningham who testified about the effect of childhood abuse and neglect on Nelson's character and development.

Petitioner argues that additional mitigation evidence could have been developed and that mental health testing and evaluations should have been conducted and presented to the jury. However, as the Court noted previously, petitioner decided that he did not want to make himself available for examination by the government's mental health experts. Thus, this precluded the use of petitioner's mental health experts. With regard to the mitigation evidence, there were undoubtably more witnesses that could have been located and called to testify. In hindsight it is easy to second guess and argue that more should have been done, more witnesses called, more evidence presented. However, the reality is that there is a limit on both time and money, even in capital proceedings. The Court finds that petitioner's counsels' conduct did not fall below an objective standard of reasonableness. He was represented by two very experienced counsel who had specific experience in capital cases. Therefore, the Court does not find that petitioner has met the requirements of Strickland. Thus, because the Court finds that the records and file conclusively show that petitioner is entitled to no relief, the Court found that no hearing was necessary on petitioner's motion. The Court finds that petitioner has presented no reason in his Rule 59 motion to alter that conclusion.

## IV. CONCLUSION

Accordingly, for the reasons stated above, the Court hereby **DENIES** petitioner's

Motion for Relief Pursuant to Fed.R.Civ.P. 59 (Doc. # 63).

Date: 4/13/07
Kansas City, Missouri

**S/ FERNANDO J. GAITAN, JR.**
Fernando J. Gaitan, Jr.
Chief United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| KEITH D. NELSON,<br>Petitioner, | ) | |
| vs. | ) | 4:04-CV-8005-FJG |
| UNITED STATES OF AMERICA,<br>Respondent. | ) | |

## ORDER

Currently pending before the Court is movant's Motion for a Certificate of Appealability (Doc. # 79). Movant seeks leave to appeal all issues presented in his § 2255 motion and also the Court's denial of his Motion to Recuse and the denial of his Motions for Additional Funding of Expert and Investigative Services. For the reasons stated in the Court's Ex Parte Order[1] filed this same date, the Court hereby **DENIES** Nelson's Motion for a Certificate of Appealability (Doc. # 79).

Date: September 4, 2007
Kansas City, Missouri

**S/ FERNANDO J. GAITAN, JR.**
Fernando J. Gaitan, Jr.
Chief United States District Judge

[1]A more detailed Order denying the Motion was filed under seal as it discusses funding requests for expert and investigative services which were also filed under seal.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| KEITH D. NELSON,<br>Petitioner, | ) | |
| vs. | ) | 4:04-CV-8005-FJG |
| UNITED STATES OF AMERICA,<br>Respondent. | ) | |

## ORDER

Currently pending before the Court is movant's Motion for a Certificate of Appealability (Doc. # 79). Movant seeks leave to appeal all issues presented in his § 2255 motion and also the Court's denial of his Motion to Recuse and the denial of his Motions for Additional Funding of Expert and Investigative Services.

### I. BACKGROUND

On October 14, 1999, Keith Nelson was charged with interstate kidnapping resulting in death and interstate travel with intent to engage in a sexual act with a child under the age of twelve. On October 25, 2001, Nelson entered a plea of guilty to count one and proceeded to the penalty phase of the trial. On November 13, 2001, a jury was selected and trial began the following day. On November 28, 2001, the jury recommended imposition of the death penalty. On December 18, 2001, Nelson filed a Motion for a New Trial. On February 28, 2002, this Court denied Nelson's Motion for New Trial. On March 11, 2002, the Court imposed a sentence of death. Nelson filed a Notice of Appeal to the Eighth Circuit. On October 22, 2003, the Court of Appeals affirmed the conviction and sentence. The United States Supreme Court denied

Nelson's petition for certiorari review on November 8, 2004. On November 10, 2004, Nelson filed a motion seeking appointment of counsel to represent him in connection with his post-conviction challenges. Counsel was appointed on December 14, 2004 and Nelson filed a § 2255 motion to set aside his conviction and sentence of death on November 6, 2005. On August 21, 2006, Nelson filed a motion to disqualify this Court from further participation in the case. On November 21, 2006, this Court denied Nelson's motion to disqualify and recuse and also denied Nelson's § 2255 motion to vacate, set aside or correct his sentence. On December 5, 2006, Nelson filed a Motion for Relief pursuant to Fed.R.Civ.P. 59. On April 13, 2007, this Court denied that motion. Nelson has now filed the instant motion for a Certificate of Appealability on the following four issues: 1) Whether the trial court correctly decided the ineffective assistance of counsel question or alternatively whether a hearing should have been held; 2) Constitutional Adequacy of Movant's Appellate Counsel; 3) Court's Denial of Recusal Motion and 4) Court's Unwillingness to Adequately Fund Efforts to Establish the Claims of Ineffective Assistance of Counsel.

## II. DISCUSSION

### A. Standard

28 U.S.C. § 2253(c)(2) states that a certificate of appealability ("COA") may issue under paragraph (1) only if "the applicant has made a substantial showing of the denial of a constitutional right." In Slack v. McDaniel, 529 U.S. 473, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000), the Supreme Court stated:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

Id. at 484. In Miller-El v. Cockrell, 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003), the Supreme Court explained:

> We do not require petitioner to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail. As we stated in Slack, "[w]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 529 U.S., at 484, 120 S.Ct. 1595.

Id. 537 U.S. at 338, 123 S.Ct. at 1040.

With this standard in mind, the Court will examine the four issues on which Nelson seeks a Certificate of Appealability.

**B. Whether the Court correctly decided the issues of ineffective assistance of trial counsel or alternatively whether a hearing should have been conducted regarding those claims.**

To prevail on a claim of ineffective assistance of counsel, a movant must show that the attorney's performance fell below an objective standard of reasonableness and that the performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). The Court is to adopt an extremely deferential approach in evaluating counsel's performance. Id. 466 U.S. at 689, 104 S.Ct. at 2065-66. There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Id. Additionally, to establish prejudice, the movant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694, 104 S.Ct. at 2068.

This is not a case where petitioner's trial counsel failed to develop any mitigation

evidence or call any mitigation witnesses. Petitioner's counsel called petitioner's mother, Nancy Nelson, Mary Smith, Nelson's aunt, Georganna Romero, another aunt, Irene Wood, a family friend, Melvin Lister, a prison guard, Lt. Bruce Roberts, a prison guard, Kenneth Nelson, Keith Nelson's brother, David Cunningham, Nelson's former employer, Steve Nelson, another brother of Keith Nelson, Gene Thompson, a former landlord for the Nelson family, Rhonda Monroe, a former babysitter, Jennifer Monroe, daughter of Rhonda Monroe who babysat the Nelson boys, Ellen Crutsinger, former teacher, Michael Griffith, former neighbor and Homer Dear, former school principal. In addition to these witnesses, petitioner's counsel called Mark Cunningham who testified about the effect of childhood abuse and neglect on Nelson's character and development.

Petitioner argues that additional mitigation evidence could have been developed and that mental health testing and evaluations should have been conducted and presented to the jury. However, as the Court noted previously, petitioner decided that he did not want to make himself available for examination by the government's mental health experts. Thus, this precluded the use of petitioner's mental health experts. With regard to the mitigation evidence, there were undoubtably more witnesses that could have been located and called to testify. As previously noted, it is easy to second guess and argue that more should have been done, more witnesses called, more evidence presented. However, the reality is that there is a limit on both time and money, even in capital proceedings. The Court finds that petitioner's counsels' conduct did not fall below an objective standard of reasonableness. He was represented by two very experienced counsel who had specific experience in capital cases. Therefore, the Court does not find that petitioner has met the requirements of Strickland. Thus, because the Court finds that the records and file conclusively show that petitioner is entitled to no relief, the Court

found that no hearing was necessary on petitioner's motion. The Court therefore does not find that reasonable jurists would find this issue debatable. Accordingly, the Court will not issue a Certificate of Appealability on this issue.

**C. The Constitutional Adequacy of Movant's Appellate Counsel.**

In determining whether counsel performed effectively on appeal, the Strickland test applies. Nelson must show both that counsel's representation fell below an objective standard of reasonableness and that the deficiencies prejudiced him. Nelson stated that at the time his brief was prepared, neither of his appellate counsel had conducted an adequate review of the record or the applicable law in order to determine which issues should be presented on his behalf. Additionally, Nelson argues that his counsel failed to brief several issues which undercut confidence in the reliability of the outcome. The Government argues that Nelson was represented by experienced counsel at the appellate level and states that their performance never fell below an objective standard of reasonableness.

The Court does not find that Nelson's appellate counsel was deficient or that this is an issue on which reasonable jurists would disagree. Nelson was represented by experienced appellate counsel, one of whom also served as his trial counsel. In Link v. Luebbers, 469 F.3d 1197 (8th Cir. 2006), the Court stated:

> When appellate counsel competently asserts some claims on a defendant's behalf, it is difficult to sustain a ineffective assistance claim based on allegations that counsel was deficient for failing to assert some other claims. . . . Because one of appellate counsel's important duties is to focus on those arguments that are most likely to succeed, counsel will not be held to be ineffective for failure to raise every conceivable issue. . . . "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." Smith v. Robbins, 528 U.S. 259, 288, 120 S.Ct. 746 (quoting Gray v. Greer, 800 F.2d 644, 646 (7th Cir.1986)).

Id. at 1205 (internal citations omitted). In the instant case, Nelson has not shown that the arguments which counsel failed to present were significantly stronger or that it is likely that if those arguments were presented, the outcome of the appeal would have been different. Accordingly, the Court declines to issue a Certificate of Appealability on this issue.

**D. The Court's Denial of the Recusal Motion**

Nelson argues that in the fall of 2005, his counsel requested funding for expert and investigative assistance. In February 2006, the Court denied three of those funding requests. The Order stated that the requests were being denied because the Court did not agree with the assertions therein and that counsel was attempting to vilify trial counsel's judgment on trial strategy. The Court also noted that the resources requested were not likely to lead to a different result. Nelson argues that this Order reveals judicial bias and reflected hostility to the efforts of Nelson's present counsel and to the merits of the litigation.

28 U.S.C. § 455 states in part:

> (a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
>
> (b) He shall also disqualify himself in the following circumstances:
>
> (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceedings . . .

In Liteky v. U.S., 510 U.S. 540, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994), the Court stated:

> First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. See United States v. Grinnell Corp., 384 U.S., at 583, 86 S.Ct., at 1710. In and of themselves ( *i.e.,* apart from surrounding

> comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal. Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.

Id. at 555. In the instant case, the Court does not find that the statements made in the Order display a "high degree of favoritism or antagonism" such as would make a fair judgment impossible. This Court has been involved with the defendant's case since it was initially filed on October 14, 1999. The Court's comments in the Order were based upon this Court's experience and involvement in the trial proceedings. The comments in the Order were made as a result of this Court's long involvement with this case and a recognition that there are limits which must be placed on requests for funding. The Court does not find that this issue would be debatable among reasonable jurists. Accordingly, the Court declines to issue a Certificate of Appealability on this issue.

**E. The Court's Unwillingness to Adequately Fund Efforts to Establish the Claims of Ineffective Assistance of Counsel**

Nelson argues that a Certificate of Appealability should issue with regard to the Court's denial of the three funding requests made in the fall of 2005, for: 1) funding of additional hours for the services of a mitigation specialist; 2) funding for the services of a clinical forensic psychologist and 3) funding for an attorney to evaluate trial counsel's representation and potentially to testify as an expert in the trial and preparation of capital

cases. The Court also denied Nelson's motion for additional funding for a specialist in Fetal Alcohol Spectrum Disorders. Nelson argues that the denial of this funding was a denial of due process of law and equal protection and violated his entitlement to a full and fair hearing.

The Court does not agree. The services requested above were not the only funding requests which Nelson presented to this Court. On August 30, 2005, the Court granted Nelson's motion for expert and investigative services of $7,500 for a neuropsychological examination and $7,500 plus travel expenses for a mitigation expert. Additionally, the Court also granted a request for up to 200 hours of paralegal services. On July 11, 2006, the Court approved Nelson' request for a private investigator in an amount not to exceed $2,400.00. The Court also approved the appointment of an expert in Fetal Alcohol Spectrum Disorders for a period of time not to exceed 20 hours or $4,500.00. Thus, contrary to Nelson's assertion, this Court authorized the expenditure of up to $21,900.00 for expert and investigative services.

18 U.S.C. § 3599(g)(2) states:

> Fees and expenses paid for investigative, expert and other reasonably necessary services authorized under subsection (f) shall not exceed $7,500 in any case, unless payment in excess of that limit is certified by the court . . . as necessary to provide fair compensation for services of an unusual character or duration, and the amount of the excess is approved by the chief judge of the circuit.

Thus, contrary to counsel's assertion, funding for expert and investigative services has a limit, even in capital proceedings. The Court finds that no reasonable jurist would disagree that the denial of petitioner's additional funding requests was justified. Accordingly, the Court hereby declines to issue a Certificate of Appealability on this issue.

## III. CONCLUSION

Accordingly, for the reasons stated above, the Court hereby **DENIES** Nelson's Motion for a Certificate of Appealability (Doc. # 79).

Date: September 4, 2007
Kansas City, Missouri

**S/ FERNANDO J. GAITAN, JR.**
Fernando J. Gaitan, Jr.
Chief United States District Judge